**Comparison of October 19, 2026 Testimony of Mel Negussie with October 21, 2026 Oral Ruling (Judge Gunn)**

| No. | Court's Finding (Oral Ruling) | Ruling Location (10/21/2026 Tr.) | What the Testimony Says | Testimony Location | Assessment | Analysis |
|---|---|---|---|---|---|---|
| 1 | The witness "has really no intention of finishing these projects"; the testimony was that "they don't intend to develop them" and are "simply going to sit and wait"; his "stated intention" is to "no longer develop the properties." | 98:23–99:6<br>102:20–22<br>105:23–24 | No such statement was made, and the witness was never asked whether he intends to complete either project. He testified: "we're not going to allow to lose the property"; he is "always prepared in case this matter is resolved to be able to refinance these two projects"; lenders say it is a project they would be interested in once the dispute is resolved; "our intention was, hey, this is a good project" and "we made all efforts after the draws were stopped to continue with this project"; "We need cash for this project"; with draws, 423 Kennedy would have been completed in March 2023. | 98:2<br>136:14–16<br>136:25–137:4<br>137:12–15<br>150:7–11<br>156:11–12<br>110:14–23 | **Not supported** | Contradicted by the testimony. Plaintiffs' counsel argued that no questions were asked at the hearing about why construction was not completed (10/21 Tr. 68:1–11) and that "they did not ask it" (69:12–18). After counsel added that the Court had "much more before you," the Court responded, "You're right. Nobody asked -- no --," and counsel resumed speaking (69:23–25). The Court relied on this finding in concluding that the testimony was "essentially contrary" to the purpose for which the injunctions were entered (99:1–6). |
| 2 | "[N]o one wants it." | 98:25 | Not said. The witness testified that lenders view it as a project of interest once the dispute is resolved, that E3 Developers was "very much interested," and that the Developer RE1 property is now worth $4.7 to $5 million, up from $4.1 to $4.5 million in July 2023. | 137:12–15<br>150:12–14<br>133:3–10 | **Not supported** | The likely source is argument of Plaintiffs' counsel about who would bid at a foreclosure under the second deeds of trust (10/21 Tr. 58:16–18). That is attorney argument about a junior-lien foreclosure sale, not witness testimony about the properties. |
| 3 | "[T]here isn't the money to develop these projects in any way." | 98:25–99:1 | The two entities hold essentially no cash and the investors fund expenses personally; construction at 423 Kennedy stopped because WCP "pulled the draws"; the Developer RE1 investors "could have and planned to" come up with the cash needed to refinance in late 2022; no lender will issue a term sheet until the dispute is resolved. | 97:2–6<br>97:11–15<br>104:22–105:5<br>152:6–7<br>140:12–13<br>142:4–10<br>136:8–11<br>137:7–15 | **Not supported as stated** | The testimony attributes the lack of funding to the stopped construction draws and the pending dispute. It does not establish an absolute inability to fund development. |
| 4 | It "was referenced by Mr. Negussie as to both properties in his testimony that the intent was never to retain these properties and manage them. The intent was to build and sell and make money on their investment and that that's no longer going forward." | 101:23–102:3 | There is no testimony on whether either property was to be sold or held. The witness gave no testimony that either property would be sold. The word "sell" appears during his examination only in an objection by counsel; the witness used "sold" only as to a prior Arlington condominium project and the tax sale. The only build-and-hold testimony concerns a different project, 201 Kennedy, which was "built and stabilized" and is operating. Nothing states that either project is "no longer going forward." | 143:22–25<br>(objection)<br>91:11–12<br>98:23–24<br>92:1–5 | **Not supported** | No testimony exists on this subject for either property. The Court used this attributed testimony to find that the entities are no longer operating in accordance with their operating agreements (Exhibits S and T), so the finding depends on a statement the witness did not make. |
