UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| In Re: | Case No. 25-00200-ELG |
| | Chapter 11 |
| JPK NEWCO LLC, | |
| | Washington, D.C. |
| Debtor. | October 21, 2026 |
| . . . . . . . . . . . . . . . | |
| DEVELOPER RE1 LLC, ET AL., | Adv. Proc. 25-10037-ELG |
| Plaintiffs, | |
| -against- | |
| DP CAPITAL LLC, ET AL., | |
| Defendants. | |
| *************************** | |
| JPK NEWCO LLC, ET AL., | Adv. Proc. 25-10015-ELG |
| Plaintiffs, | |
| -against- | |
| DEVELOPER RE1 LLC, ET AL., | |
| Defendants. | |
| *************************** | |

PRELIMINARY INJUNCTION HEARING
SCHEDULING CONFERENCE - MOTION FILED BY DEVELOPER RE1 LLC AND 423 KENNEDY ST HOLDINGS LLC
BEFORE HONORABLE ELIZABETH L. GUNN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor: WOLFF & ORENSTEIN, LLC
By: JEFFREY M. ORENSTEIN, ESQ.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850

For the Plaintiffs: GREENSTEIN DELORME & LUCHS, P.C.
By: JAMES D. SADOWSKI, ESQ.
801 17th Street, Northwest
Suite 1000
Washington, District of Columbia 20006

For the WCP Defendants and Special Counsel to the Debtor: ROSENBERG MARTIN GREENBERG LLP
By: JEFFREY S. GREENBERG, ESQ.
25 South Charles Street
21st Floor
Baltimore, Maryland 21201

NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.
By: STEVEN J. WILLNER, ESQ.
One South Street
27th Floor
Baltimore, Maryland 21202

For the Defendant Russell Drazin: THE VERSTANDIG LAW FIRM, LLC
By: MAURICE B. VERSTANDIG, ESQ.
9812 Falls Road
Suite 114-160
Potomac, Maryland 20854

Also Present: RUSSELL DRAZIN
Defendant

Proceedings recorded by electronic sound recording. Transcript produced by transcription service.

(Proceedings commenced at 10:10 a.m.)

THE CLERK: All persons having business before the Honorable Elizabeth Gunn of the United States Bankruptcy Court for the District of Columbia, draw nigh and give your attention. This honorable court is now in session.

On today's calendar, we have case number 25-10037, Developer RE1 LLC, et al. v. DP Capital LLC, et al. Matter before the Court is the continued hearing on the preliminary injunction. We also have a scheduling conference in the motion filed by Developer RE1 LLC and 423 Kennedy St Holdings LLC in the main case 25-200, JPK NewCo, LLC, and the related adversary proceedings.

Judge, I'll let you take attendance for the appearances.

THE COURT: All right. Let's start with Mr. Orenstein.

MR. ORENSTEIN: Good morning, Your Honor. Jeff Orenstein, on behalf of the Debtor in the main case.

THE COURT: All right. And Special Counsel Mr. Willner.

MR. GREENBERG: Special counsel is Mr. Greenberg.

THE COURT: Oh, good morning, Mr. Greenberg.

MR. GREENBERG: Good morning. Jeffrey Greenberg, on behalf of the Debtor, DP Capital LLC, WCP Fund I LLC, and Daniel Huertas.

THE COURT: All right. We also got Mr. Willner, though, right?

MR. GREENBERG: Yes, we do.

MR. WILLNER: Good morning.

MR. GREENBERG: Go ahead, Mr. --

THE COURT: Good morning.

All right. Mr. VerStandig.

MR. VERSTANDIG: Good morning, Your Honor. Maurice VerStandig, on behalf of Russell Drazin, who is joining me on Zoom.

THE COURT: And Mr. Sadowski.

MR. SADOWSKI: Jim Sadowski, counsel for the Plaintiffs in this case, 423 Kennedy St Holdings LLC and Developer RE1 LLC. Good morning, everyone.

THE COURT: So I take it from the comments, Mr. Greenberg, you're arguing for the Debtor-Defendants?

MR. GREENBERG: Mr. Willner's going to handle the --

THE COURT: I'm sorry. I guess I should say the WCP parties. Sorry.

MR. GREENBERG: No, Your Honor, Mr. Willner is actually going to argue closing on behalf of the WCP parties. And I will address the bond issue.

THE COURT: Okay. Tag team. Got it. Okay. Mr. Willner is. All right. Go ahead.

MR. WILLNER: Yes. Yes, Your Honor. And yes, I'll go

first, and I'll do the lion's share of the arguing. And then Mr. Greenberg will present after me on the bond issue, if that is okay with the Court.

THE COURT: That's fine.

MR. WILLNER: Okay. Thank you, Your Honor. Steve Willner, on behalf of the WCP Defendants.

Your Honor, there are two categories of reasons here to consider dissolving, or at the very least, modifying, the preliminary injunctions issued by the Superior Court. One category would be changes in the law, or really, changes in the legal posture that we have here, by virtue of the cases being removed to a federal court. And the second category would be changes in the facts and the procedural posture of the case, or the cases, and primarily by virtue of the fact that we are now three and a half years after the preliminary injunctions were issued. And I'll tackle these two categories in turn, starting with the change in the legal landscape of the case.

We're now in U.S. bankruptcy court. The federal law applies. Under 28 U.S.C. Section 1450, as discussed in the Granny Goose case that I cited numerous times on Monday, the statute provides that whenever any action is removed from a state court to a district court of the United States, all injunctions, orders and other proceedings had in such action prior to its removal shall remain in full force and effect, and the key words are until dissolved or modified by the district

court. Until dissolved or modified by the district court.

In Granny Goose, the Supreme Court in 1974 said that the import of those last few words of the statute is that what happens when a case is removed from state court to federal court is that those state court orders become subject to federal law. As has been noted in -- the following quote, has been noted in this proceeding several times now. In Granny Goose, the Court said, "Once a case has been" -- and I'm quoting from page 437 of the opinion.

"Once a case has been removed to federal court, it is settled that federal rather than state law governs the future course of proceedings, notwithstanding state court orders issued prior to removal."

The Court said that Section 1450 implies as much by recognizing the district court's authority to dissolve or modify injunctions, orders, and all other proceedings had in state court prior to removal. And importantly, what the Court went on to explain immediately thereafter was that a federal court is authorized to revisit or redetermine state court rulings in certain circumstances where the rulings are inconsistent with federal law.

In Granny Goose, the Supreme Court cited a much earlier Supreme Court opinion, Ex parte Fisk. It's an 1885 case, where the state court ruled on an issue about deposing a witness. And the federal court reversed. Came to a -- came to

a different decision on that issue. And the Supreme Court upheld the federal court's doing so and said that if one of the advantages of removal was an escape from this examination, meaning the deposition, then there was a right to that benefit if the case was rightfully removed.

Of course, Mr. Sadowski has been claiming that these cases have not been rightfully removed. That is a -- that is a question for another motion that is continuing to be pending before the Court. But as this Court has found already -- and we've been in this Court for several months now, or almost actually after -- it's been more than a year since the removal was filed. We are in federal court as of now, the removal was proper, and federal law applies. And that gives this Court the right to, or actually the obligation to review state court orders that were issued prior to removal and determine whether they are correct under federal law or whether they need to be dissolved because they contravene federal law.

This same notion is reflected in Wright & Miller. Wright & Miller, and this is Section 3738 of the treatise, provides the following. I'll read from one blurb from this section of the treatise.

"Under Section 1450 of Title 28, orders or rulings issued by the state court prior to removal are not conclusive" in the federal court -- "in the federal action after removal. It is well settled that state

court rulings do remain binding on the parties unless and until formally set aside by the federal district court. Indeed, the third paragraph of Section 1450 provides" -- this is the paragraph that was cited -- that was discussed in Granny Goose -- "all injunctions, orders, and other proceedings had in such action prior to removal shall remain in full force and effect until dissolved or modified by the district court."

And Wright & Miller continued, "The federal court thus may redetermine, for example, the propriety of state court orders concerning the sufficiency of process and even may reconsider a default judgment entered by the state court prior to removal."

And the treatise went on to say, "A federal court has particularly good reason to reconsider state court determination when federal standards differ from state law standards on an issue."

And the Wright & Miller treatise went on to cite a Ninth Circuit case called Fairbank v. Johnson, which is cited in the treatise, that where the Ninth Circuit held that a district court did not abuse its discretion by revisiting a motion for summary judgment order that was issued by the state court and doing it in -- revisiting the motion in federal court because the summary judgment standards were different.

This same notion is repeated in a Sixth Circuit case called Schuler v. Adams. And the cite is 27 F.4th 1203. In that case, the primary issue in the Schuler case was whether a appellate jurisdiction existed where a state court issued a ruling, and then I believe it was an injunction. And then the case was moved to federal court, and a notice of appeal was immediately filed before any federal action was taken on the state court ruling. And the question there was whether appellate jurisdiction existed over a state court order when no federal action was taken.

In concluding that there was no appellate jurisdiction, the court really threaded the needle between what occurs to a state court ruling when an action is removed. The court explained that the ruling doesn't necessarily transform from a state court order into a federal court order. That's not what occurs. What occurs is, is that the parties -- under Section 1450, the parties remain bound by the state court ruling until and unless it is dissolved or otherwise modified by the federal court.

And the federal -- but the federal court has an obligation to, upon a motion made by the parties, to review and redetermine the state court order to see whether it complies with federal law. And the court in Schuler v. Adams concluded, says, and this is a quote, "As we have explained, a district court may, after removal, modify or dissolve a state court's

injunction if the injunction conflicts with federal standards."

And in a further outgrowth of Granny Goose, we have a federal district court opinion from Minnesota. The case is Marco Techs, LLC v. Midkiff. The citation is 2019 WL 4298086. And that case really has very similar effects to this one, which is that a preliminary injunction was issued by a state court. The case was then removed to federal court.

The federal court found that the state court issued the preliminary injunction with no bond. The no bond issue was a violation of federal law, and therefore the Court did not modify the preliminary injunction. It dissolved it. It dissolved it completely because -- and it cited three reasons for dissolving the bond -- for dissolving the preliminary injunction, and one of those three reasons was there was no bond that accompanied the preliminary injunction order.

That is what we have here. There is no bond. There was no bond that was issued by either Judge Lee or Judge Scott. I'm sorry. There was no bond that was required by either Judge Lee or Judge Scott when issuing the preliminary injunctions in those cases.

In D.C., there apparently remains an open question whether a bond is required. The D.C. Circuit, there is no longer a question about that. Very recent D.C. Circuit case law, including a per curiam opinion from the D.C. Circuit bench, which was cited in Mr. VerStandig's motion to

dissolve -- motion to dissolve the injunction that was filed back in May. But the cite is NTEU v. Trump. It's 2025 WL 1441563. That's a per curiam opinion that was issued in May of 2025. That opinion has been cited by several district -- U.S. District -- District of Columbia courts, including Adya LLC v. the DEA. And that cite is 826 F.Supp.3d 115.

In short, there is no question whether bonds are discretionary or mandatory under Rule 65. They are mandatory. It is within the discretion of the Court, certainly, as to the amount of the bond or security, and Mr. Greenberg will present argument on that. But it must -- but a bond must be ordered in conjunction with a preliminary injunction. And if one is not, the cases out there in other circuits reflect that it will be reversible error for there not to be a bond that is required.

So that is one reason why, or one grounds for the preliminary injunction to be dissolved, one inconsistency between D.C. law and federal law, which provides the basis for a dissolution of the preliminary injunctions. There is another one, which is a little bit more esoteric, but it's worth mentioning. D.C. law, when analyzing the four preliminary injunction factors, there is a traditional analysis called the sliding scale analysis, which provides that a stronger showing on one or two of the factors can compensate for a weaker showing on one or two of the other factors.

So ordinarily, a case will be very strong on the

irreparable harm factor, but weak on the likelihood of success on the merits factor. And courts in the past, and D.C. law remains this way, based at least on some very, very recent 2026 case law, including a case called Gallo v. Schwab (ph.), which is not published yet but is in line to be published. This sliding scale approach to the four factors still permeates in D.C.

In federal court, it certainly appears, and it certainly appears from the D.C. Circuit, that ever since the Supreme Court's 2008 opinion in Winter v. Natural Resolution (sic) Defense Council, the sliding scale analysis has been rendered obsolete. And now, there is now a paramount consideration on the likelihood of success on the merits. And that's particularly true -- or that particularly appears to be the stance of the D.C. Circuit.

And that's reflected in an opinion called Sherley v. Sebelius. That's 644 F.3d 388. The D.C. Circuit Court in that case said, and I quote, "Like our colleagues in Davis", which was another previous opinion issued by the D.C. Circuit, the D.C. Circuit says, "we read Winter at least to suggest, if not to hold, that a likelihood of success is an independent, free-standing requirement for a preliminary injunction."

And then the D.C. Circuit went on to cite several other circuits that hold the same, that post-Winter, we don't go with the sliding scale approach anymore. The D.C. court

still does. Federal court, likelihood of success on the merits is now a paramount element, a critical element, for the issuance of a preliminary injunction,

So the standards under which the D.C. Superior Court injunctions were issued, one would argue, and we would certainly argue, is different. There, it's very possible and very likely that Judge Lee and Judge Scott were analyzing this under a sliding scale standard. The sliding scale standard shouldn't be used in the D.C. Circuit anymore based on the D.C. Circuit precedent. So those are the reasons to dissolve the injunction based on the changes in the legal landscape that we are dealing with, now that we are in federal court.

There are also factual changes. My apologies, Your Honor. There are also factual changes. And the reason to address the factual changes arises from the case that the Plaintiffs primarily rely on for the standard that's to be governed here. And that's Doe 2 v. Shanahan, which is an unpublished opinion from the D.C. Circuit in 2019.

And the Doe standard for a motion to dissolve a preliminary injunction -- and this is the quote from the Doe opinion -- is that,

> "A party seeking to dissolve an injunction has the burden of showing a significant change, either in factual conditions or in law, such that continued enforcement of the injunction will be detrimental to

the public interest."

And I'll address the public -- sorry. Go ahead, Your Honor.

THE COURT: I'm going to disagree with you all on that standard because Doe is misquoting the underlying Supreme Court case that established that standard. And so I'm going to go ahead and tell you all that I disagree with Doe's statement of the standard. It is not a conjunctive standard.