| 5 | The "uncontroverted" testimony "was the only thing he has done on the property was to patch holes, essentially"; the entities acted "only to patch holes." | 102:6–8<br>102:17–18 | The phrase is not the witness's. He testified to 24/7 camera monitoring; personal inspections two to three times a week; plugging leaks and hiring contractors to stop them, including sealing leaks at the roof and parapet wall the weekend before the hearing; weekly landscaping in summer and snow removal; cleanup of dumped trash and removal of dead animals; about $250,000 in maintenance and carrying costs; tax exemption applications and appeals; refinancing inquiries; and outreach to 1Sharpe. | 105:11–18<br>106:17–23<br>107:1–3<br>105:20–106:1<br>106:6–16<br>107:16–19<br>131:14–19<br>93:5–96:1<br>98:9–19<br>136:1–11<br>99:11–102:23 | **Not supported as stated** | The record describes a continuing preservation effort rather than only patching. The witness did testify that he tries to "plug" leaks and that leaks were "sealed," but that was one part of what he described, not the only thing done on the property. |

| No. | Court's Finding (Oral Ruling) | Ruling Location (10/21/2026 Tr.) | What the Testimony Says | Testimony Location | Assessment | Analysis |
|---|---|---|---|---|---|---|
| 6 | The entities were "investing hundreds of thousands of dollars in lawsuits"; "[t]he use of the money here was to litigate"; and, in colloquy, "he said, we chose not to complete. We chose to sue instead"; "he had a choice. One was to refinance . . . . And the other was to sue, and he chose to sue"; and the witness "made a choice back in 2022, 2022 and 2023, to file a lawsuit." | 102:17<br>103:1–2<br>67:20–21<br>69:4–9<br>69:19–22 | The "choice" testimony concerned October 2022, when WCP stopped the construction draws, not the December 2022 default notices. Counsel asked: "the construction draws stopped in in or around October of 2022, right?" and "at that moment, you needed to go see if . . . you can get a refinance for the 423 Kennedy loans, right?" The witness answered: "We had a choice of suing them, WCP, or going out and try to find another partner, refinance, and so forth," and "at that time, that was the effort. We were trying to do all kinds of things to be able to resolve this issue." He had just testified that when WCP said "we're not going to give you any more draws," "it's around that time that we intentionally went out and tried to find someone basically to take over the project." He did not say that the entities chose not to complete the project, or chose to sue instead of refinancing. When counsel said he "obviously chose the suing path," he later answered, "I don't agree with your characterization that, you know, we -- you know, we like lawsuit or whatever that you said at the beginning," and testified that "we made all efforts after the draws were stopped to continue with this project," including approaches to E3 Developers and Builder's Capital. When counsel asked whether, "based on your disagreement with the default," he "decided not to raise money" but instead to pay attorneys' fees "to sue the WCP defendants," an objection was sustained and | 148:24–149:4<br>149:5–17<br>149:19<br>150:4–14<br>150:20–151:16<br>152:3–7<br>142:11–21<br>97:2–6<br>154:3–10 | **Not supported as stated** | The Court placed the "choice" at the wrong point in time. It described the testimony as: "when they called the defaults in December of 2022, he had a choice. One was to refinance . . . . And the other was to sue, and he chose to sue" (10/21 Tr. 69:4–9). The testimony was about October 2022, when the draws stopped, and the witness described the effort made at that time as seeking a new partner and refinancing. The statements "we chose not to complete" and "We chose to sue instead" do not appear in the testimony. The suggestion that he decided, in response to the default, to fund litigation instead of a refinance came from counsel's questions (10/19 Tr. 142:11–16; 149:19), not from the witness; the objection to the first of those questions was sustained (142:17–21). Plaintiffs' counsel pointed out that no question was asked about whether the funds spent could have completed construction (10/21 Tr. 68:1–11; 69:12–18). |