In fact, if you go to the original Supreme Court case from which that language derives, it is three alternate things. So it is a change in facts and law. Or there's a second one which isn't applicable here. Or the equitable standards, or the other piece you said, Mr. Willner. I don't have the language right in front of me.

But I don't think that's an accurate statement actually of the standard upon which Doe is relying. Maybe it was applicable in that case, and they wanted to put them there. But going back to the original Supreme Court case, which I think is superior authority to the statement made in Doe, I do not believe it's a two-part standard.

So if that guides your arguments in any way today, I disagree that I have to make that second finding, if you are arguing solely on a change of facts and law. If you want to argue both of them, that's fine. They are separate and distinct standards on which I could modify, dissolve the

injunction, but I don't think that -it is not a conjunctive standard. Despite the phraseology of Doe, it is clearly quoting from two separate parts of that opinion. It's a very long paragraph, and it combines them in a way that was not written in the original opinion.

MR. WILLNER: Your Honor, you took the words out of my mouth. That was literally what I was about to say in regard --

THE COURT: Oh.

MR. WILLNER: -- on the -- so we are in agreement with the Court on this one. The two Supreme Court cases that Doe cites are Horne v. Flores and Rufo v. Inmates of Suffolk County. And very briefly, because it seems like the Court has already reached this conclusion, the Court's ability, Your Honor's ability, to revise an injunction is rooted in Federal Rule 60(b)(5).

Federal Rule 60(b)(5), according to those Supreme Court cases, Federal Rule 60(b)(5) provides that authority and provides that relief may be granted from a preliminary order issued by a court if -- and this is a quote from the rule -- "applying it prospectively is no longer equitable." And from the precedent, it appears that when looking to -- when looking to see if a prior preliminary order or interlocutory order is no longer prospectively equitable, one thing to review, or perhaps the main thing to review, are changes in factual circumstances.

And there are changes in factual circumstances that make the preliminary injunctions no longer equitable. The biggest one is the passage of time. It's been three and a half years since the preliminary injunctions were issued. The passage of time, there is law to back this up, but the passage of time in and of itself is a fact that can constitute a change in factual circumstances for dissolving an injunction.

One case, a primary case on this is Ahmad v. City of St. Louis. The citation is 995 F.3d 635. It's an Eighth Circuit 2021 case. In that case, a preliminary injunction was issued against the City of St. Louis' police force to curtail certain policing customs and practices. And the Eighth Circuit said three years was just too long. It was too long to have a preliminary injunction.

That's the same thing here. We're three and a half years past the time when the preliminary injunctions were issued. Your Honor, the WCP Defendants submit that is just too long. It's particularly too long when we don't know when the trial date is going to happen in this case. There's a lot going on in this case. There is a motion to dismiss the current venue for this case.

So we don't know. We presume that we will continue before Your Honor and have a trial in this case, but we don't know. We don't know if we're going to be back in Superior Court. We don't know if this ruling that will be issued today

by the Court will be appealed. We don't know when a trial can be had in this case. Trial can be -- it could be in six months. It could be in a year. It could be two years from now. It could be even -- it could be even longer for the preliminary injunction to be in effect. The preliminary injunction should no longer be in effect. They should be dissolved.

In addition to the passage of time, though, the state of play of the properties has gotten worse. The facts demonstrated at yesterday's hearing show that the collateral is not safe in the Plaintiffs' hands. As Mr. Negussie testified, the Plaintiffs have no money in order for them to pay for necessary expenses, and Mr. Negussie described, there are certainly necessary expenses.

There are maintenance expenses, particularly for 423 Kennedy, which is not waterproof, even though it's an eighty percent constructed building, with certainly eighty percent constructed means that there are items to be protected from the elements in that building. It is not weatherproofed and doesn't have windows, or doesn't have adequate windows, doesn't have a roof, and they don't have money, at least in the Plaintiffs' bank accounts, to address those issues.

They have to, every time -- every time that they need to pay for maintenance costs, they have to go back to their investors, hope that their investors are able to or and willing

to fund the maintenance expenses, and who knows. Who knows where the investors are. I mean, Mr. Negussie didn't describe these investors -- or I believe he described these investors as not necessarily people of vast wealth.

And as evidenced by the fact that there are significant outlying expenses, or outstanding expenses, that are critical for the continued vitality of these projects, the financial condition of the Plaintiffs does reflect that they are going to be unable to address all of the issues arising from these properties, particularly the tax sale, the tax sale of 423 Kennedy, or the tax -- or the outstanding property taxes on both properties.

There are about 123, $124,000 in unpaid property taxes at 423 Kennedy. There's about $145,000 of unpaid property taxes at Developer RE1. These are significant tax burdens that, based on the testimony of Mr. Negussie, it doesn't appear that -- or the WCP Defendants cannot sit back with confidence and say, oh, these taxes are going to be paid. We don't have to worry about senior liens accruing on these properties. And we don't have to have any concern about the pending tax sale.

Mr. Negussie did not necessarily explain that payment of the property taxes at 423 Kennedy is imminent. He testified that, as a business person, he's going to wait until the last possible time to pay the taxes. Well, when is -- first of all, whether that's even a good business decision is subject to

debate. I mean, the longer you wait to pay the property taxes, the more interest and penalties accrue. But who knows if these property taxes are actually going to get paid. We have no idea. What Plaintiffs are asking is for WCP Defendants to sit back and just wait and see if the taxes are going to get paid, and that is a significant risk to the collateral, the only collateral, the only security that the WCP Defendants have for these significant 14 to $15 million loans.

So Your Honor, based on the legal landscape that we are in right now, in light of the removal, and based on the factual changes that have occurred, the significant lapse in time, and the state of play of the properties, it appears that Your Honor has more than enough grounds to dissolve the injunctions, or Your Honor can modify the injunctions and require a bond in an amount to be proposed by Mr. Greenberg.

So Your Honor has a choice, dissolve or modify. And in our opinion, dissolution, we would urge the Court to strongly consider dissolution. And that is primarily for the reason -- for the reasons that the Court has noted, which is that these injunctions suffer significant flaws in their logical reasoning.

The Plaintiffs defaulted on these loans over and over and over again. There are at least six categories of defaults that we could -- that we could point to. There were defaults. There were payment defaults over and over again. The

Plaintiffs were late on their monthly interest payments before maturity. There were defaults after the acceleration of the debt on December 8th, 2022. There were defaults at the time of the acceleration of the debts on December 8, 2022. There were maturity defaults. There are current defaults, including the unpaid property taxes. There are cross-defaults between all the loans.

And we could spend some significant time -- and I would ask, and if Your Honor would like me to, we can spend some significant time going through the defaults, all the defaults in these loans. But these loans were defaulted. They defaulted over and over and over again, significantly and materially.

THE COURT: What I'd like you to do, Mr. Willner, because your witness didn't testify necessarily to those, point me to the documents that are in the record which support the claims of default.

MR. WILLNER: Yes, Your Honor. And if I have the ability to share my screen, I actually have a bit of a PowerPoint to show the six categories of defaults, if that works for Your Honor.

THE COURT: I have no objection. I just, I want to make sure the facts you're arguing are in the record because as we noted, there's a significant amount of documentary evidence that we've referred to or necessarily referenced by the

witnesses. And so to the extent that the arguments you're making are based upon those, I want to make sure I'm clear on which of the record you're relying on for the various defaults.

MR. WILLNER: Okay. So yes, I will go through them.

THE COURT: Take your time.

MR. WILLNER: So the most important documents that are part of the documentary record are the loan documents. And I will go through -- I'll go through some of those documents as I explain the different categories of defaults.

The first category of defaults are defaults that occurred before December 8th, 2022. And the date of December 8th, 2022 was important because that is the date that default notices were sent out. And that is reflected in Exhibit I of the WCP Defendants' exhibits.

So Exhibit I is the email and the attachments in which the lender sent default notices to the Plaintiffs, and the default notices -- and accompanying the default notices were the payoff statements. And the payoff statements included all the amounts that were due under the loans, including the default interest and the default fees that were being charged. That is Exhibit I.

And there was also an email that Mr. Drazin then sent to the Plaintiffs, Plaintiffs' counsel, Mr. Sadowski, and that is Exhibit 25. But the key date here is December 8th, 2022.

THE COURT: So wait. But this Exhibit 25 was not

entered into evidence.

MR. WILLNER: I apologize, Your Honor. That is correct. Exhibit 25 was not entered into evidence.

THE COURT: So I'm referring just to Exhibit I then.

MR. WILLNER: That is fine. Okay.

THE COURT: Okay.

MR. WILLNER: Then Exhibit I is the key date. Exhibit I is the key date when -- I'm sorry. The date of December 8th, 2022 is the key date for the claims that Mr. Sadowski and Plaintiffs are alleging because that is the date when the acceleration occurred. So the question is -- so the first question would be is what defaults were in effect at the time, and then were there defaults that occurred afterwards that justified the acceleration of the loans. And the answer to both of those questions is yes.

So the category 1 defaults are the defaults that occurred December 8th, 2022, but what the Plaintiffs will assert were cured at the time of the acceleration. And those are the payment defaults. Those are the monthly payment defaults that occurred because repeatedly and repeatedly those payments were late.

And that is reflected in the loan payment histories, which were the crux of Ms. Cordova's testimony. That is Exhibits E, F, G, and H. And if Your Honor peruses those exhibits, it is reflected in there that the payments were

regularly late. And late payments on these loans is a default. That's reflected in the promissory notes, the promissory notes which are admitted into evidence as Exhibits 3, 4, 7, and 8.

The promissory notes reflect that these were both -- all four of these loans were twelve-month loans. One-year loans. And during the term of the loans, the loans were to be serviced with interest-only payments on the first of every single month. That's set forth in section 3 of each of the notes.

Your Honor can pull any one of those notes. The notes have the identical terms. The only thing that's different are the borrowers and the amounts, the amounts of principal, and some differences in the amounts of interest. Or the interest rate. I'm sorry.

The notes also have times of the essence clauses in section 10. The notes also have default clauses in section 5 that provide that there is no notice required for default and importantly, that there is nonwaiver language in each of those notes. And let me -- and I'll read from it. Section 5 of the notes provides,

"Failure to exercise any of the options aforementioned" -- which and the aforementioned options are the options under which a default occurs -- "or the failure to exercise any other option herein or in the deed of trust provided for shall not

constitute a waiver of the right to exercise the same in the event of any subsequent default."

So traditional anti-waiver language in a promissory note, which provides that even if a lender doesn't exercise its default remedies at the time of a default, it can reserve its right to exercise its default remedies upon a future default.

So to the argument that Mr. Sadowski has made in this case and will certainly make again, that at the time of the acceleration on December 8, 2022 the defaults were "cured" because the payments were made, it doesn't matter. The payments were made late. Repeatedly late.

And it's not as if the lender expressed any sort of sentiment that that was okay that the payments were going to be late. In fact, it was quite the opposite. There is evidence in the record to reflect that Mr. Huertas, as the CEO of WCP, was not okay with late fees. And that came in the form of a text message.

This is Exhibit Y, WCP Exhibit Y, a text message between Mr. and Mr. Huertas that says that, and I quote, "Mel, we need payments on 419 Kennedy. You are two payments behind. What's going on? At this point, we have late fees assessed." And that was in July of 2022, at a time when late fees were occurring on the 423 Kennedy loan or on the 423 Kennedy junior loan.

So the bottom line is, is with this category 1, this

category 1 of defaults, which is defaults that occurred prior to the acceleration date of December 8th, 2022, which the Plaintiffs will claim were cured, these defaults were reserved. They were reserved by the lender pursuant to the terms of the note, and they legitimized the acceleration on December 8th, 2022, so long as other defaults were in effect. And they were.

And that leads me to category 2 of the defaults. Category 2 of the defaults are defaults that occurred December 8th, 2022 and indisputably were uncured as of December 8th, 2022. And for this, the primary one here is a water and sewer lien default, or default for unpaid water and sewer lien charges on the RE1 property. And this is reflected in Exhibit J -- in an Exhibit J, WCP Defendants' Exhibit J.

Exhibit J is a copy of a lien instrument that was recorded by D.C. against the Developer RE1 entity, reflecting a lien of $43,956.32 for unpaid water and sewer charges. And this default created a senior lien against the Developer RE1 property. And that is pursuant to D.C. law. D.C. Code Section 34-2407.02(b) reflects that unpaid water and sewer charges constitutes a senior lien against a property, even taking priority against any deeds of trust, prior deeds of trust recorded.

And these are defaults. Why? And it's pursuant to the express terms of the loan documents. Section 4.2 of the RE1 deed of trust, and these deeds of trust are -- they're

duplicated in the record, but they are in the WCP Defendants' exhibits as Exhibits A and B. Again, the deeds of trust, all four loans had mirror image deeds of trust. The only differences were the names of the borrowers.

Section 4.2 of the deeds of -- of the deeds of trust provide that the borrower must pay all defined impositions, capital I impositions, and impositions are defined in the definitions section of the deed of trust, in section 1(d), as to include all real estate taxes, all water and sewer rents and charges, and all other public charges. So unquestionably, water and sewer charges fall within the category of Impositions, and section 4.2 of the deeds of trust provides that all Impositions are to be paid by the borrower.

Section 5.1 of the deeds of trust also provides that the borrower -- or I'm sorry. I guess the language there is the grantor, which is the borrower. The grantor shall not -- or I'll quote the language.

"Grantor will not, without the prior written consent of the beneficiary, create or permit to be created or obtain any mortgage, pledge, lien, lease, encumbrance, or charge or security interest," et cetera, with respect to the mortgaged property. So no liens. Section 4.2, pay all impositions. Section 5.1, prevent any liens on the property.

And section 7.2 of the deeds of trust -- Article 7 lists all the different events of default. Section 7.2 of the

deeds of trust provides that an event of default occurs, and I'm reading from the language of section 7.2, "if the grantor shall default in the due observance or performance of any of the obligations under the note or this deed of trust."

So by virtue of Developer RE1's breach of section 4.2 and 5.1 of both deeds of trust, a default, an event of default occurred under section 7.2. And just to be abundantly clear, section 5 of the promissory notes reflects that any default or breach of the deed of trust constitutes a breach of the note and therefore permits the lender to accelerate the note.

And once acceleration -- so in other words, just to bring home the butterfly effect of a breach of the deed of trust, a breach of the deed of trust constitutes a breach of the note. A breach of the note permits acceleration of all amounts due under the note and the imposition of default interest and a late charge. And then that means that at that moment in time, on December 8th, 2022, Developer RE1 correctly accelerated the Developer RE1 notes, imposed late charges and default interest, required them all to be due, and if all of those were not paid immediately, pursuant to section 5 of the note, then foreclosure was permitted under the deed of trust.