| 7 | District law "gives a four-year period" for exemptions; "Mr. Negussie testified to that in some ways. He testified that they had run out of their allowed exceptions." | 103:21–25 | The witness did not testify to a four-year exemption period. He said the 2025 appeal for 423 Kennedy failed "because we had, by that time, exhausted the five years." The only other testimony about a number of years was not about exemptions. Counsel asked: "When 423 Kennedy signed off on the loans . . . , how long did 423 Kennedy expect that it would have to pay the real estate taxes?" The witness answered: "Two years. The maximum of three years, sometimes you can have an extension of one year because of unforeseen circumstances, COVID being one," and explained that the project came with "a permitted set of drawings" and a schedule of "about a year and a half," and that "COVID and -- and other things changed that circumstance." For Developer RE1 he testified to no exhaustion: the 2024 exemption was granted, the 2025 request was denied, a hardship exemption was filed, an appeal is awaiting hearing, and a 2026 request is pending with DOB. | 93:21–25<br>94:3–17<br>98:9–19<br>99:3–10 | **Not supported as stated** | The witness did not testify to a four-year exemption period, and he did not say that the District allows four years. His only reference to a limit on exemptions was to "the five years," and only as to 423 Kennedy. The answer at 94:7–17 responded to a question about how long the entity expected, when it signed the loans, to pay real estate taxes. Read as a whole, the answer describes the expected duration of the project: two years, with a maximum of three allowing a one-year extension for unforeseen circumstances, against an original schedule of about a year and a half. It does not mention exemptions or any statutory period. Nothing in the testimony shows exhaustion for Developer RE1. The statutory limit is five tax years in any twelve-year period, D.C. Official Code § 42-3131.06a(d); no four-year limit exists. See the Statute tab. |
| 8 | It "appears that these properties lost that after the 2023 tax year because 2024 has been taxed at a vacant rate. 2025 has been taxed at vacant rate." | 104:2–4 | As to 2024: the challenge succeeded and an exemption was granted for 423 Kennedy ("the 2024 was successful. So they gave us an exemption"). For Developer RE1, an exemption request was filed with DOB and "[t]hey granted in 2024." As to 2025: for 423 Kennedy, "they actually again designated it as vacant," and the appeal was "not successful"; for Developer RE1, "they denied it," a hardship exemption was filed, and an appeal is "waiting for a hearing." | 95:20–21<br>93:15–18<br>98:11–12<br>93:21–25<br>95:21–96:1<br>98:12–17 | **Contradicted** | Contrary to the testimony for both properties as to 2024: the witness testified that the 2024 exemptions were granted, so the exemptions were not lost "after the 2023 tax year." The Court's statement as to 2025 is consistent with the testimony for 423 Kennedy; for Developer RE1 the 2025 determination is under appeal. |

| No. | Court's Finding (Oral Ruling) | Ruling Location (10/21/2026 Tr.) | What the Testimony Says | Testimony Location | Assessment | Analysis |
|---|---|---|---|---|---|---|
| 9 | "[T]he properties themselves are no longer allowed, under this ownership, [to] have an entitlement to request to not be declared vacant"; the ability to seek exemptions under D.C. law has "expired" and is "no longer available." | 104:5–12<br>105:20–23 | Not testified to for Developer RE1, whose 2025 appeal and 2026 request remain pending. The witness did not testify that either property is permanently barred. | 98:13–19<br>99:3–10 | **Not supported (RE1); overstated (423 Kennedy)** | Also legally incorrect as framed. The "under this ownership" limit was the three-year limit of former § 42-3131.06(f)(1), eliminated when § 42-3131.06 was rewritten effective October 1, 2025 (D.C. Law 26-41, § 202(d)). The current limit runs within "any 12-year period," so eligibility is not permanently extinguished. |
| 10 | "[I]nstead of making them developable, habitable, moving them forward, Mr. Negussie has simply chose[n] to challenge the tax classification." | 104:13–16 | The exemptions were sought to avoid paying at the vacant rate (about $25,000 per half year at the vacant rate against $5,000); construction at 423 Kennedy had stopped because the draws were pulled. Taxes were paid: 423 Kennedy through the 2024 year and Developer RE1 through 2025, including a payment made before a tax sale. | 93:15–20<br>95:13–17<br>104:22–105:5<br>95:5–11<br>95:20–21<br>98:21–24<br>99:3–8 | **Not supported** | No testimony presents the tax challenges as a substitute for development. The witness testified that construction stopped because the draws were stopped, and that the exemptions were sought to avoid the vacant rate. |