THE COURT: Make sure we have a clear record. I think you intended to say that WCP parties correctly accelerated the note as to Developer RE1?

MR. WILLNER: Yes. Yes. My apologies.

THE COURT: I'm sure they weren't -- I'm sure they didn't want to accelerate their note, sir.

MR. WILLNER: Yes.

THE COURT: Go ahead.

MR. WILLNER: In addition, 423 Kennedy also had an unpaid lien that was incurred -- or I'm sorry, that was encumbering the property. And that was a smaller lien that is reflected in Exhibit L, WCP Exhibit L. And that lien was for a delinquent fine and infraction in the amount of $1,590.

And yes, while that lien is a little bit less, or Mr. Sadowski will argue a rather immaterial amount, it still constitutes a lien. And the 423 Kennedy defaults became more egregious December 8th, 2022, which then leads me to category 3 of the defaults. And the category 3 defaults are defaults that occurred December 8th, 2022, but before the loans matured. And this focuses primarily on 423 Kennedy.

The Developer RE1 loans matured on December 23rd, 2022. The 423 Kennedy loans matured or were not going to mature March 31st, 2023. So several months December 8th, 2022 acceleration date. Yet as Mr. Negussie testified, yes, on Monday, 423 Kennedy stopped paying monthly interest payments of any kind after the acceleration date. They failed to pay the January 2023 interest payments due. They failed to pay the February 2023 interest payments due. And they failed to pay the March 2023 interest payments due.

Now, granted, 423 Kennedy believed that the WCP Defendants shouldn't have accelerated the loan, but notwithstanding that, they could not have taken the position -- 423 Kennedy could not have taken the position that they were simply absolved of making the regular monthly interest payments. There was no reason. There was no defense for them not to make the regular monthly interest payments. They just stopped because of the acceleration note.

Perhaps 423 Kennedy would make the argument that they were excused from making further interest payments because there were no construction draws that were going to be issued anymore, which Mr. Negussie testified on Monday, described how the construction draws stopped coming in I believe he said around October of 2022. There are several problems with this approach.

Problem number 1 is that 423 Kennedy, just like Developer RE1, 423 Kennedy had two loans, a senior loan and a junior loan, both originated by WCP. Only the senior loan had construction draws. The junior loan did not. The junior loan did not have any construction draws. So there was no reason -- so even assuming that the lack of funding construction draws became a reason, a defense, or some sort of excuse for 423 Kennedy to stop making monthly interest payments, that would have only applied to the senior loan and not to the junior loan. That's number 1.

Number 2, the refusal to disburse further construction draws in and of itself is no excuse to stop making monthly interest payments because under the express terms of the note -- of the notes, the lender has sole and absolute discretion to fund or not to fund portions of loan proceeds. And I will read from section 1 of the note, this language, and this is the same language in all four of the notes.

"Borrower expressly and specifically agrees that the entire original principal balance of this note, or any part thereof, may be withheld from borrower at the closing on the loan amount memorialized by this note, and may be funded, if at all, in lender's sole and absolute discretion."

So as a matter of practice, what happened was is that for the loans that did not include construction reserves or prepaid interest -- and actually they all -- all but three of the four loans included prepaid interest that was withheld at closing of the loans. The balance of the loans were disbursed to the borrowers, except for one loan, the 423 Kennedy senior loan. And pursuant to the loan terms, the 423 Kennedy senior loan, that construction draw balance was to be disbursed in the lender's sole and absolute discretion, and those were the terms that 423 Kennedy agreed to when it took out this loan from WCP.

It's important to note that that language, the sole and absolute discretion language that is in the promissory

note, was never addressed by Judge Lee in his preliminary injunction order. He never mentioned the sole and absolute funding discretion for the lender, nor did he draw a distinction between the senior loan and the junior loan on 423 Kennedy. He simply ordered -- but yet, he still reached the conclusion that failure to fund those construction draws was a breach of the loan documents. We argue that that was the incorrect conclusion, certainly with respect to the junior loan.

So the bottom line is this, that for these category 3 defaults, which is defaults that occurred after the acceleration date of December 8, 2022 but before maturity, even if 423 Kennedy didn't have the authority to accelerate the note on December 8th, 2022, which we are --

THE COURT: You mean WCP parties?

MR. WILLNER: I'm sorry. Even if the lender didn't have -- I apologize, Your Honor. Even if the lender didn't have the authority to accelerate the notes on December 8th, 2022, certainly have the authority very shortly thereafter, in January, February, and March 2023, before those loans matured.

Category 4 defaults. And Your Honor, I'm going to try to get through these last three categories as quickly as possible. The category 4 defaults are the maturity defaults.

As I discussed, the Developer RE1 loans matured on December 23, 2022. The 423 Kennedy loans matured on March 31,

2023. These loans matured, in other words, three and a half to four years ago, or almost four years ago, for Developer RE1. They haven't been paid. It's about 14 to $15 million in total, unpaid loan principal, not including interest. Default interest. Late charges. Et cetera.

In this case, from as far as I can tell, the Plaintiffs' primary arguments for not paying these loans are essentially twofold, that they were excused from paying these loans because of a breach by the WCP parties, or and they were prevented from refinancing the loans because of the actions of WCP parties. Let's address both arguments.

The breach argument is essentially the failure to fund construction draws, which Judge Lee pointed out -- which was the Judge Lee approach in his order in the 423 Kennedy case. First of all, there were no construction draws in the Developer RE1 loans. There were no construction draws in the junior loan on 423 Kennedy. And the only loan -- the only loan that had construction draws was the senior loan at 423 Kennedy, and as we just discussed, there was no breach by WCP not to fund those construction draws because those construction draws were to be disbursed or not disbursed in the sole and absolute discretion of the lender, based on the language that I had just read.

And actually, I digress. There was another argument out there from the Plaintiffs that the default interest and the late charges that were imposed by WCP are unenforceable

penalties. I don't believe that there's any legal authority that backs up the Plaintiffs on this issue. And in fact, the legal authority goes the other way. There is in a case called Allen v. Yates -- this is 870 A.2d 39. It's a D.C. case that was issued in 2005.

In that case, for example, the District of Columbia Court of Appeals ruled that a thirty percent default rate to compensate the lender for the value of money lost as a result of delay is enforceable. In other words, these are commercial loans. Commercial loans routinely have default interest and late charges that are enforced by courts to compensate the lender for the risk of making the loans and for the -- and for the value of -- and for the time value of money that is lost when a borrower doesn't pay.

WCP is a hard money lender. They're going to take -- they're going to make loans that are more risky than traditional banks, as Mr. Negussie suggested in his testimony. Hard money lenders like WCP are lending funds that are in excess of a property's value. They are taking on a greater risk.

They're entitled to be protected with that risk by higher default interest and late charges. That is the reason why courts do not find that default interest and late charges in commercial loans are unenforceable liquidated damages or penalties. They are negotiated contractual terms that are

enforceable.

Regarding the prevention argument from the Plaintiffs, the facts as -- even those facts that Mr. Negussie had testified to on Monday indicate that it wasn't the actions of the lender Defendants that caused the maturity default here. Let's take Developer RE1 first.

As Mr. Negussie testified, and as is also reflected in the default payoff statements that are part of Exhibit I -- these are the default statements that were attached to the default email that was sent on December 8th, 2022 -- the payoff without default interest and fees for Developer RE1 in total, for both the first and second position loans, was just over $4 million. It was $4,012,201.

And as was discussed during the hearing, during Mr. Negussie's cross-examination on Monday, the term sheet that was obtained by Developer RE1 for a refinance, which was from MainStreet -- was from MainStreet Bank was only going to cover -- was only going to be a loan in the amount of seventy-five percent of the property value. And as Mr. Negussie testified, the property value at the time was about 4.1 million to $4.5 million.

Therefore, the MainStreet refinance loan, the contemplated MainStreet refinance loan, would have only provided proceeds in the amount of 3 million to $3.3 million. The nondefault payoff for those loans, for the Developer RE1

loans, as just discussed, was just over $4 million. So there necessarily would have been a shortfall somewhere between $700,000 to $1 million, which the Developer RE1 entity would have had to -- would have had to supply cash for to even execute this refinance.

And as Mr. Negussie testified during cross on Monday, they didn't have the money in the bank. Mr. Negussie testified with his own relative certainty that he would have been able -- he would have been able to raise that money from investors. But we don't know that. That's speculation. And if Mr. Negussie was such a capable raiser of investor funds, then perhaps one would say that he would have been -- and he would have been able to raise $1 million, perhaps he would have also been able to raise another $600,000 to cover the default interest.

But suffice it to say, there was nothing in the record before with respect to this hearing, and there's nothing in the record that I've seen for any of the proceedings that have occurred in this case prior to today and prior to Monday, that reflects that Developer RE1 was absolutely positioned to close that refinance, but for, but for the acceleration of the notes by the lender Defendants. If anything, what the facts suggest is that the maturity default of Developer RE1 was inevitable. It was going to happen. They were not going to be able to pull the trigger on refinance. They had a significant shortfall

that they were not going to be able to cover. And therefore, the prevention argument falls flat.

For 423 Kennedy, the story is a little bit different because as Mr. Negussie testified, and as is reflected in the Cushman & Wakefield appraisal, which was admitted into evidence, and that is Exhibit 39, the value of the 423 Kennedy property was $11.9 million at the time of the underlying events. As shown in Exhibit I, which attached the default payoff statements for the 423 -- for all four loans, including the 423 Kennedy loan, the default interest -- the payoffs, even with the default interest and default late charges, was going to total $8,614,669, so just over $8.6 million.

There was a refinance that was contemplated, and this was discussed during Mr. Negussie's cross-examination. And it is evidenced by Exhibit V, WCP Exhibit V, where a loan commitment was issued by MainStreet for a refinance loan of $10.7 million. That loan commitment letter contemplated reserves for prepaid interest and other items, and those reserves were going to be about $1 million.

So those loan proceeds that would have been available for a refinance to pay off the prior lender would be around $9.7 million. $9.7 million would have been more than enough cash to pay off even default interest and default fees and all of the principal and other balances due under the 423 Kennedy payoff statements. When asked about this during cross-

examination, Mr. Negussie essentially said, well, we didn't agree that 423 Kennedy was responsible for default charges and late fees, and therefore, they essentially decided not to go forward with the refinance, but to sue. They sued the lender instead of pulling the trigger on refinance.

And what's important about that, Your Honor, is that what we can gather is at the time that the underlying events occurred, the borrowers have a choice. They could either -- upon receipt of these default payoff statements, they could have either rushed to try to raise funds to cover a shortfall and go forward with a refinance, refinance these loans, and then sue the WCP Defendants for damages, given their belief that there were breaches by the WCP Defendants, although obviously we dispute that claim. They could have gone forward with a refinance and covered any shortfalls necessary. Or they could rest on their laurels, decide that with one hundred percent confidence, they're right, and just go ahead and file suit.

They chose the latter. And that is a big reason why we are where we are today, with millions of dollars in accrued default interest and late charges that could have been avoided had they gone ahead and tried to mitigate the possible damages of a loss and proceeded with a refinance back in late 2022, early 2023. They made that decision, the Plaintiffs did, not the WCP Defendants. And they have to live with consequences.

Turning to the category 5 defaults, and these are the current material defaults, which has already been discussed, primarily the very, very significant property tax bills that are encumbering both properties. Developer RE1 is $145,000. That's reflected in Exhibits M and N, submitted by WCP. And $124,000 plus change against 423 Kennedy, which is reflected in Exhibits O, P, and Q. And amongst those exhibits includes a tax sale notice that shows that the 423 Kennedy tax sale lien has been purchased and is subject to a potential redemption.

And as discussed, those unpaid property taxes are breaches of the deeds of trust. Breaches of sections 4.2 and 5.1 of the deeds of trust, all four deeds of trust. They are events of default under section 7.2 of the deed of trust. They permit acceleration of the notes under section 5 of the promissory notes. And they provide a further independent basis for the WCP Defendants to proceed with loan enforcement, including foreclosure.

Finally, category 6, and these are the cross defaults. Section 7.9 of the deeds of trust provides as follows.

MR. SADOWSKI: Judge, may I just interrupt briefly?

THE COURT: Sure.

MR. SADOWSKI: Yeah. I'm just trying to get a time estimate for the conclusion of their arguments. I am supposed to go to a match this afternoon in Salisbury, which is a couple hours away, and 12:30 is about the max point where I could jump

in the car and get that ref and get there on time.

And then on the issue of the affiliates, Judge, I don't like to object during argument, but there was no evidence put on at the hearing about the affiliate status or that they were affiliates so --

MR. WILLNER: Yeah, there was.

THE COURT: Well, I'm going to let Mr. Willner make his argument. I'm not sure what kind of match you have, Mr. Sadowski, but I'm going to -- I'm going to stay here till the end of argument. If that's more important than arguing for your client, then that's fine. You're welcome to leave at that point, and I'll hear Mr. Willner's reply to your argument.

MR. SADOWSKI: Okay.

THE COURT: But we're going to go -- we're getting this done today.

Go ahead, Mr. Willner.

MR. SADOWSKI: I didn't say that. I just wanted to let you know, Judge, that there was that issue --

THE COURT: Go ahead, Mr. Willner.

MR. WILLNER: Thank you, Your Honor. Thank you, Your Honor. And I should be about five to ten minutes.
I'm again trying to put the --

THE COURT: It's fine. Go ahead, just --

MR. WILLNER: Okay. Thank you, Your Honor. Section 7.9 of the deeds of trust provides as follows. Any default

under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature, other than the indebtedness and the obligations secured hereby, of grantor or any guarantor of indebtedness or any of their affiliates to beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, et cetera. In other words, an independent grounds for an event of default is when a default occurs under an affiliate -- under an affiliate's note instrument or loan instrument or loan obligation.

First and foremost, 423 Kennedy is certainly an affiliate of itself, and Developer RE1 is certainly an affiliate of itself. Thus, a default under, for example, the 423 Kennedy junior loan would constitute a default under the 423 Kennedy senior loan. So for example, if the 423 Kennedy -- if 423 Kennedy failed to pay interest that was due in January, February, and March of 2023 under the junior loan, section 7.9 of the deed of trust provides that that would constitute a default under the 423 Kennedy senior loan, even if the 423 Kennedy senior loan had some sort of excuse to not make those interest payments, which, of course, we argue they did not have any excuse. But suffice it to say, under Section 7.9, a default of a junior loan constitutes a default of senior loan, and vice versa, for all four loans.