| 11 | Mr. Negussie's "stated intention" is that they "simply are trying to hold on to them to make sure they can be sold and to recover his recruitment [sic]." | 105:23–25 | There is no testimony about selling either property or about recouping an investment. The nearest statement is that the owners will not allow the property to be lost. | 98:2 | **Not supported** | No testimony on sale or recoupment exists. The transcript word "recruitment" appears to be a transcription of "recoupment." |
| 12 | "[T]he testimony that that bond could not be posted." | 106:5–7 | Limited to 423 Kennedy: the entity has no money for a bond; a bond would have to come from the witness personally or from borrowing; the property cannot serve as collateral "as far as I know"; no cash is available without borrowing. Questions about surety requirements were excluded on hearsay objections. The only amount put to the witness was a hypothetical $50,000. | 108:23–109:7<br>110:3–9<br>109:8–110:1 | **Not supported as stated** | The witness testified that 423 Kennedy lacks funds, not that a bond could not be posted. No bond questions were asked about Developer RE1. |
| 13 | It "seems that they are not operating in accordance with their operating agreements": "[i]f . . . the purpose of these two entities was to develop and do this, simply letting these properties sit without any improvements, any change, anything, while investing hundreds of thousands of dollars in lawsuits and only to patch holes," that is "a change in the operation of the business, which would be a change in facts" supporting dissolution. The Court, stating that it was "paraphrasing," read Developer RE1 § 2.3 as to "purchase, own, lease, manage, and develop and sell the real property at 67 to 61 Kennedy Street," and read 423 Kennedy § 1.4 as "impl[ying] that this was to develop." | 100:23–102:24<br>105:12–14 | The witness was not examined on either operating agreement; the phrase "operating agreement" does not appear in his testimony. Exhibits S and T were admitted among WCP's exhibits (10/19 Tr. 43:8). The only use any party made of them in argument was WCP's reliance on them to show that he is managing member of both entities, for its affiliate and cross-default argument (10/21 Tr. 41:19–42:4). No party argued that the entities were acting contrary to their operating agreements. The statements the Court attributed to the witness for this finding ("never to retain," "build and sell," "patch holes," "sit and wait") do not appear in his testimony; see items 1, 4, and 5. The investors fund the litigation and carrying costs themselves. | None (operating agreements not addressed)<br>97:2–15 | **Not supported** | The Court first referred to the purpose clauses of the operating agreements in its ruling. During argument the Court had raised the point without reference to the operating agreements, asking why "a company formed for the purpose of constructing a building has not involved itself in the business of constructing a building" (10/21 Tr. 66:16–19). The full text of the agreements does not support the finding. Developer RE1 § 2.3 lists ownership, management, development, and sale as permitted purposes ("including, but not limited to"), and § 7.3(A)(2) lists a sale of the Project among the Major Acts requiring the written consent of 51% of the membership interests, subject to § 7.4. 423 Kennedy § 1.4 does not mention development at all; its purposes are the investment, ownership, and management of real property and the lawful activities reasonably necessary to carry them out. Both agreements vest the managers with authority to make all company decisions (RE1 § 7.4; 423 § 7.1(a)), and both provide for arbitration of member disputes (RE1 § 7.5; 423 § 18.4). No member has objected. Under D.C. Code § 29-801.05, an LLC may sue and be sued and do all things necessary or convenient to carry on its activities, and the statute provides for enforcement by members through direct and derivative actions (§§ 29-808.01, 29-808.02). The litigation predates the injunctions (see 10/21 Tr. 69:4–9; 10/19 Tr. 97:9–10), so it is not a changed circumstance. |