Moreover, section 7.9 creates cross-defaults between

423 Kennedy and Developer RE1, and that is because they are affiliates of each other. And there is evidence in the record to support this, but let's start first with the definition of affiliate.

Affiliate, which is undefined in the deed of trust, with a lowercase a for affiliates, is defined all over the place, but let's go with the Black's Law Dictionary definition first. Black's Law Dictionary defines affiliate to mean "a corporation that is related to another corporation by shareholdings or other means of control". Control is the key word. Similarly, the U.S. District Court for this District, in Luokung Technology Corporation v. the Department of Defense, that's 538 F.Supp.3d 174, and at page 184 are set as follows.

> "The overwhelming weight of authority supported the finding that the plain and common meaning of affiliated with is a company effectively controlled by another or associated with others under common ownership or control."

Under this definition, we assert that Developer RE1 and 423 Kennedy are affiliates of each other. First, there's evidence in the record to this effect. Exhibits T and S are the operating agreements for Developer RE1 and 423 Kennedy. They both provide that Mel Negussie is a managing member, and was at all times during the events relevant to this, was a managing member of both of those entities authorized to carry

out acts and to bind the entities. The relevant sections of the 423 Kennedy operating agreement, Exhibit S, are sections 2.3 and 7.5. And the relevant section for the Developer RE1 operating agreement in Exhibit T is section 7.4.

In addition, as a practical matter, Mr. Negussie was the principal person who led the charge of both developments, and he confirmed that in his testimony on Monday. As such, 423 Kennedy and Developer RE1 --

THE COURT: What about the fact -- what about the fact that there isn't a unity of ownership interest?

MR. WILLNER: Your Honor, we would submit that that is not -- notwithstanding that, there is still a common control, and therefore common control -- and common control is the key factor with respect to an affiliation. That's, I believe, the takeaway from the Black's Law Dictionary and Luokung Tech definitions of affiliates. In other words, you don't have to have unity of ownership or matching ownership in order to be an affiliate. All you have to have is common control.

THE COURT: Okay.

MR. WILLNER: Now, one quick word about pretext. It's the theme of the third amended complaint, which is the operative complaint -- the operative pleading for the Plaintiffs at this moment is that the WCP Defendants were operating under some sort of pretext in accelerating and pursuing the loan enforcement. I'm not totally sure what the

pretext was. Some sort of money grab.

I'm confused about what the pretext was, but that's the argument. The argument is that acceleration and enforcement was all pretextual. It doesn't matter. The law is clear that it doesn't matter why or what the motivations are for a contract party to enforce the terms of its contract. If a party breaches, the opposing party, the nonbreaching party, has the right to enforce its terms.

And to be sure, in abundance of caution, this is supported by D.C. case law, recent D.C. case law, and the case is Corp. Car Services Houston Limited v. Carey Licensing. That's 325 A.3d 1235. That's a 2024 District of Columbia Court of Appeals case. And the standard is as follows, and this is a quote from the case. "Absent such purposeful sabotage, a termination for cause cannot breach the implied covenant, even if motivated by reasons unrelated to a cause."

So in other words, and in that case, the court is particularly addressing the implied covenant of good faith and fair dealing, whether a pretextual enforcement of contractual rights is a breach of the implied covenant, and the Court there essentially holds no because the implied covenant is not there. Does not exist to rewrite the terms of an agreement. It is simply there, essentially, as a gap filler to make sure that the spirit of a contract is enforced. It doesn't replace the express terms of an agreement. Here, the express terms of the

agreements -- of the loan documents reflect that there were not one. Not two. Six. Six different categories of defaults.

In closing, Your Honor, and before I turn it over to Mr. Greenberg -- and I appreciate Your Honor's consideration of the extensive argument today. The four injunction factors here simply do not support a revitalization, continuation, or sustaining of the preliminary injunctions issued by the Superior Court. Plaintiffs do not have a likelihood of success on the merits. None of their claims -- or all of their claims hinge on the contention that the WCP Defendants somehow breached the loan documents.

The opposite is true. The WCP Defendants were enforcing contractual rights. When you enforce contractual rights correctly, you are not tortiously interfering. You are not breaching the implied covenant of good faith and fair dealing. There is no right to a permanent injunction, certainly not, permanently enjoining you from foreclosing on the sole form of collateral for a loan. None of those factors apply.

The equities favor the lenders here. Lenders lend on the basis -- or at least commercial real estate lenders lend on the basis and assumption that they will be able to foreclose on their collateral if the default occurs. It's been three -- it's been over three and a half years since these loans have matured.

The lenders have been estopped by preliminary injunctions, which were really issued in a TRO framework, on an undeveloped record, in haste, in expedited fashion, with foreclosure sales pending, and simply to create a status quo environment where the foreclosure sales didn't go through. It's three years later. The equities no longer favor the Plaintiffs, and in our opinion, they never did.

Accordingly, Your Honor, the WCP Defendants wish for Your Honor to dissolve the injunctions or at a minimum, to modify them, to modify them to require a bond that will legitimately secure the Plaintiffs' -- I'm sorry, the WCP Defendants from the continued -- from their continued forestalling of their right to foreclose. And on that note, I'll turn it over to Mr. Greenberg. Thank you, Your Honor.

THE COURT: All right. Thank you.

MR. GREENBERG: Thank you, Your Honor. Jeffrey Greenberg, on behalf of the Debtor, as special counsel and as counsel to WCP Fund I LLC, DP Capital LLC, and Daniel Huertas.

Your Honor, as Mr. Willner explained, we do not believe that the injunction should continue here, but to the extent it does, a bond should be required. And that is because under Bankruptcy Rule 7065, which incorporates Federal Rule of Civil Procedure 65(c), the Court must condition the preliminary injunction on the posting of a bond by the Plaintiffs. And Your Honor, this is irrespective of the procedural posture that

we are here on a motion to dissolve because any preliminary injunction issued by the state court prior to a removal must be dissolved by the federal court, unless the injunction satisfies the requirements of Federal Rule of Civil Procedure 65. And that's the Schuler case that Mr. Willner cited, and it's at 27 F.4th 1203. It's from the Sixth Circuit, and it's a 2022 case.

And further to the point of a bond, you have Bankruptcy Rule 7065, which further provides that on application of a debtor, trustee, or debtor-in-possession, the Court may issue a temporary restraining order or preliminary injunction without complying with subdivision (c) of Federal Rule 65. And as Your Honor is well aware, subdivision (c) is what relates to the bond requirement, and we are not here on application of a debtor, trustee, or debtor-in-possession to request an injunction. And Your Honor, the purpose of the bond, as set out in Federal Rule of Civil Procedure 65(c), is to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

And I haven't reviewed all the cases cited by Mr. Sadowski in his filing this morning and was candidly surprised that he filed something. But to the extent the Court is inclined to waive a bond or set a nominal bond in light of that submission, we'd of course appreciate the opportunity to file a brief. But I think we're prepared to address it right now because as you know, courts have discretion in setting the

amount of bond address today, which would be the appropriate amount.

And Mr. Willner also cited the Adya LLC v. U.S. DEA case, at 826 F.Supp.3d 115. That's from the District Court of the District of Columbia on March 23rd, 2026, and it repeats what the D.C. Circuit recently said, which is that an injunction bond is generally required, no matter how much the preliminary injunction factors favor an injunction. And of course, we don't believe the factors favor an injunction here. But nevertheless, a bond should be required.

And additionally, courts also state that when setting the amount of a bond, they should err on the high side. And I have three cases for that proposition. It's Mead Johnson & Company v. Abbott Labs. That's 201 F.3d 883, from the Seventh Circuit in 2000. GlaxoSmithKline, LLC v. Boehringer Pharmaceuticals. That's 484 F.Supp.3d 207. That's from the Eastern District of Pennsylvania in 2020. And St. Michael's Media, Inc. v. Mayor and City Council of Baltimore. And that's from the District Court in Maryland, and it's at 566 F.Supp.3d 327.

And we encourage the Court to err on the high side because three years have passed since these loans matured. We have the payment history that Mr. Willner discussed. We have the tax sale of the Kennedy property and the tax status of the other property. And we also have Mr. Negussie's testimony that

Developer RE1 and 423 Kennedy have no money.

I thought I heard him testify that the Developer RE1 property could be razed or demolished, although I may be incorrect about that. But also, Mr. Negussie's own words, these are entities that pay when they need to pay. And to the extent these are entities that pay when they need to pay and perhaps can't pay at all, this is a situation that merits a bond on the higher side of what is appropriate.

I would note, Your Honor, that in a loan context, courts are a little bit all over the place in determining the appropriate amount of a bond when a lender is enjoined from foreclosing its collateral. But I've not located any decisional authority which the Court appropriately set a nominal bond in such a context. And I'm just going to cite a few cases here.

I have Windforge, Inc. v. Coachmen Industries. That's 2006 WL 1750678, and that's from the Southern District of Indiana on June 23rd, 2006. And the court stated that the bond must reflect the value of the property as of the time of defendants' foreclosure efforts were thwarted and encompassed the value of the property at the time defendants would theoretically have been entitled to recover but for the injunction.

Wells Fargo Home Mortgage v. Neal, that's from the Maryland Court of Appeals, now the Maryland Supreme Court.

It's at 398 Md. 705. And in that case, the court stated, "If a default is admitted, the mortgagor must post a bond with or otherwise pay into the court for the full amount of the mortgage and any applicable interest." And while we don't have an admitted default, I also have not heard that there's any challenge to what was the principal and outstanding interest at the time the payoffs were made on December 8th of 2022.

Talbott v. Laurel Building Association is also a case out of the Maryland Court of Appeals. And in that case, the Court stated, "It is well settled upon all authorities that the mortgagor must pay the amount to be admitted to be due in this court before the court will grant an injunction to restrain the sale upon a default of the mortgage." And here, the full amount of the principal and noninterest default owed as of December 8th, 2022 was $14,540,207.12. The Developer RE1 loan matured on December 23rd, 2022, and the 423 Kennedy loan matured on March 31, 2023. And that's Plaintiffs' Exhibit 3 to 4, 7 to 8, and Defendants' Exhibit I, which were the payoff statements.

And finally, I would cite Franklin Savings Association v. Reese. This is a state court case out of Texas from 1988. It's at 756 S.W.2d 14. And in that case, the Court expressly acknowledged that the amount of the bond could be backwards looking and remanded the case for further proceedings consistent with that opinion. And the court stated.

"We do not believe that the $10,000," which was the bond in that case, "adequately protects appellants in this case. The property is valued at between 25 million and 50 million. The debt to appellant is some 34 million, and the unpaid interest on the debt has been accruing about the rate of about $300,000 each month.

"Thus, the potential loss of interest alone over the life of the injunction, which took effect on December 1, 1987, already exceeds 2 million. Further, should the appellant prevail on the merits, it might sustain other losses from its inability to develop the property during the term of the injunction. We think the trial court abused its discretion in failing to set a bond at an amount adequate for the appellant."

And again, the bond in that case was only $10,000. So we would assert that a nominal bond is completely inappropriate in this case. And here, we have a number of additional indicia that would support the amount of the bond.

In its third amended complaint, Developer RE1 valued its property at 4 million, and 423 valued its property at 11.9 million as of December of 2022. Mr. Negussie testified on Monday that value of the Developer RE1 property is 4.1 million to 4.5 million and that they would need to cover shortfall in respect of just principal and interest, which is $4,345,215.07

as of December 8th, 2022 in the context of a refinancing. Mr. Negussie also testified on Monday that the value of 423 Kennedy is approximately 11.9 million. Given the nonpayment at maturity, a shortfall would likely need to be covered in respect of just principal and interest in the amount of $10,194,992.05, which was as of December 2022 in the case of a refinance.

Indeed, he also testified that refinance is coming in in advance of resolution of this matter, which the Plaintiffs brought. And Mr. Negussie testified that no one will refinance the properties currently in light of the fees and the context of this case. And just contract interest accrues on the 423 Kennedy loans at $2,386,966 per annum. And again, we encourage the Court to err on the high side.

We have asked for a bond for our motion to dissolve in the amount of at least $2 million, and we submit this as an eminently reasonable, given that it just covers approximately 1.5 years of default interest on the loan. Again, three years have passed since maturity. As Mr. Willner stated, we have no idea when this case will ultimately be resolved, and we also surmise that the Plaintiffs would appear to -- would probably appeal an adverse ruling.

Your Honor, interest accrues on all four notes at the nondefault rate of $1,280,712 per annum, and the default rate is $3,371,686 per annum. The injunction of the foreclosure

deprives at least the WCP Defendants of the collection of interest. Two years of nondefault interest on all the loans is about $2.5 million. It's $2,561,424. And we submit that that would be the appropriate amount for a bond in this case.

But even, but even, if this Court credits all of Mr. Negussie's testimony, we know that the WCP Defendants will need to redeem 423 Kennedy tax from tax sale and pay taxes in the approximate amount of $269,075.94. That includes about $145,000 for RE1 and $124,075.94 for 423 Kennedy. Further, we know that interest accrues on the first trust at the nondefault rate of $1,067,165 per annum. Again, that's $285,962 for RE1 and $781,203 for 423 Kennedy, which will eat away the availability of any equity to the WCP Defendants. And that would cause direct irreparable damage, given the testimony and evidence in this case.

So while we submit that a bond should be at the amount of approximately 2.5 million, at a bare minimum, we submit that a bond should be required in the amount of $1,336,240.94, with a modest adjustment to 1.5 million. So I think the Court can comfortably issue a bond in the context of 1.5 to 2.5 million. I think those are both kind of bare minimums in terms of what's acceptable. And that's all I have for the bond. And again, we submitted a bond shouldn't be required, but to the extent there is one required, we assert that 1.5 to 2.5 should be the appropriate amount.

THE COURT: All right. Thank you.

I'm going to hear from Mr. VerStandig, and then we're going to take a brief recess before we hear from Mr. Sadowski so that everyone can use the restroom. But I want to get through with all of the affirmative arguments first. So Mr. VerStandig.

MR. VERSTANDIG: Thank you, Your Honor. Your Honor, Mr. Willner screwed up my argument quite badly. I was going to make the point that in two days, no one other than me has mentioned Mr. Drazin's name. And then Mr. Willner had to go reference an email by Mr. Drazin. But I think the thesis still mostly holds.

Mr. Drazin appears to be the individual who is -- I don't want to say lost because I know the Court pays attention, and obviously to him and I, it's far from lost. But who is stuck in this rigmarole, suffering from an obnoxious series of pernicious allegations that are completely unsupported by the record and that are completely unsupported by the law.

So now that we are in federal court, which is in and of itself grounds to dissolve an injunction, I'm going to quote the precedent of this court. It's Judge Teel from 1994. The case is In re: Rothenberg, 173 B.R. 4.

"As a general proposition, trustees of deeds have only those powers and duties imposed by the trust instrument itself, coupled with the applicable statute

governing foreclosure sales in the District of Columbia."

All four deeds of trust are in evidence. There is absolutely not one iota of evidence in front of you that Mr. Drazin has violated in the slightest any obligation imposed upon him by any of those four deeds of trust, nor is there any evidence in front of you that he has violated any obligation imposed upon him by the District of Columbia statute. He is a revered and respected local attorney who has borne this case around his neck like an anvil for three and a half years and --

THE COURT: Okay. So other than rearguing your motion for summary judgment, what does this have to do with the question of whether or not I dissolve the injunction today?

MR. VERSTANDIG: Well, Your Honor, the injunction binds Mr. Drazin, amongst others. He's my client. I'm arguing for dissolution against him.

THE COURT: Okay.

MR. VERSTANDIG: And at the moment, my argument is to whatever extent there's a change in law -- and I would love to hear Mr. Sadowski explain how an injunction against Mr. Drazin is even vaguely supported by the law of this court, which is what I just said to you, that is grounds to dissolve it. The three years is also grounds. Mr. Willner touched upon that capably. The tax sale, which Mr. Willner touched upon more than capably, is grounds as well.

Mr. Negussie acknowledging the deterioration of the building is grounds to dissolve it. The fact that Mr. Negussie's two entities now have time to file for Chapter 11 relief, and thus, they have an adequate remedy at law, is grounds to dissolve the injunction. The manifest injustice being visited upon Mr. Drazin now is unto itself grounds to dissolve the injunction. And the fact that no one other than me talks about him is a reminder that he is in this case for whatever strategic reasons that ought not be countenanced by this Court.

And while, yes, I want to ask you to grant summary judgment, and I've done that time and again, the most I can do today is to ask you to dissolve the injunction against him so there is one less thing hovering over his head like a Damocles sword. And that is why I raised the issue. But Your Honor, I will be more pithy than the other two gentlemen who spoke. That is all I have, unless the Court has any questions.

THE COURT: No, I didn't.

All right. Let's take a short recess for everyone to use the restroom, and then we'll hear from Mr. Sadowski.

THE CLERK: Thank you, Judge. The court will be in a brief recess.

(Recess 11:40 A.M./Reconvene 11:47 A.M.)

THE CLERK: This court is again in session.

MR. SADOWSKI: Good afternoon, Jim Sadowski for the

Plaintiffs in the case. Judge, I don't have anyone to tag team, but I'll tag team myself at the right time. But I don't think that this is a close call for you on this record and under the case law that you're bound to uphold.

So I'll start out with the legal standards. We're here on the motion to dissolve the injunction, not on a renewed preliminary injunction hearing. And under the Doe v. Shanahan case, I'll carve out that exception and not talk about that part that the judge didn't agree with. But they have the burden to show a significant change in either factual conditions or in law.

And the court limits review -- and this is really the key -- to new material, N-E-W, presented, and that means presented at the hearing on Monday, to the motion to dissolve. The inquiry is limited to whether the movant has demonstrated that changed circumstances make the continuation of the injunction inequitable. Right. They haven't met that burden under the law, and they surely haven't met that burden under the facts. Ninety percent of the time in their argument, they've been talking about old material and revisiting the initial injunction decision. And that's just not -- that's just wrong under Doe.

And so I'm going to turn to the evidence, which is really not turning to the evidence, but it's turning to a lack of evidence. There's been no new testimony or evidence to

rebut the prior factual findings that the defaults were pretextual. There has been no new testimony or new evidence presented to rebut the factual finding that Mr. Huertas threatened to make trouble on these properties and in fact, did. There's been no new evidence or testimony to rebut the finding that there was at least an implied-in-fact contract to provide construction draws to 423 Kennedy. There has been no new testimony to support the claim that 423 Kennedy was deteriorating in any significant way beyond the way that has been exposed to the elements since the initial injunction was issued.

And take yourself back to where they filed this motion, Judge. Deterioration of the property and an email from Mr. Negussie. Right. And they did not present one witness, not one, to show that that property was deteriorating. That the value had gone down. That they even attempted to inspect the property.

There also was no new testimony or evidence to show that 423 Kennedy would not have completed the project if construction draws were not stopped, and Mr. Negussie's testimony now stands unrebutted on that point at both the initial hearings and at this hearing. And of course, as I just alluded to, there's no evidence that they ever inspected the property, even though they have a clear right to do so under all the deeds of trust. Not even a drive-by of the property do

we have a witness testify that they did, to check on its condition.

And most importantly, there's been no testimony to support the damages they claim they will suffer if the injunction continues. Zero. Okay. No one testified about what a price of foreclosure sale might net. No one testified about when that date would be. No one testified about what the time value of money would be for the proceeds under any such hypothetical foreclosure sale. And you'll have to ask them why they didn't present that evidence, but I have a good idea. Because they know the answers to those questions are not favorable to their position. And this is just common sense.

What they didn't say in their opening or at the hearing, which is an undisputed fact, they are foreclosing under the second deeds of trust, not the first, on either property. Who is going to buy a property at a foreclosure sale if they are stuck with the first deeds of trust and the related penalties and interest? I suggest no one.

Mr. Negussie also testified that the fact that there is ongoing litigation effectively prevented refinancing and continues to prevent refinancing. So who do you think is going to touch these properties at a foreclosure sale, that they have no witness to testify about at what price they would fetch? Right. And I suggest the answer is that they will get zero at a foreclosure sale. They will probably bid the property

themselves and then take it back.

And Mr. VerStandig himself called the JPK debt instruments "toxic". Right. But what did the evidence show? The evidence showed that 423 Kennedy cares about the property, and they don't. The evidence did show that the buyers did not commit to paying real estate taxes indefinitely. They were only supposed to pay them during the time of the loan and have paid them up until 2025.

They also didn't get the properties reappraised to show any decline in value. I don't know why. Those appraisals are, what, four years old now. Almost. And as I said at the initial hearing on this motion, this whole episode, in my opinion, has been a back door attempt to collect the notes by way of a bond or get a bond that the Plaintiffs can't pay.

Getting back to the cases, and let me turn to -- sorry. The only real new conditions that they've shown, the only real new evidence, Judge, are the unpaid taxes, and I'll get to that in a second. Let me flip back to their arguments, Judge.

We're here in D.C. Circuit. The Doe case applies, not any of these other state courses (sic) that they have cited to you. Not Wright & Miller. And as I alluded to in our opposition at the hearing argument itself, the proper remedy for them, if they were unhappy with the preliminary injunction, whatever the judges called them, was to appeal that to the D.C.

Circuit Court of Appeals, which they had an absolute right to do as a matter of right pursuant to the D.C. Code, and they didn't. And now, they're trying to get you to revisit the injunction decision because they think that the decision was going to go your way, and they're not allowed to relitigate the injunction decision under the case law.

For whatever you think about the Trump administration -- and I'll dare not say what I think -- we got a lot of good case law recently about bonds and preliminary injunctions. But they've utterly failed on their burden of proof.

I like this Windforge case, Judge, that they cited, not because it's binding on you, but if you look at the Windforge case, Judge, and this is the key, I think, here, that case says the bond must reflect the value of the property as of that time of the defendant's foreclosure efforts were thwarted and encompassed the value of the property that the defendants would theoretically be entitled to recover but for the injunction.

You have zero evidence, none, to make that bond decision based upon the damages they have suffered as a result of not being able to go to foreclosure. And we don't go back to 2003. We go back from the day you dissolve the injunction through whatever theoretical, hypothetical foreclosure sale they're going to have over a property which has toxic efforts

and -- which are toxic, that nobody's going to buy.

That's their burden, and which is why I said at the very beginning of the hearing, and I looked at their witness list. Why aren't they offering a witness to tell you what their actual damages were going to be? And I think we know why. Because their actual damages for this not being able to foreclose are zero because nobody's going to touch these properties if they foreclose under these two deeds of trust.

Passage of time. All right. This is my favorite. Why has time passed so far? Time has passed so far because in July of 2024, when we had a trial date set for September 4th, I believe, 2024, they removed these cases. That's why this case has dragged on. That's why they didn't get their early trial date, a trial date that they bargained with Judge Scott to give them and got and then got Judge Lee's case, by the way, that didn't have a trial date set.

When the cases were consolidated, they automatically got the early trial date on the 423 Kennedy property. Right. So they blew their bargain with the Superior Court and the other reasons for the delay. Now, they want you to come back and say there's a bit of passage of time. That's really just rich.

Then they say the collateral is not safe in our hands. It's not adequately windowed. Not accurate roof. Right. Where's the testimony on that? Where's the WCP witness who

went inside and said, heck, these windows are falling apart. Heck, there's rot. Heck, there's mold. Heck, there's that. Whatever. Right. Zero. Zero.

I'm going to tick through my notes now. Oh, the defaults. They spent all this time this default. Category 1. 2. 3. 4. 5. 6. None of that's new. None of that's new, with the exception of the real estate taxes. Right. So the only new evidence that you have before you is that a tax sale is unlikely to happen because Mr. Negussie said he would probably, if push came to shove, pay the taxes.

But here's another thing that I don't understand. Right. If they know that there's a tax sale of the 423 Kennedy property and they know that the District is itching to perhaps pull the plug on RE1, why aren't these bankruptcy lawyers sending a letter to the District of Columbia, saying you have violated the automatic stay. According to their JPK NewCo turnover complaint, they have been assigned two deeds of trust, the junior ones, and the D.C. government is attempting to transfer property and sell that property.

Those are interfering. That's a clear violation of the automatic stay, both of those -- both those acts. So why aren't they running, sending letters to the District government saying, hey, you can't do this. This is a violation of the automatic stay, which is also why the real estate taxes unpaid did not move the needle either.

Under D.C. law, the person to purchase a tax certificate, aside from putting the stay issue aside, they ha four months to initiate the claim, and then to get the actual deed for the property, they have to file a new lawsuit, which would also be a violation of the automatic stay, against everybody that holds an interest in the property. And then that case would have to go through litigation. None of those things are imminent. None of those things can happen without the District of Columbia government coming before this Court, at least as while the JPK NewCo case is pending, and saying, I need relief from the stay.

The MainStreet Bank document --

THE COURT: Wait. Hold on. Your argument is that the turnover complaint, which is under Section 542, in which JPK has sought turnover of property of the estate, which would be sought that they are entitled to foreclose on the real property creates a property of the estate interest sufficient that real estate titled -- and I mean, the complaint is asking me to make that determination. It's being challenged. But you're arguing that's an interest sufficient to have the automatic stay extend to the properties of two nondebtors?

MR. SADOWSKI: If JPK NewCo is holding a deed of trust on the property, they have an interest in that property that the District is impairing. And I don't know any exception under Section 362 that would allow them to do that, to --

THE COURT: So you're telling me in any case we want to go ahead and get protection for a person we don't want to put in bankruptcy, we should just put a deed of trust on their property to extend the automatic stay to an interest of -- to the entire entity to give them an automatic stay?

MR. SADOWSKI: No. No, Judge, that's not what I'm arguing. What I'm arguing is I don't believe that any tax right of redemption lawsuit can go forward without first seeking relief from the automatic stay. And also, I don't think JPK NewCo ever recorded their interest, but I'm not positive about that.

But when the tax deed certificate holder goes forward to foreclose the right of redemption, he's got to name or she or it has to name as a defendant every person that has an interest in the property. So I'm going having to go to the title and look through all these things and say, okay, first deed of trust holder. Second deed of trust holder. UCC holders. Anybody that has an interest in the property will have to be named as a defendant because those folks would have the right to challenge the foreclosure on the right of redemption and not lose their senior interest. Does that make sense?

THE COURT: I understand the argument you're making. I'm not sure --

MR. SADOWSKI: Okay.

THE COURT: -- I conceptually agree with it, but I understand the argument.

MR. SADOWSKI: Okay. Okay. Okay. Let me just move you over, Judge. Get back to my notes.

The MainStreet documents, MainStreet Bank documents that they didn't introduce, actually supported our position that the refinances were in progress and that there clearly was a business relation. And again, there's been no evidence of deterioration. Court's indulgence.

The borrowers have carried the properties longer than they should have. I think I raised that point. They have already spent $250,000 on maintenance and carrying costs.

Exhibits E, F, G, and H were not new. And by the way, Judge, I went back and looked at those exhibits and where they appeared in the record, and they were actually almost identical, E, F, G, and H, to the loan statements that they attached in their opposition to the initial motions for injunctive relief. And I think those are the same exhibits that they used at those two hearings. So that's not new stuff. It's not new at all.

And again, it's gone unrebutted, based on the prior judge's findings. They also prevented the completion of the construction, prevented the trial date, and have not lifted a finger to out to the property. There's also a couple equity maximums that come through here --

THE COURT: I have a question for you on that --

MR. SADOWSKI: What?

THE COURT: -- on the prevention of the completion of the construction.

MR. SADOWSKI: Yep.

THE COURT: What part of the preliminary injunction prohibited either of the parties from completing construction on the properties?

MR. SADOWSKI: The preliminary injunction certainly did not, but as Mr. Negussie testified, they couldn't complete construction because they had no money to pay. They could not get further construction draws because Mr. --

THE COURT: But Mr. Negussie also testified that he's come up with over $850,000 between attorney's fees and maintenance costs. None of that could have been put forth instead towards the completion of the project? I mean, I struggle with why there's been three years an a company formed for the purpose of constructing a building has not involved itself in the business of constructing a building.

MR. SADOWSKI: Judge, they didn't ask Mr. Huertas why he didn't start completion on his own. So I'm not going to speculate about what he would or would not have said on that. But that's, again, the factual findings from the previous judge --

THE COURT: But so the only fact you have to support

the fact that they haven't completed is because they didn't -- that there was no loan on one loan, 423 Kennedy, not on Developer RE1, on either of their loans, or on the second for 423 Kennedy loan. But both projects haven't been completed in the last three years. And the only evidence we have for your argument that's been prevented to do so is the fact that 423 Kennedy didn't advance loans after October -- or advance funds after October of 2022?

MR. SADOWSKI: Well, but I don't know that that's my only argument, Judge. We're not at this hearing required to revisit factual issues that have already been decided in our favor. It was their burden to show that new evidence, right, supported an overturning of those factual findings and --

THE COURT: Right. That wasn't my question, Mr. Sadowski. I said, your argument today -- just, you just made an argument to me which says they prevented completion of the projects. Period. Full stop.

I said, but isn't there $850,000 that was testified to by Mr. Negussie spent on other things in the last three years, none of which went to completion of the projects? In fact, he said, we chose not to complete. We chose to sue instead. And is that my only evidence that supports your argument that it was the lenders who prevented completion of the projects, period, full stop, despite the fact that that testimony is in evidence?

MR. SADOWSKI: Well, I don't believe there were questions directed at the hearing why didn't you complete construction and raise the money to complete construction at the time. I don't believe that testimony came out. I don't know that it's one can draw the inference that because Mr. Negussie was able to drum up funds to pay the lawyers or to pay for ongoing expenses or real estate taxes means that they could have completed construction. I guess the Defendants should have asked him, isn't the fact that you could have completed construction despite the fact that you didn't have any refinancing, any construction draws. That question would --

THE COURT: Yeah, but your other argument -- and I understand that's not in evidence. But your other argument was they've been paying taxes all this time when they didn't have to and so -- but isn't that presuming that they had the right to not complete the projects and continue to have the injunction? There is a disconnect between those arguments, where you're saying they've been doing all these things --

MR. SADOWSKI: Yes.

THE COURT: -- they've been carrying all these things, and yet, there's no addressing any obligation they had to mitigate, I suppose.

MR. SADOWSKI: Right. But I mean, completing the project, why, if all that's going to happen is when they go to sell the project, there are these massive loans and default

interest and penalties they have to pay, on top of the interest rates are different. The costs are higher. Et cetera. So I --

THE COURT: So it goes -- so then your argument goes back to Mr. Negussie's testimony, which was, when they called the defaults in December of 2022, he had a choice. One was to refinance, or try and refinance, and deal with the default interest at that point. And the other was to sue, and he chose to sue. And then since that choice has been made, there's no other testimony, no other evidence, that they've done anything other than invest at least $600,000 towards the lawsuit, right?

MR. SADOWSKI: You're raising the other evidence in a way that wasn't testified to and doesn't really describe the actual situation on the hand. We can't sit here in 2026 and say that in 2022, if you hadn't spent all this money on litigation over the past four years, you could have completed this construction. And the burden was on them at that hearing to ask him that very question, and they did not ask it.

THE COURT: Okay. But what I'm saying is you agree with me, the only thing I have as to why nothing's been done is Mr. Negussie's testimony that he made a choice back in 2022, 2022 and 2023, to file a lawsuit.

MR. SADOWSKI: Now, you have much more before you.

THE COURT: You're right. Nobody asked -- no --

MR. SADOWSKI: You have much more before you than

that. You have two judges --

THE COURT: Okay.

MR. SADOWSKI: -- finding that that was the cause of why they didn't complete construction, which have been unrebutted. I'm sorry. One judge who --

THE COURT: But that was not having completed construction as of July 2023, right?

MR. SADOWSKI: That's right.

THE COURT: Okay. Got it.

MR. SADOWSKI: All right. Well, what developer is going to go spend -- and we don't know how much that's going to cost. That testimony didn't come up. What developer is going to go and spend 3, $400,000 to complete construction for a property that they cannot sell because they're burdened by these deeds of trust and these default interest and penalties? Right. Unless the market took some wild swing in our direction, and it hasn't. It's actually swung the other way. And no developer in his right mind is going to go finish a project, when they know they're going to lose more money than they've already lost. That's the answer.

THE COURT: Okay.

MR. SADOWSKI: Okay.

THE COURT: But if you're convinced that you're right on the lawsuit, not only do they not lose, but arguably, they get the entire upside of the benefit of that property. If

WCP's loans are partially or completely invalidated, damages are awarded. So they're acting on a presumption of failure in the lawsuit or acting or not acting because a percentage of presumption of failure in the lawsuit, not because they believed in the lawsuit and think they were going to succeed. And so they've completed the project and got it paid out before the three years have passed. Right?

MR. SADOWSKI: I don't know. I very much think they have very strong positions on succeeding in the lawsuit. Does that mean we'll be able to escape all the deed of trust monies that are owed? Absolutely not. We're going to have to pay them something back. But that something back may very well be offset by a punitive damages award, or a judge will say --

THE COURT: Right. Okay. I got it.

MR. SADOWSKI: Yeah. Yeah. So , I don't think they're being consistent there. Sorry, Judge. I have to flip back to my notes.

THE COURT: It's fine.

MR. SADOWSKI: Oh, yeah. On the bond -- and I've jumped around a little bit here. On the bond, Judge, I thought, and in the cases that we cited, that I -- and I apologize if I was supposed to send that by email. I actually probably misrecollected that and didn't go back and have time to listen to the hearing, which came in really late last night. And I tried to load it on my phone. It was so large, I

couldn't listen to it. So my bad on that. Counsel thought that the Court wanted us to put that in a submission.

The takeaways to the case, the mere fact an injunction creates hardships for the enjoined party is not in itself a changed circumstance. That's the Huk-A-Poo case, which is cited in our materials this morning.

And then one more second. Make sure I don't skip any, Judge. Court's indulgence.

On the bond issue, they have not, on this record, given you evidence that they're likely to suffer further harm. They haven't put that witness before you that would tell you what the property would fetch at a foreclosure sale and when that would be. It's just, they just, frankly, Judge, I think, made the same mistakes they made in the initial injunctive hearings by not giving you that evidence and that testimony.

We cited to the Sutton investor case, which is on page 2 of our submission and that the Court has to consider the quantum of equity, equitable factors, and the fact that these parties have limited financial resources.

And again, I think we cited to the American-Islamic case because they have to actually prove to you a relationship between the injunction and what their actual damages is going to be, and they just haven't done that.

We cited to the Sanofi-Synthelabo case. I hope I pronounced that right. That's also on page 2. 470 F.3d 1368.

And all the cases we try to give you, Judge, by and large, mostly were circuit cases, if we could. That you have to base your determination on the bond on the evidence that they presented to you, and they just failed on that issue.

We cited to City of New York v. Lopez because one person was claiming they suffered business losses, and the court said that wasn't enough.

And then we cited to Beatty v. Trump for the same reason I just described earlier. They have not pinpointed quantifiable costs they would incur as a result of the injunction. Right.

A bond amount is not allowed to give a debtor that chose to have a nonrecourse loan to use the opportunity to collect their interest or their default penalties or their principal. That's not the purpose of the bond. The purpose of the bond is to compensate them for what they could lose during the injunctive relief period, and they've just not -- there's no evidence before you to show that fact. Zero.

So it's our position, Judge, and let me just check through my rebuttal notes, all the issues about the defaults, categories 1 to 6, that was all past material. There was a case out there that they cited that the bond is the value of the property. I'd suggest you drill into that case and see where they were at the time. But that does not jive with the cases in the D.C. Circuit, and the ones that I've just cited to

you, that you don't get the full value of your property in a bond. That's just not the way it works.

Then they suggest that there should be a bond for $269,000 in taxes, which I've already discussed why I don't think that anyone has the ability to collect those taxes on the D.C. government side because of the stay. And by the way, if they wanted to, they could have gone to the tax sale and bought the tax deed as well.

Mr. VerStandig, God bless his soul, he does a really good job of advocating for his client no matter what chance he gets, but he's bound by the injunction because he's the trustee under the deeds of trust. And we asked him to resign as the trustee, and he's refused to do that. So until he continues to remain as trustee, he could also continue to issue a new foreclosure notice. So that's why he's still named and bound by the injunction. And on top of that, Judge, you know that from the other hearing that there's a shifting burden under the claim against him that he has not met yet.

So in our position, Judge, you have to deny the motion to dissolve. It fails for a lack of evidentiary support and as a matter of law, and we don't believe that any bond would be appropriate. If the Court does decide to impose a bond, we believe it should be a nominal bond of $500 to $1,000, which is the cost of what one of these very good lawyers could do to write a letter to the District and tell them to stop violating

the automatic stay. If the Court imposes a different bond, and depending on --

THE COURT: Wait. So your argument is, in properties worth something worth -- let me give the numbers Mr. Negussie gives. Something worth $15 million, you think my discretion should be somewhere close to 1/1000 of 1 percent of the value for the bond? It's not even close --

MR. SADOWSKI: That's right, Judge, because --

THE COURT: It's not even -- it's not even a day's worth of interest?

MR. SADOWSKI: Because you don't get to collect your interest in the bond. Their burden was to prove to you what they will lose if they are allowed to foreclose. Okay. They did not put on a single witness that said, if we were able to foreclose, we would be able to do that sixty days out. We would be able to fetch a price for the property of X. And with that X, we would make Y in interest. And we would also have some other costs of the foreclosure. And particularly, that's true, Judge, because these are the second deeds of trust. And I think --

THE COURT: Well, but your preliminary injunction doesn't just apply to the deeds of trust, does it, because your lawsuit is against all the entities holding all of the notes. So while the foreclosures that were stayed were the second deeds of trust, don't I have to take into consideration that

the first deeds of trust are also stayed from foreclosing on their notes, despite the fact that they weren't foreclosing, and that there could be damages to them as well?

MR. SADOWSKI: Okay. And I'll take that as a yes, you could take that into consideration, but you still don't have evidence of what would happen if they foreclosed under all the deeds of trust. You have no evidence. Zero.

THE COURT: And so your position is the discretionary bond that the Court should set for granting a preliminary injunction, in a situation where a -- the very rare situation where an injunction is granted to stop the foreclosure of real property, despite the fact that the only damages that come out of that injunction are monetary damages, should be something that requires the losing party to have come to court with an expert to show what they would have gotten on foreclosure. And the only number the Court can impose is the difference between what they could have collected and what they're not able to collect now. That's the only thing I can consider for the bond?

MR. SADOWSKI: You put a lot of stuff in there that I don't agree with, Judge. That burden --

THE COURT: Okay. Well, I mean, that's what I'm hearing you argue. You're telling me I can only come up with this very, very specific number for the bond. And I'm trying to understand what you're trying to tell me is what I can or

cannot consider if I'm going to impose a bond.

MR. SADOWSKI: Right, and that very specific number for the bond has to relate to the money that they will lose by not being able to foreclose. All right. If they foreclose, they don't get -- their interest doesn't get collected. Their default penalties don't get collected. Well, sorry.

They haven't shown you what this property would fetch at foreclosure, which is what they should have done in order to give you a reliable number to use to calculate the bond amount for damages. They haven't done it. They should have done it. They should have done it at the first two hearings. And I think they just messed up.

The bond could be revisited again at a later time, which is another reason not to dissolve the injunction, for example, if somehow the real estate tax matters become more serious or imminent. Or if they come back and say, okay, Judge, we're going to do this over again, and we're going to -- we're going to prove to you --

THE COURT: Okay. Well, I agree that if I was -- well, I agree that if I was applying District of Columbia "state law", that that may be an option. But if I'm applying federal law, and I agree with you to leave the injunction in place, which I have to apply D.C. Circuit law, I am obligated today to put in place a bond. So I can't just kick it down the road, right?

MR. SADOWSKI: Oh, no. You can put in today a nominal bond, and then you satisfied your obligation to impose a bond. And that's clear throughout the cases.

THE COURT: Okay.

MR. SADOWSKI: And on a -- and on a case where you've been provided no actual evidence of what their damages are, that is the appropriate remedy, in my opinion.

THE COURT: All right. And you disagree with Mr. Willner and Mr. Greenberg's argument that taking it straight from the language of the notes and just taking the contractual rate of interest, no default penalties, no default fees, nothing, just the contractual rate of interest on the notes for one year, not for the three and a half years, that none of that is evidence that would support a determination of an amount that's more than nominal.

MR. SADOWSKI: Correct because those numbers do not have any relation to their actual damages from not being able to foreclose, which you have not been given. Now, they --

THE COURT: So wait. The fact that -- the fact that three years have passed and interest has accrued isn't actual damages?

MR. SADOWSKI: Not if you can't collect it. But no, you don't measure the actual damages based upon three years of what's due under the note. Under the law, their burden is to show you the actual damages that they are out because they

cannot foreclose, and they have not proven that. They have not even given you a witness to give you $1 of damages on that issue.

THE COURT: And I'm inferring from your argument, as you just stated it -- and if I'm inferring wrong, tell me wrong -- but inferring from that, you're saying actual damages because they cannot foreclose, that you're arguing that I have to consider the amount of the bond as if I was sitting as Judge Lee or Judge Scott back in July and August of 2023, not on the date of removal, and not on the date I'm having this hearing today, all of which are much more -- which is further in the future and has a significant passage of time, which would provide other evidence and time.

MR. SADOWSKI: I don't think you stated that quite right, Judge, but my position --

THE COURT: Okay.

MR. SADOWSKI: -- is that under the Doe case, they can't go back and revisit the preliminary injunction factors and relitigate the preliminary injunction.

THE COURT: That's not what I said.

MR. SADOWSKI: But other than that --

THE COURT: I'm asking you, at what point in time --

MR. SADOWSKI: Right.

THE COURT: -- do I have to consider what the bond number is. Do I consider it when it was still in state court?

MR. SADOWSKI: Right.

THE COURT: Do I consider it on the date of -- this date of removal? Or do I consider it on the date of today's hearing?

MR. SADOWSKI: Our position is you don't look back at -- the furthest I think you could look back would be the date they filed their motion. But again, they would have to show you that from the date they filed their motion -- sorry. I don't think you can go back that far. It's the time period for which they are continued to be enjoined. And that's going to be, if you continue the injunction, which I believe you should, from today forward how are they damaged. What are their actual damages for not being able to foreclose. And their actual damages are not, we're going to be able to collect our interest and penalties and default fees. They are nonrecourse loans.

Their actual damages, had should they put on the right evidence, would be here's what this property would fetch at a foreclosure sale under the second deed of trust, or even the first, which they didn't give you. And if we got that money, we could -- let's say they could foreclose for 2 million. If they had that $2 million, then that $2 million would be sitting in the bank for now until your projected trial date, which is, I'm guessing, is a year out. And that amount would then be quantifiable as to their loss, what the interest they could

have earned on the money they could have got at the foreclosure sale from today until the trial date. That would be an appropriate measure of damages, but you don't have that evidence.

THE COURT: Okay. Thank you.

MR. SADOWSKI: Okay.

THE COURT: Anything further, Mr. Sadowski?

MR. SADOWSKI: Not at the moment, Judge. I just have to -- if I may be permitted off camera, I have to text my referee that I'm going to be late.

THE COURT: All right. That's fine.

Mr. VerStandig, you popped back on camera.

MR. VERSTANDIG: Yes, Your Honor. I'd like to give Mr. Willner the last word. And I'm going to be incredibly brief in rebuttal.

THE COURT: Mr. Willner. Mr. Greenberg. You want to go last-last?

MR. WILLNER: Doesn't matter to me.

THE COURT: All right. Go ahead, Mr. VerStandig.

MR. VERSTANDIG: Thank you, Your Honor. Two points, one legal, one factual.

Legally, I don't believe Mr. Sadowski can make the argument he did about the turnover claim. As this Court is well aware, in connection with request to remove the reference, Mr. Sadowski's clients have asserted time and again that there

is no core issue in these cases, meaning there is nothing arising under the Bankruptcy Code because the turnover claim is noncolorable as a matter of law. Now, obviously, we've always disagreed with that, but I don't think you can on one hand say it's noncolorable as a matter of law, and on the other hand, rest his argument upon it today.

Two, factually, on behalf of Mr. Drazin, as his attorney, with all parties represented through counsel present today, he hereby resigns as trustee under all four deeds of trust. Please release him from this injunction and if you see fit, grant summary judgment as well. Thank you, Your Honor.

MR. WILLNER: Your Honor, Steve Willner on behalf of the WCP Defendants. Your Honor, I will be certainly much briefer than I was during my opening.

I am not aware of any rule of law that provides that I have to put on or the WCP Defendants have to put on a certain type of evidence in order to prove out what we need to prove in the hearing before Your Honor. We didn't need to provide a witness. In fact, many of the arguments -- much of the evidence that have been -- that supports our position was extracted from Mr. Negussie's cross-examination testimony. The other evidence that supports our positions is from the documents themselves.

We don't need to put on a witness regarding the deterioration of the property because Mr. Negussie said it in

an email. He also said that the 423 Kennedy property is not weatherproofed. He said it's eighty percent complete and not weatherproofed. That is evidence or if not deterioration, but exposure to the elements, which is not being protected by the Plaintiff, by 423 Kennedy, because they don't have money to protect it.

The lack of inspections of a property is just simply a red herring. We didn't need to inspect the property because again, the testimony regarding the state of play, or the change in the state of play of the property, comes from Mr. Negussie himself and the documentary evidence on the record.

Similarly, we don't need a witness to describe the damages that would matriculate to the junior lenders, JPK NewCo, on these loans. In fact, Mr. Sadowski made the point for us. It is exactly right that due to the significant interest and default interest and even regular interest that has accrued on the senior debts -- on the senior debts on both of these properties in the interim, that it is very likely that if these properties were to be foreclosed from the second position today, the damage to the junior position would be they wouldn't get any money.

And that's because of the delay. Of the passage of time. Of the three years of accrued interest. So that is the damage. And like Mr. Sadowski said himself, what is likely to happen is that if these properties were to go to foreclosure,

no one would bid on them.

And that is a material change in circumstances from what would have happened in 2022 or 2023 if foreclosure occurred because the amount of debt or amount of interest that would have accumulated on the first position loans would have been significantly less. And as Mr. Sadowski again himself noted, the market for real estate was better. The interest rates were lower. The market was better. We didn't need to put on this evidence because Mr. Sadowski said it himself, and Mr. Negussie even hinted to it in his testimony when he said that the real estate market has changed. It's worsened. And therefore, the property values are not where they could have been.

So and regarding the type of evidence or the manner in calculating damages, Mr. Sadowski is arguing and has been arguing that the type of evidence we needed to -- we needed to provide was basically evidence regarding diminution of value, that here's what we would have fetched in a -- here's what the properties were worth in 2022-2023. Here's what the properties are worth now. That's simply incorrect, and he cited no case to support that. The time value of money that is lost here from delay and from enjoinder is -- I'm sorry, from injunction is reflected in the interest rate.

And I quote again from the Allen v. Yates case, which I quoted during my primary argument. And again, that's 878

A.2d 39, page 52, of the D.C. Court of Appeals in 2005. And the court there said,

"The increase of the rate to thirty percent in case of default, on the other hand, was intended to encourage timely payment of the indebtedness and to compensate the lender for the time expended and for the value of money lost as a result of any delay in obtaining a judgment."

So to the extent that there was a question about what the purpose of interest is in a loan, the purpose of interest in the loan is, A, to compensate the lender for lending his money in exchange for -- right. It's an agreement in exchange for where the borrower gets money and the lender gets money on their money. And B, the default interest, which increases the amount, is to further compensate the lender for the damage of not having its money back at the time that it was contemplated. Right. The lender loans on the assumption that they're going to get their money back at the maturity date. If you don't get your money back, here's your damages.

It's inherent in the documents. We didn't know -- we don't need a witness to say that. A, it's common sense, and B, it's reflected in the case law. That's the basis of our damages, and that's been proven. And it's just a matter of math at that point, and the math that is what Mr. Greenberg provided.

Regarding the defaults and Mr. Sadowski's point that nothing is new on that end, perhaps that's true. Well, I think there are arguments that weren't properly considered by Judges Lee and Scott at the time that they were issuing their preliminary injunctions under emergent and expedient circumstances. But it's worth revisiting because again, Your Honor, at this point, has the occasion to dissolve the preliminary injunctions simply on the basis that they violate federal law under Section 28 U.S.C. 1450. So Your Honor has the opportunity to make a decision whether to dissolve them outright or to modify them and impose a bond.

We would submit that they should be dissolved, particularly because there is no -- there is no -- it would be improper to continue them, for them to be revitalized, because that's essentially what the Court would be doing is revitalizing preliminary injunctions that were issued improperly because there is no likelihood of success on the merits in this case. The defaults are manyfold. Six categories. Yes, six categories of defaults. And therefore, they are worth revisiting by this Court.

The passage of time argument, that it is all the WCP Defendants' fault, there's blood on all parties' hands, Your Honor, on this one. The WCP Defendants removed the cases from Superior Court to federal court. And ever since then, Plaintiffs have been fighting to get them back to Superior

Court. And that's what's been happening for the past year plus is procedural gamesmanship. Fight over where to fight. There' is reasons on both sides.

The bottom line is, is for whatever reason, whatever has transpired over the past three and a half plus years, we are where we are. It's been three years. That wasn't the contemplation of the preliminary injunctions when they were issued. Three years is just far too long. It's a material change in circumstances.

And I'm glad that Your Honor -- and I apologize. I neglected to raise the idea of the $800,000 that has been spent. And it is a good question about whether the Plaintiffs could have used the $800,000, instead of on attorneys' fees and maintenance costs, on actually cost to complete the project, at a minimum to finish -- to waterproof the building, the 423 Kennedy building.

It is correct that there isn't specific evidence regarding what the cost to complete construction were or would have been. But the evidence is clear that the Plaintiffs did spend $800,000 on attorneys and maintenance costs, and $600,000 of that on attorneys' fees, rather than putting that money into the projects, or like I suggested, and what was elicited from Mr. Negussie's cross-examination, or to cover a refinance shortfall. And particularly that $800,000 would have gone a long way towards covering a refinance shortfall, so that the

parties -- so that the Plaintiffs could have mitigated their damages significantly, closed the refinance, not had to worry about lenders breathing down their neck, completed the construction projects, and then they could have sued the WCP Defendants for damages, had they so -- had they so deemed it was the right idea.

And it is -- well, strike that. I want to quickly address the applicability to the senior lender. Under Rule 65(d)(2), Rule 65(d)(2) provides that every order granting an injunction and every restraining order must -- I'm sorry. I'm in the wrong rule. That was (1). Subsection (2), persons bound.

"The order", meaning the preliminary injunction order, "binds only the following who receive actual notice of it by personal service or otherwise. (A), the parties. (B), the parties' officers, agents, servants, employees and attorneys. And (C), other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."

Suffice it to say, there is likely an argument, and I'm sure Mr. Sadowski would make this argument, if the senior lenders went ahead and foreclosed today or put in motion foreclosure today, that the senior lenders, the senior noteholders, are bound by the preliminary injunction. Of course, I'm sure the senior lenders will be more than happy for

a ruling saying that they're not bound by the preliminary injunction. But I think all the parties up until today were under the -- were operating under the assumption that the senior lenders are bound by the injunction.

And in fact, that is exactly what Judge Scott stated in her order. She stated that -- and I'm reading from page 5 of Judge Scott's injunction. Whatever. I guess it's a preliminary injunction at this point. She wrote, "Order that this order enjoining any foreclosure sale applies to SF NU LLC," who is a senior loan noteholder on Developer RE1, "and the Defendants must immediately notify SF NU LLC of the contents of this order."

So yes, the Court should, and we believe that it would be a proper exercise of discretion for the Court to consider the impact of an injunction on the senior lien holders and to take that into account when fashioning the bond amount, when certainly the Plaintiffs will assert that this preliminary injunction, if it continues, binds the senior loan holders. Certainly, that is damages that should be encapsulated in setting a bond amount. And that is all I have. thank you, Your Honor.

THE COURT: All right. Thank you.

MR. GREENBERG: Yes, Your Honor. Jeffrey Greenberg, just very, very briefly.

THE COURT: Um-hum.

MR. GREENBERG: There's no doubt in this case that the loans were advanced. As Mr. Willner stated, the interest, which can be determined by the evidence in the record, reflects the time value of the money. The loan documents speak for themselves. Mr. Negussie testified that there's little to no equity in the property and that we're experiencing a worse real estate market than what existed in 2022.

With respect to actual damages, there is no doubt that by virtue of the injunction, the WCP Defendants experienced actual damages. The Developer RE1 senior loans accrue interest at a nondefault clip of $286,000 per year and at the default rate, $89,000 a year. The 423 Kennedy senior loans accrue interest at a nondefault rate of $781,203 a year at the nondefault rate, and the default rate is $2,085,526. So there's no doubt that by virtue of the delay in these proceedings and the injunction prohibiting the foreclosure, that the WCP Defendants continue to incur damages. And the suggestion of no evidence is unavailing.

Also, I think a bond should reflect the protective advance that the bank would have to make to take these loans out of tax sale or pay the taxes with respect to Developer RE1 property. Again, those are amounts that prime both the senior lien holders and the WCP Defendants' interest. And the suggestion about the automatic stay is, in my view, a fundamental misreading of Section 541 and Section 362 of the

Bankruptcy Code. I don't think it's even close. And we would finally just submit that a bond is appropriate in this case in the amounts that were previously suggested to the Court. And in no way do the facts, equities, law, et cetera favor a nominal bond in this matter. That's all.

THE COURT: Mr. Sadowski, you came back on camera. Was there something else you wanted to say?

MR. SADOWSKI: I did not want to say a thing, Judge, because I took your cue from the other day. Like, just because you're quiet doesn't mean I can start talking. But if you want the --

THE COURT: Yeah.

MR. SADOWSKI: Windforge, Judge, they cited it. This is precisely my point. Right. You have to measure the damages caused by the injunction.

THE COURT: I understand your -- I understand your argument, Mr. Sadowski.

MR. SADOWSKI: Yep. And I couldn't find any other case, nor could Alex, nor could Spencer, nor could Erin, that was closely mirroring the facts of the case. And that case specifically deals with a bond set in a foreclosure scenario. And I think that's probably right on the money, without having read the case.

THE COURT: All right. Thank you, all. I'm going to go talk to my law clerks.

MR. GREENBERG: Thank you, Your Honor.

THE CLERK: Thank you, Judge. Court is in a brief recess.

(Recess 12:39 P.M./Reconvene 1:19 P.M.)

THE CLERK: This court is again in session.

THE COURT: All right. So as a preliminary matter, on Monday, before we went into the evidence and argument, the Court heard the question of whether the existing orders issued by the two Superior Court judges, Judge Scott and Judge Lee, were temporary restraining orders, which would then be subject to a preliminary injunction hearing, or preliminary injunctions.

At the conclusion of that -- at the conclusion of the argument and before we begin this, the Court made a finding consistent with federal law that the fact that both of the injunctions extended past the rules and statutory allowed twenty-eight-day period for a temporary restraining order, by their terms, despite the language contained therein, meant that both of those matters were preliminary injunctions, which would continue up until the Court modified or dissolved them under Federal Rules of Civil Procedure 65 or Federal Rule of Bankruptcy Procedure 7065.

We then held an evidentiary hearing, including testimony of a witness for both the movants, which are the WCP Defendants and Mr. Drazin, as well as the testimony of Mr.

Negussie for the RE1 and 423 Kennedy Plaintiffs. In addition, the Court accepted and had a number of exhibits entered into evidence, as indicated on the record at the hearing, in which the Court kept record of, including most of the exhibits from the moving parties, except for Exhibit X, and the Exhibits Numbers 39, 40, and 1 through 8 of the Plaintiffs. Upon that record, the Court adjourned the hearing to today for continuance and oral argument for conclusion, and now the Court is prepared to issue an oral ruling on the Defendants' motion to dissolve.

As an initial matter, the Court agrees with the Defendants that the Gray Goose case controls. That upon removal of a state court injunction to federal court, that this Court has the ability and the obligation -- Granny. Sorry, Granny Goose. I cited the Gray Goose matter. Really, let's just be real. That's what I feel like having today. We're going to redact that from the transcript, just to be very clear. The Granny Goose case does say that this Court has the obligation to review and to consider a motion to dissolve upon request of one of the parties, if removed from state court.

I also agree with -- I also am bound by the record as I find it and that one the injunctions are removed from state court to federal court, that the Court applies federal law to the consideration of the motion to dissolve. It is clear that the parties are bound by the orders until such time as this

Court considers and modifies or dissolves the injunction -- modifies or resolves the injunction. And so in this case, I'll apply federal law. District of Columbia Circuit law.

I will note that Judge Lee's opinion states the standard for an injunction under D.C. state law, but also cites to a D.C. Circuit law. So it's unclear from the Court what law Judge Lee necessarily applied to his analysis. But I have to take it that he mostly applied, or I have to infer that he applied state law, since the one citation was to a circuit court case but does not go to the standard to which he applied.

Upon review of both injunctions, and as is noted by the parties, Judge Lee makes extensive findings after a hearing on his motion, of which Judge Scott adopts the findings and conclusions as to tortious interference with business claim. Judge Lee makes a finding under both breach of contract, whereas Judge Scott -- or breach of contract and tortious interference with business opportunity, whereas Judge Scott's findings are limited just to the second.

And that was highlighted by today's argument, that there really wasn't an argument on breach of claim because there were not construction draws related to the obligations under which Judge Scott was considering her order. It is clear that both injunctions applied not just to the second lien holders, but to the first lien holders, and that they've been bound by them since the entry in late -- or in mid-2023.

Court acknowledges the Doe case, which has been cited as the most recent opinion from the D.C. Circuit on the question of dissolution of injunctions, and that the parties seeking to dissolve an injunction has the burden of showing a significant change in either factual conditions or in law, such that the continued enforcement would -- sorry, that they have to show a significant change in the factual conditions or in law, or in the alternative, could show that continued enforcement would be detrimental to the public interest.

That originates from a Supreme Court case, which had three alternatives, although only two were argued here. And while Doe states it as a conjunctive, the Court's review of the Supreme Court authority that Doe relies upon shows that the real standard is a significant change in factual conditions or in law or alternatively, detrimental to the public interest, that that doesn't have to be a conjoined standard in this case.

In applying federal law to the two existing injunctions, the Court finds that the injunctions do not meet the standard for federal injunctions because they do not require a bond. Now, that doesn't mean that -- I don't believe that stands alone as a reason to dissolve the injunctions. While I appreciate the citation to the District of Minnesota case, Mr. Willner's very skilled argument mentioned that there were three reasons, and the other two, I think, are more valid than just the lack of a bond, it being

that the lower court did not state its reasoning and specificity as required by Rule 56. In addition, the other -- I pulled up the other one. Sorry. In addition, in that case, the injunction was issued without notice and without the opportunity of the opposing party to respond in any way to the motion.

So while it does list three factors, one, two, and the third being the failure to impose a bond, I think, taken in consideration if that's the only -- that really is the primary authority being relied upon, that the nonissuance of a bond is sufficient grounds to fully dissolve an injunction from state court isn't sufficient for me to find that that's a sole and that that is a sufficient ground on its own to grant the motion to dissolve.

However, it does mean that I now know that the -- it does make a finding that the injunctions as issued from the Superior Court do not meet federal law, and the Court must then make a decision whether there is sufficient grounds to dissolve the injunctions entirely or to issue a bond. I'm going to take the first question up first.

As I said, under Doe and the authority that it relies upon, the movants had a burden to show there was a material change in law or facts. And it is clear that that is a change from the entry of the original order through the date of the motion to dissolve and when it's heard by the Court. As an

initial matter, there is a significant change in law in that we have moved from the District of Columbia state law to the District of Columbia Circuit law, and there is a different standard of application of standards for imposition of an injunction. There is a slightly different standard.

Judge Lee, as I mentioned, cites to the D.C. Circuit standard to not use a totalities test, but he cites to a language. But it shifts from the case that he cited. It relies on that earlier case, which is more of a totality of all of the elements, whereas circuit law has moved now to likelihood of success on the merits or irreparable harm being the two main factors.

Judge Lee found likelihood of success on the law on both counts. As I mentioned, Judge Scott found likelihood of success on the law -- or on the merits, sorry, not on the law, on the merits, just with tortious interference.

However, Judge Lee also makes a finding, and Judge Scott simply adopts this finding of an irreparable harm finding. And that is under the -- it is not specifically stated how he comes to that, other than a reference to that the property is property, and they may lose it. That is not the standard under the D.C. Circuit when it comes to a real property economic loss question. It has been law of this circuit since at least 1985, if not before, that economic loss in itself does not constitute irreparable harm.

In fact, the D.C. Circuit held earlier than 1985, all the way back in the Virginia Petroleum case, but quoted it extensively in Wisconsin Gas v. FERC from 1985, that,

"The key word in the consideration of irreparable harm is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later day, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

Judge Lee found irreparable harm solely on the argument that there was a property that had been developed. It had been seventy to eighty percent developed. And that if foreclosure happened, the -- I want to make sure I have his order up. He specifically says, "The property is unique, and the money damages would do nothing more than a potential monetary loss, to the extent such loss could be quantified by money." He previously states, "A foreclosure sale would undoubtedly result in the loss", typo, loss, "of investment for Plaintiffs and would almost certainly mean they would never see the fruits of their labor, the completion of the project."

However, Mr. Negussie testified on Monday that he has really no intention of finishing these projects. That this is -- no one wants it. One's a teardown. And there isn't the

money to develop these projects in any way. So even if at the time the injunctions were entered, the purpose that they were testified that the party -- that the Plaintiffs intended to continue to develop them, the testimony on Monday was essentially contrary to that, that this is not something that's going to be completed.

Furthermore, there was argument on this, and Judge Lee recognized that the bankruptcy option, while initially appealing, overlooks the impact bankruptcy will have on the ability of Plaintiffs to secure financing to complete the project if they prevail on the merits is an inaccurate statement of bankruptcy law on its face. DIP lending is very prevalent.

And while I can appreciate what Judge Lee thinks about how you can restructure in this court, I do take knowledge that these were issued on the eve of foreclosure. But the ability of bankruptcy to be filed now is a very much different state, and I disagree with Judge Lee's unsupported, uncited, and based conclusion with respect to bankruptcy option, or no other option available in law.

He then just says likelihood of irreparable harm for Plaintiffs is significant. I can only infer from his finding in that order that he's relying on the economic loss potential to the Plaintiffs. And as is very clear from all the District of Columbia law that economic loss is not in and of itself

sufficient to argue irreparable harm.

So for that reason, I find that there is a change in law sufficient to show that there would be -- there are two changes in law which would be sufficient to establish a reason to dissolve the injunction. One is that the Plaintiffs don't have a showing -- that there is a change in the standard for irreparable harm, and the fact that all of the causes of action, except for a cause of action for entry of a permanent injunction, which actually isn't a cause of action, it is a remedy, all ask for monetary damages and are compensable with monetary amounts. And that Judge Lee did not substantiate anything beyond an economic loss to the parties.

And the District of Columbia Circuit law for decades has said that economic loss is insufficient to establish irreparable harm for the purpose of an injunction means that the Defendants would have failed the second prong, had they been evaluated under District of Columbia Circuit law. In addition, the failure to issue a bond makes it an invalid injunction under District of Columbia Circuit law. And that, combined with the irreparable harm issue, would be sufficient to find there's a change in law that would support a change in -- a change to dissolve.

Furthermore, there's also a change in facts that would be -- I find also raises to the issue to support dissolution. The operating agreements, which are in evidence at Exhibits S

and T in this case, specifically state that the purpose of these two entities -- and I'm going to quote. Exhibit S is from -- oh, gosh, hold on. Computer just froze. Let's try T. Okay. We're going to give S a moment to get its thing together.

So S and T is Developer RE1. Specifically, the purpose of Developer RE1, in section 2.3 of the operating agreement, which is entered into evidence at Exhibit T, says the company's purpose is -- the purposes of the company were to purchase, own -- I'm paraphrasing without putting the gerunds in -- but purchase, own, lease, manage, and develop and sell the real property at 67 to 61 Kennedy Street.

Similar language is found in -- come on. Sorry. I have to reopen Exhibit S.

Similar language is found in 423's amended and restated operating agreement in section 1.4, which is described as business of the limited liability company. "The purposes for which the company is organized are the investment, ownership, and management of real property, investment, ownership, and management of personal property, lawful investments, engage in all other activities," which implies that this was to develop.

While this one doesn't specifically talk about the property that's in question here, it was referenced by Mr. Negussie as to both properties in his testimony that the intent

was never to retain these properties and manage them. The intent was to build and sell and make money on their investment and that that's no longer going forward. At the time the original injunctions were issued, the businesses were attempting, or had been attempting, to develop the properties.

It's been three years. Mr. Negussie's testimony, uncontroverted, was the only thing he has done on the property was to patch holes, essentially. The property remains in the same seventy-five to eighty percent completion as it was referenced in the injunction. It is specifically referenced in the injunction issued by Judge Scott. I think it's also specifically referenced in percentage by Judge Lee. That was a percentage I find it now three and a half years later.

If the purpose of these -- the purpose of these two entities was to develop and do this, simply letting these properties sit without any improvements, any change, anything, while investing hundreds of thousands of dollars in lawsuits and only to patch holes, seems that they are not operating in accordance with their operating agreements. And that is a change in circumstances, including Mr. Negussie's testimony, which said they don't intend to develop them. They're not going to develop them. They're simply going to sit and wait. That is a difference and a change in the operation of the business, which would be a change in facts.

There is also a question of the use of money in these

cases to do something other than to advance the business purpose. The use of the money here was to litigate. To fight. To continue to use those. I mentioned that there are other available remedies at law, as opposed to the -- there's a change in facts there. These were both heard on the eve, or with a notice of foreclosure, on the eve of notice of foreclosure, where there was a credible threat to lose the properties. Those have been canceled. There's no leave -- there is no foreclosure being scheduled here. There is nothing pending because they've been stayed for three and a half years from collecting on their debts.

There's, as was noted, that it takes a significant period of time in D.C., at least more than thirty days, to complete a commercial foreclosure. And that is a significant change over the fact that these lawsuits were filed within days of the date of foreclosure. And both judges thought the bankruptcy, while a possible argument in a different situation, was not a viable alternative as of the date. That's a different set of facts here as well.

In addition, there's a significant change in the tax status of these properties. District of Columbia law gives a four-year period in which to receive exemptions from being a vacant or blighted property. Mr. Negussie testified to that in some ways. He testified that they had run out of their allowed exceptions. And I can take judicial notice of the D.C. Code,

which allows for only four years to apply for and obtain those exemptions. It appears that these properties lost that after the 2023 tax year because 2024 has been taxed at a vacant rate. 2025 has been taxed at vacant rate.

While Mr. Negussie testified he is independently, on behalf of both entities, trying to see if there's other mitigations, the facts are that the properties themselves are no longer allowed, under this ownership, have an entitlement to request to not be declared vacant properties, meaning that they will continue to accrue taxes at a higher amount of taxes as a vacant property, as opposed to a status of properties occupied, into the future until they're developed.

And instead of making them developable, habitable, moving them forward, Mr. Negussie has simply chose to challenge the tax classification, or the classification of the property for tax rate purposes, meaning that that is a material change of facts as well. The properties initially were being under -- were being developed, but now that they've been sitting for three and a half years, they will continue to incur much higher taxes.

In addition, as both parties concede, the fact that there is one that has been subject to a tax sale, there is at least one half of year, if not more, of unpaid taxes on both properties impairs the liens. They're not being paid. And the companies themselves have argued today that they were not under

an obligation to pay the taxes under the notes. Well, they're the owners of the property. I'm not sure I understand that argument. But nonetheless, there is a material change in facts by the tax classification of these properties in moving forward.

There was much made about the passage of time. The accrual of interest. The accrual of interest, the terms of the notes, all of that were before Judges Lee and Scott and wouldn't be necessarily appropriate facts to take into consideration with respect to whether or not there's been a material change in facts sufficient to dissolve the injunction.

However, the change in the purpose and operation of the business, in contrary language to the operating agreement and the way they were operating as of the date of the entry of the injunctions, the change in the circumstances as to the timing, the existence of a pending foreclosure action, or the ability of or a notice foreclosure or intent to foreclose being noticed and the timing and the availability of other adequate remedies at law, including filing a bankruptcy or other action therein where they could obtain relief, the change in the status from the ability to seek tax relief or to seek exemptions under D.C. law having expired and being no longer available, and the stated intention of Mr. Negussie no longer develop the properties but simply are trying to hold on to them to make sure they can be sold and to recover his recruitment,

all support a finding that there have been a significant change in facts that support the dissolution of the injunction on a factual basis as well.

So for both those reasons, both the change in law, as to the requirement of a bond that would be sufficient to cover the potential damages, the testimony that that bond could not be posted, and the fact that the irreparable harm standard applied by Judge Lee, and relied upon and assumed by Judge Scott, not accepting or not relying economic harm exception or the economic harm rule applied by the D.C. Circuit means that there is sufficient change in law. And for the facts that I just elicited, a sufficient change in post facts, not even taking into consideration the numerous defaults and all of that, just post facts, would be sufficient for the Court to find that there's been a change sufficient to dissolve the injunction.

So I'm going to enter an order dissolving the injunction for the reasons stated herein. However, I'm going to stay the dissolution for fourteen days, so that if an appeal is docketed and a motion to stay -- and a motion for stay pending appeal is filed, the question and sufficiency of a bond can be addressed therein under Bankruptcy Rule 8007(a)(1)(B), if brought before -- when brought before this Court, and again, if this Court denies it, if brought before the District Court on appeal.

So the Court will order that the stay is -- that the two injunctions are dissolved for the reasons stated herein. That the dissolution is stayed for a period of fourteen days, which would allow for the order to become a final order. If the order is appealed and a motion for a stay pending appeal is filed, the question of what an appropriate bond would be would be appropriate to bring up at that time under Rule 8007(a)(1)(B).

Are there any questions in the Court's ruling today?

MR. VERSTANDIG: Your Honor, will the Court prepare an order, or is it looking to the parties to do so?

THE COURT: If I enter an order, it's simply going to say for the reasons stated on the record in my oral ruling, and reserving the right to supplement with written findings consistent therewith. Is there something more? If there's something more that the parties are looking for in addition to that, I would ask you to submit that.

MR. WILLNER: No, Your Honor. That would be fine for the WCP Defendants.

THE COURT: All right. All right. So that'll be the order. The Court will enter an order that, for the reasons stated on the record at the hearing held October 21st, 2026, in its oral ruling, the stay will be dissolved under Rule 65, but stayed for a period -- that dissolution will be stayed for a period of fourteen days, pending anything further being filed,

and reserving the rights to supplement with written remarks or written findings consistent with the findings today.

All right. Thank you all for very good argument and for a very good presentation. And I'm going to go to the panel that I'm now fifteen minutes late for.

IN UNISON: Thank you, Your Honor.

(Whereupon, at 1:44 p.m., the hearing was adjourned.)

I N D E X


| RULINGS: | PAGE | LINE |
|---|---|---|
| Defendants' motion to dissolve injunction is granted, with modifications, as noted on the record | 106 | 16 |

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/

______________________________ Date: November 9, 2026

ESCRIBERS LLC