UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| In Re: | . Case No. 25-00200-ELG |
| | . Chapter 11 |
| JPK NEWCO LLC, | . |
| | . Washington, D.C. |
| Debtor. | . October 19, 2026 |
| . . . . . . . . . . . . . . | . |
| DEVELOPER RE1 LLC, ET AL., | . Adv. Proc. 25-10037-ELG |
| Plaintiffs, | . |
| -against- | . |
| DP CAPITAL LLC, ET AL., | . |
| Defendants. | . |
| *************************** | . |
| JPK NEWCO LLC, ET AL., | . Adv. Proc. No. 25-10015-ELG |
| Plaintiffs, | . |
| -against- | . |
| DEVELOPER RE1 LLC, ET AL., | . |
| Defendants. | . |
| *************************** | . |

PRELIMINARY INJUNCTION HEARING
SCHEDULING CONFERENCE - MOTION FILED BY DEVELOPER RE1 LLC AND 423 KENNEDY ST HOLDINGS LLC
BEFORE HONORABLE ELIZABETH L. GUNN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor: WOLFF & ORENSTEIN, LLC
By: JEFFREY M. ORENSTEIN, ESQ.
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850

For the Plaintiffs: GREENSTEIN DELORME & LUCHS, P.C.
By: JAMES D. SADOWSKI, ESQ.
ALEXANDRIA J. SMITH, ESQ.
801 17th Street, Northwest
Suite 1000
Washington, District of Columbia 20006

For the WCP Defendants and Special Counsel to the Debtor: ROSENBERG MARTIN GREENBERG LLP
By: JEFFREY S. GREENBERG, ESQ.
25 South Charles Street
21st Floor
Baltimore, Maryland 21201

NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.
By: STEVEN J. WILLNER, ESQ.
One South Street
27th Floor
Baltimore, Maryland 21202

For the Defendant Russell Drazin: THE VERSTANDIG LAW FIRM, LLC
By: MAURICE B. VERSTANDIG, ESQ.
9812 Falls Road
Suite 114-160
Potomac, Maryland 20854

Also Present: RUSSELL DRAZIN

MEL NEGUSSIE

Proceedings recorded by electronic sound recording.
Transcript produced by transcription service.

(Proceedings commenced at 10:45 a.m.)

THE CLERK: All rise. All persons having business before the Honorable Elizabeth Gunn of the United States Bankruptcy Court for the District of Columbia, draw nigh and give your attention. This honorable court is now in session. Please be seated and come to order.

On today's calendar, I have case number 25-10037, Developer RE1 LLC, et al. v. DP Capital LLC, et al. Matter before the Court is the preliminary injunction hearing. We also have a scheduling conference in the motion filed by Developer RE1 LLC and 423 Kennedy Street Holdings, LLC in the main case 25-200, JPK NewCo LLC, and the two related adversary proceedings.

Will the parties please come forward and state your name for appearances?

MR. SADOWSKI: Good morning, Judge. Jim Sadowski for the Plaintiffs.

THE COURT: All right. I don't mind if you do it from there, but I want to make sure we're picking you up so --

MR. SADOWSKI: Oh, sure.

THE COURT: Okay. We are. Go ahead.

MR. SADOWSKI: Can I stay seated then, Judge?

THE COURT: That's fine.

MR. SADOWSKI: Probably better. Good morning, Judge Gunn. Jim Sadowski for Developer RE1 LLC and 423 Kennedy St

Holdings LLC. Seated with me at counsel table is Mel Negussie, who is a witness, potential witness, and Alexandria Smith of my office.

THE COURT: All right. Good morning.

MR. SADOWSKI: Good morning.

MR. WILLNER: Good morning. Good morning, Your Honor. Steve Willner, on behalf of the Defendants DP Capital LLC, WCP Fund I LLC, and Daniel Huertas.

THE COURT: All right. Good morning.

MR. GREENBERG: Good morning, Your Honor. Jeffrey Greenberg, on behalf of the Debtor and the additional clients that Mr. Willner represents.

THE COURT: All right. I think we picked those up.

Go ahead.

MR. VERSTANDIG: Good morning, Your Honor. Maurice VerStandig, on behalf of Russell Drazin, who's joining me in the courtroom today.

THE COURT: All right. Good morning. All right.

MR. SADOWSKI: Mr. Orenstein, Judge, is on Zoom.

THE COURT: Oh, Mr. Orenstein, I'm sorry. Go ahead.

MR. ORENSTEIN: Good morning, Your Honor. Jeff Orenstein, on behalf of the Debtor. I'm not sure my presence is required, but given the confusion last week, I wanted to appear.

THE COURT: I think we figured out last week that

special counsel is handling all this, but you're welcome to obviously observe.

MR. ORENSTEIN: Thank you, Your Honor.

THE COURT: Any other appearances on Zoom?

No. All right.

MR. SADOWSKI: And Judge, I know Ms. Mathewes was thorough, but I believe we're also here on the motion to dissolve injunction, and I'm not sure if she mentioned that in her --

THE COURT: Yeah. She called the preliminary injunction hearing.

MR. SADOWSKI: Okay.

THE COURT: That's what she called it.

MR. SADOWSKI: Okay.

THE COURT: All right. Any preliminary matters before we begin?

MR. SADOWSKI: There's two, Judge, I believe.

THE COURT: All right. Well, when you're going to do them, come to the podium --

MR. SADOWSKI: Sure.

THE COURT: -- just so everybody can see you.

MR. SADOWSKI: Good morning, again. Jim Sadowski for the Plaintiffs. Judge, we did file this morning a supplemental memorandum. Actually came across that research over the weekend. Congratulate Alex Smith for finding that case. But

in our opinion, the D.C. Superior Court orders were, under federal law, preliminary injunctions and therefore, under the Doe case, which --

THE COURT: So tell me why the paragraph before the ordered paragraphs, which says I have to set a preliminary injunction hearing, and I'm going to do that in conjunction with the trial, makes Judge Lee's order a preliminary injunction itself.

MR. SADOWSKI: I agree there's a conflict there, Judge, but as --

THE COURT: Okay. Well, then I'm overruling that argument. It is a temporary restraining order, Mr. Sadowski. It was filed as a temporary restraining order. The standards put forth in the order were a temporary restraining order. I don't appreciate getting a memorandum on the morning when I told you I wasn't going to be here. I've clearly read it. I've also read the Doe case.

Underlying the Doe case was a full scheduled preliminary injunction hearing on more than three days' notice, which allowed for discovery before then. That's not the case here. This was a three-day hearing. And while there were witnesses, under all of the rules, it would nonetheless only allow for a temporary restraining order to be entered. I'm not sure how you get past any of those factors to get to argue that the use of the word injunction, despite the clearly stated

intention of the judge in the paragraph before, changes this to anything other than a temporary restraining order.

MR. SADOWSKI: And the answer to that, Judge, is as once these cases were removed over here, federal law applies. And federal law clearly states, under the cases we cited, that orders, no matter how they're titled, become preliminary injunctions when the relief extends beyond the TRO period. And in Judge Lee's order, he --

THE COURT: What part of that -- what part of Rule 65 says that?

MR. SADOWSKI: It's not in Rule 65, Judge.

THE COURT: Okay.

MR. SADOWSKI: It's in the cases that we cited in the supplemental memorandum, that it doesn't matter how a judge titles something, and this perhaps was an error on the judge's part, under federal law, those TROs, as they were called, became preliminary injunctions because they extended beyond fourteen days. Both of them said they extended until further order of the Court, and we know that they extended way beyond a normal traditional period.

And on top of that, Judge, those cases --

THE COURT: So wait. Hold on. I want you to tell me which cases in your supplemental memorandum because I've read Doe. It's not in Doe.

MR. SADOWSKI: Oh, you're right. It's not in Doe.

Give me a -- Court's indulgence.

THE COURT: Um-hum.

MR. SADOWSKI: Yeah. It was, I believe, Turner v. Epps and Sampson v. Murray, but --

THE COURT: All right. Hold on. Give me a minute to look at this.

MR. SADOWSKI: -- let me make sure of that. And we probably should have attached those cases, Judge, to the supplemental briefs. Yes, Turner v. Epps and Sampson v. Murray. That's cited on page 2 of the supplemental memorandum.

And what those cases also said, Judge, is that you actually have to look at, under federal law, what actually happened at those proceedings. And these TRO motions weren't just filed on very short notice. And in particular, the Developer RE1 motion, it was filed in December with the original complaint. There also was a prior TRO involving 423 Kennedy's first case that was heard and denied.

And in both of those proceedings, as noted in the supplemental memorandum, the judge heard evidence. It was a contested hearing. There was motions practice. There were witnesses. There was oral argument. And the Turner and the Sampson case says, when you have that type of proceeding, that is, in effect, a preliminary injunction hearing.

And then we also pointed out, Judge, although we couldn't find a case under Rooker-Feldman that was directly on

point, it makes sense. Their remedy to appeal a preliminary injunction, or a TRO that turns into a preliminary injunction, is with the D.C. Court of Appeals. They never took advantage of that remedy all the way through the time they removed the cases. And the reason I think Rooker-Feldman applies in principle is because they're doing what I had said kind of at the beginning of these cases, when they first started. They're treating this Court as an appellate court over a state court decisions, and under Rooker-Feldman, that's wrong.

So I concede that the way the motions were filed and the orders were issued do not --

THE COURT: So I want to go back. I'm going to go back because you're --

MR. SADOWSKI: Yeah.

THE COURT: -- sending me to the Epps case --

MR. SADOWSKI: Okay.

THE COURT: -- in which a circuit court normally does not have jurisdiction to consider a TRO. But given in a very limited situation, when the district court's granting of a TRO has the same practical effect as the granting of a preliminary injunction, it makes it immediately appealable. In what sense did the granting of the TRO in this case essentially turn into a preliminary injunction, unless and until you're arguing that magically later on, when it was removed, it does that, in which case, this is not on point at all.

MR. SADOWSKI: It turned into a preliminary injunction because federal law says it did. It turned into --

THE COURT: You're quoting me one case from the Fifth Circuit and one in a Supreme Court case, which I also don't think is particularly on point. It is a very limited exception in Sampson v. Murray. So is there any controlling law in the D.C. Circuit, if I don't accept that Sampson v. Murray from 1974 is still good law, saying that Rule 56 has been modified since then?

MR. SADOWSKI: I did not --

THE COURT: I mean, or that it's not applicable or directly on point?

MR. SADOWSKI: We did not view this -- Alex not find the D.C. Circuit case --

THE COURT: Okay. So you're trying to argue me that federal law definitely magically turned this TRO into a preliminary injunction, despite the fact the only authority you have is a 1974 Supreme Court case and a Fifth Circuit case that was basically a very limited and narrow exception to the rule?

MR. SADOWSKI: I'm telling you, federal law applies because it does. They've argued that. And --

THE COURT: Right. Well, I'm giving you that, but you're telling me federal law necessarily magically turned this into a preliminary injunction, despite the clear language of the orders.

MR. SADOWSKI: Federal law considers what was done below as a preliminary injunction.

THE COURT: Based upon these two case?

MR. SADOWSKI: On those two cases.

THE COURT: A Fifth Circuit case and a 1974 Supreme Court case, right?

MR. SADOWSKI: Correct.

THE COURT: Okay.

MR. SADOWSKI: And well, depending on where things goes, I'm happy to have Ms. Smith do some work while we're sitting here to see if she can find any additional authority for that.

THE COURT: Well, I mean --

MR. SADOWSKI: And in light of that, Judge, I think just, you could, without prejudice, start the hearing on the motion to dissolve the injunction and then see where we're at. I'll have Ms. Smith look for some more cases. But I don't think you're going to find those that vary from those decisions.

And remember, like, a TRO is typically -- some of them are handled without notice, which is why the reason it's temporary. These were all issued with notice, with a contested hearing, and in the Developer RE1 case, it was seven months' notice because they had filed a motion for TRO with the complaint. So there was already discovery. There was no

unfair surprise for them at that TRO hearing because we were already well into discovery in that case.

And so I think it's inescapable. There's no contrary authority that I'm aware of, although, I granted, they got that this morning. And I would have loved to have gotten that to you sooner, Judge, but we literally came across a research yesterday afternoon. And that's just a function of how Ms. Smith and I broke up the work for this hearing. I did the preparation on the facts and the state law stuff, and she handled the federal stuff. The federal research, I should say.

THE COURT: All right. Hold on. I want to look at the underlying case here.

MR. SADOWSKI: Sure.

MR. WILLNER: Your Honor, I don't mean to interrupt Your Honor's concentrate on reviewing some case, but we do have some responsive points.

THE COURT: I'm going to let you go, but I'm not done yet.

MR. WILLNER: Thank you.

THE COURT: All right. So Mr. Sadowski, you're relying on a Supreme Court case with granted review of a temporary restraining order as a preliminary injunction on a portion of Rule 65 that no longer exists. Under that version of Rule 65 -- (audio ends midsentence).

(Recess 10:57 A.M./Reconvene 11:11 A.M.)

THE CLERK: This court is again in session. We were muted in the Zoom.

THE COURT: Okay. So the last thing we have on the record, Mr. Sadowski, was my question to you regarding the fact that there's a -- that the version of the Rule is not the same as the Rule -- that the current rule is. So if you want to go back to whatever those comments were, we can pick up at that point.

MR. SADOWSKI: Yeah. So if the old version of the Rule had a different time period, it really doesn't matter. You have to look at the actual orders themselves that were issued to determine whether they're TROs or whether they're preliminary injunctions.

There is an additional case, Judge. I'm not sure why it didn't make it into the binder. It's Belo Broadcasting Corp. v. Clark, 645 F.2d 423, at 426. And it also cites Dilworth v. Riner, 343 F.2d -- another Fifth Circuit case -- 226, from 1965. And it has the same feel to it.

> "The label appended by the requesting party or the judge is not conclusive as to its proper characterization. The central inquiry goes to the nature and scope of the hearing that precedes the denial of the motion. The denial of a so-called temporary restraining order is properly appealable when entered after a hearing in which all interested

parties had an opportunity to participate, thus allowing for a full presentation of relevant facts."

So the trend of these cases is you have to look at the order itself, what happened before, and all the things that happened before the Superior Court had the trappings of a preliminary injunction, on top of the fact that the orders themselves are of unlimited duration. Judge Scott's order says until further order of the court that they have to stop their foreclosure. And that's in the second order paragraph of her order. And Judge Lee's opinion also says, and he uses the word, "injunction shall immediately issue that prohibits Defendants from conducting a foreclosure sale on the property located at 423 Kennedy Street until further order of this court or at any time before the conclusion of the litigation."

So to me, these federal cases are conclusive as to what the effect of those orders were and were under Doe, and under Doe, they have to move to dissolve the injunction and have the burden of proof on that. And we do not have to relitigate all of the issues that were held -- that were already decided. Likelihood of success on the merits, irreparable harm. Public and private interest factors.

And that makes a lot of sense, Judge, because they had a year and a half to take action in Superior Court to either appeal those orders, which they can do. And I cited that provision in the D.C. Code. They could have appealed either of

Judge Scott's or Judge Lee's orders under D.C. Code 11-721(a)(2). And that actually permits an appeal from interlocutory orders granting, continuing, modifying, refusing or dissolving, or refusing to dissolve or modifying injunctions. And that takes us right back to Rooker-Feldman. They're using this Court as an appellate court to decide an appeal that they should have filed years ago with the Superior Court.

And as far as explaining the judge's orders' language, Judge Lee took this case on a Friday, and he issued his decision on a Monday. So he didn't have a huge amount of time to consider. And there's actually a couple typos in his order you see. And there's, like, a reference to something that didn't get deleted.

So irrespective of what they wrote in the order, their actions were the Supreme Court case says this is a preliminary injunction, or these orders are preliminary injunctions. And what else could they be? They weren't temporary, they lasted through the end of the trial, and they never moved to dissolve them. So there's no conclusion that those orders were anything other than preliminary injunctions.

THE COURT: All right. Let me hear from Mr. Willner. Sorry. Brain fart.

MR. WILLNER: Your Honor, it's too bad that this supplemental memorandum was filed the morning of this hearing

because I would have loved to have responded to it in writing. The bottom line is that this Court set this hearing for today, months ago, as a preliminary injunction hearing. That order came down at the conclusion of the hearing on the motion to dissolve the -- whatever was in effect at the time. We would argue that actually there was nothing in effect at the time under the Granny Goose case.

But what the Court did was consistent with the Granny Goose case. And Granny Goose is -- it's Granny Goose v. Brotherhood of Teamsters, 415 U.S. 423. And the case here before Your Honor is quite consistent with the facts that occurred in Granny Goose. I think it's worth just reviewing what occurred in that case.

Granny Goose involved an appeal -- well, let me start from the beginning. In Granny Goose, a company sued the Teamsters for engaging in what they believed was illegal strike activity. The Superior Court of the State of California issued a TRO. The case was then promptly removed, while the TRO was in effect, to federal court in California. The union then started striking again after the TRO dissolved on its own, or I'm sorry. It expired on its own terms, and the union started to strike again, even though the TRO was issued prior to removal.

So the employers filed a motion for contempt, and the district court granted it. And the case then made its way to

the Ninth Circuit, and the Ninth Circuit reversed the district court -- the district court's ruling, saying that the appeal -- I'm sorry. The TRO had expired on its own accord. It expired under not only California law, but also under federal law.

And it noted what has been noted in this court many times, that once a case is removed from state court to federal court, federal law applies. And under Rule 65(b), as it was written then in 1974, and as it is written now, TROs expire on their own accord. Then it was ten days, and now it is fourteen days.

Mr. Sadowski raises contentions that there is a difference between a TRO that is with notice or without notice, but federal law is also clear on this point, that even TROs that are issued with notice expire within on fourteen days. And I can quote from a case, Dellinger v. Bessent. That's 768 F.Supp.3d 30. And that's a 2025 case from the District Court of this district. It says,

"While Rule 65(b)(2) is silent on the timeline for temporary restraining orders entered with notice, it is generally accepted that the standard fourteen days followed by a fourteen-day extension for good cause applies to a TRO entered with notice as well."

So regardless of whether a TRO is entered with notice or without notice, it expires on its own terms, within fourteen days or after fourteen days --

THE COURT: So inherent in your argument is the argument that these TROs won't be on that because the language in them was something complying with 65(b)(2) of the D.C. Superior Court Rules, where it says the order expires not -- fourteen days that the court sets, unless before that time, the court, for good cause, extends it for, like -- this is a like period. I mean, I don't know on what authority either of these judges did the time line beyond twenty-eight days, but that's the closest to the language I can get to it.

MR. WILLNER: And well, in addition to that -- and let me address that real quick right on point, regarding what Judge Lee or Judge Scott believed that they were ordering when they ordered it. It's clear from a review of the record that those judges believed they were issuing TROs. The motions before them were emergency motions for TROs. Both of their orders say that what they were granting were emergency motions for TROs.

In fact, Judge Lee's opinion, close to the end of his opinion, he said in -- just before he issued his rulings, he wrote,

> "Section (a)(2) of the rule," referring to Rule 65 of the D.C. Superior Court rules, "Section (a)(2) of the rule permits the trial court to consolidate the preliminary injunction hearing with the trial on the merits. It is this court's intention to schedule this matter for a hearing on a date convenient to the court

and available to the parties."

So obviously, Judge Lee, in his mind, was issuing a TRO, not a preliminary injunction because his intention was to have the preliminary injunction combined with the trial at a later date. That was clearly Judge Lee's perspective, and it makes sense with the time line.

The emergency motion for a TRO in Judge Lee's case was filed on July 18th. The hearing was held three days later, on July 21st. Quite expedited. The order from Judge Lee came out the next day after the hearing, on July 24th. So whether this was issued with notice, without notice, it was certainly being issued on expedited circumstances, with a rather undeveloped record and with very limited time for the parties to prepare for the hearing and frankly, for the court to issue a ruling based on whatever evidence was in front of it. It was acting under emergency circumstances, not how a preliminary injunction is supposed to be issued. So appropriately, Judge Lee issued a temporary restraining order. That's Judge Lee.

Judge Scott, the facts are pretty similar. Emergency motion for TRO, which was the motion that was before her, was filed on July 11th, 2023. A hearing was held on July 25th, 2023. A review of the transcript reveals that Judge Scott's hearing was held on the day the foreclosure was supposed to be held. The hearing was started -- I wasn't there -- 9 o'clock in the morning. 10 o'clock in the morning. Something like

that. The foreclosure sale was scheduled for 2 p.m.

So what happened? Judge Scott had to hear evidence quite quickly. And the parties, the transcript reveals that the parties were moving very, very quickly through the evidence, rushing through the evidence. And Judge Scott had to ingest quite a bit of evidence before issuing her ruling. And what she did was she essentially, as has been pointed out in this court, in this proceeding previously, she essentially adopted Judge Lee's version of the facts and issued and granted the motion. The motion, again, in front of her was a TRO, a motion for a TRO, certainly occurring under expedited circumstances.

After that, the case was moved to federal court. Everyone has been operating under the assumption that this is a -- that these are TROs. I'm new to the case, but from my understanding, there has never been an argument in this case at all before today that what Judge Lee and Judge Scott did was issued preliminary injunctions.

That argument should have been at least raised at the motion to dissolve hearing. My understanding, it was not. It should have been raised in between the five months after the motion to dissolve hearing and today's hearing. It wasn't until this morning.

And what the Court has done here -- well, let me actually take a step back. Everyone has been operating under

the assumption that what we have today is a preliminary injunction hearing. All of the parties' filings, the witness lists, the exhibit lists, everything says motion for preliminary -- or hearing on preliminary injunction. Exhibit list for preliminary injunction hearing.

Everyone, everyone, has been operating under the assumption that today's a preliminary injunction hearing, until I opened my mouth, probably without looking at the law first. Shame on me. But I opened my mouth and asked on Wednesday to confirm the mode of operations, to see whether we -- to confirm that we were going to go second because the burden of proof is on the plaintiff seeking for the preliminary injunction. And then what followed is the memorandum that was filed this morning, a couple of hours before the hearing.

Your Honor, looking back at this case, coming in at this late juncture, it certainly appears to me that what happened here are -- everyone, again, has treated these orders from the Superior Court as TROs until this very late hour of 8 o'clock this morning. It certainly seems from our perspective that what the lender Defendants have been doing here, frankly, has been judicious.

The TROs expired. Under federal law, they expired. They were not converted to preliminary injunctions. There's certainly nothing in the rules that provides as much. There's nothing in the case law that addresses these precise

circumstances that provides as much.

And what the lender Defendants probably could have been doing for the past few years was proceed with the foreclosures because the TROs expired on their own terms under federal law. That's the linchpin of Granny Goose. They didn't, and they didn't do that. And probably, that was the right move because what would have happened if the foreclosure sales would have been scheduled -- if had the foreclosure sales been scheduled, I'm sure Mr. Sadowski would have filed a motion to renew the TRO or to hold a preliminary injunction hearing. And I guess what we're doing today would have happened perhaps several months ago.

We are where we are here today, and where we are is, again, consistent with the Granny Goose case because what happened in Granny Goose is the Supreme Court held, and I think the critical language is as follows. There's a couple of key paragraphs, and I would just -- I think it's worth reading aloud. At 437, the court wrote,

> "More importantly, once a case has been removed to federal court, it is settled that federal rather than state law governs the future course of proceedings, notwithstanding state court orders issued prior to removal."

Later on in the page, the court wrote, "By the same token, respondent Union" -- that was the party seeking the

injunction in that case -- "had a right to the protections of the time limitation in Rule 65(b) once the case was removed to the District Court," meaning, once, under the law, the TROs expire under the terms of the law, they're done, and there's no contempt. Had the lender Defendants gone ahead and done a foreclosure two months ago, three months ago, a year ago, two years ago, there would have been no contempt. There would have been no ability to find them in contempt.

And then subsequently, regarding the motion to dissolve standard in these circumstances, here's what the court wrote, and this is at 441.

> "As indicated earlier, once a case has been removed to federal court, its course is to be governed by federal law, including the Federal Rules of Civil Procedure. Rule 65(b) establishes a procedure whereby the party against whom a temporary restraining order has issued can move to dissolve or modify the injunction upon short notice to the party who obtained the order."

Pause here. That's what happened five months ago, when Mr. VerStandig, then-counsel of record, filed a motion to dissolve. Continuing with the quote.

> "Situations may arise where the parties, at the time of the hearing on the motion to dissolve the restraining order, find themselves in a position to present their evidence and legal arguments for or

against a preliminary injunction. In such circumstances, of course, the court can proceed with the hearing as if it were on an application for a preliminary injunction. At such hearing, as in any other hearing in which a preliminary injunction is sought, the party seeking the injunction would bear the burden of demonstrating the various factors justifying the preliminary injunctive relief, such as" --

And then it recites the factors for the preliminary injunction hearing. This is precisely the procedural posture that's before the Court. The Court heard a motion to dissolve the injunction. The Court reasonably concluded, let's have a preliminary injunction hearing. The parties have accepted that.

A preliminary injunction hearing was scheduled. We are here for it today. Everyone was operating under the assumption that that's exactly what was happening. That's what should be here. The burden of proof is on the Plaintiffs. And the Court is now in a position to decide whether a preliminary injunction should be issued. Thank you, Your Honor.

THE COURT: Thank you.

MR. SADOWSKI: Jim Sadowski again for the Plaintiffs. Judge, let's go back a little bit. They did not -- first of all, the title of their motion is a motion to dissolve

injunction.

THE COURT: Right, but when we were here on May the 13th --

MR. SADOWSKI: Right.

THE COURT: Right.

MR. SADOWSKI: And I'll get to the May 13th hearing.

THE COURT: Or May the --

MR. SADOWSKI: In their motion, right, they did not ask for a preliminary injunction hearing. Mr. VerStandig raised that issue orally, and the Court agreed. And I pushed back on that. So but whatever the Court did on the 13th, we cannot change the fact of what these orders did.

And Granny Goose, we're not Granny Goose. In Granny Goose, they removed when there was a TRO pending. That's when they removed. In this case, they removed on July 4th, 2024 the first time. And at that time, you're stuck with the orders before you that existed at that time under the federal statute that we cited and that is cited in Granny Goose. You take the cases where you find them. And tangentially, Judge, this is one of the reasons why I argued in the abstention remand proceedings that it was probably better for those judges to get the cases back.

But where we are today is you got injunctions from the federal court -- from the state courts below. There's no other way to dress it up as a TRO, given the way the orders read.

And the cases say it doesn't matter what the judges say. It doesn't matter what we titled our motion as. What matters is that there was an adversary proceeding beforehand and that it -- and that it was lasted beyond the terms of a traditional TRO. And that's exactly what we have here, and that's why Granny Goose doesn't apply. Granny Goose was removed when the TRO was still pending. This cases was removed way, way later.

And then the orders themselves, Judge, Judge Scott's order is titled a hearing order. Judge Lee's order specifically uses the word injunction. But again, Judge, under the federal cases, which apply once they remove, it doesn't matter what the judges titled it. And there's some language in the Sampson case, that actually addresses that. It's like, if the judges could title an order as a TRO and it's really a preliminary injunction, they would effectively prevent appellate review because the TRO was not appealable.

And that, again, gets us back to the unfairness here of what's going on. They're using this Court to appeal those decisions, which they didn't like. They want us to have to reprove all the evidence that we proved. And that's just not -- under Rooker-Feldman, that's not the way it's supposed to go.

So I don't think -- and on the -- like, we advised you it was too late. If they had put in their motion to dissolve the injunction, we want a preliminary injunction hearing,

right, I would have researched that issue. Right. But they didn't. And that was a surprise argument by Mr. VerStandig at that hearing and --

THE COURT: Well, couldn't we characterize this as a surprise argument by you at this hearing? And we'll just disregard that, and let's go forward with what's been noticed for today?

MR. SADOWSKI: Well, you could --

THE COURT: I mean, good for the goose, good for the gander, right?

MR. SADOWSKI: Well, no, Judge, because if they had raised this issue back then, then I would have done a lot more research on opposing their motion. And their motion was only based upon an email from Mr. Negussie that the condition had changed. That was the only basis for their motion. Nothing else. They didn't say, we want a preliminary injunction hearing. They didn't say that these aren't TROs. They made none of those arguments. And here we are.

And in my view, Judge, I believe I have an obligation, when I come across a case that's controlling, to tell you, just like I did years ago, when there was a motion to dismiss pending before you, and I found a case that was against me. This case is dead for us. Granny Smith (sic) is not. And I am sorry that it happened the way it did in terms of the research and the disclosure, but they're leading you down a path to

reversible error.

THE COURT: Okay. Well, but Granny Goose was cited in the original motion.

MR. SADOWSKI: Right, but that was cited --

THE COURT: So I'm not sure what path they're leading me down, as they cited it in the original motion. In fact, quoted it. The exact language you're telling me to look at is quoted in that original motion.

MR. SADOWSKI: Look in their motion, and correct me if I'm wrong. The words "we want a preliminary injunction hearing" are nowhere in that.

THE COURT: Well, I'm rereviewing it. That's what I'm doing.

MR. SADOWSKI: They're nowhere in that motion, I believe.

(Pause)

THE COURT: What?

MR. VERSTANDIG: Briefly, Your Honor.

THE COURT: Go ahead.

MR. VERSTANDIG: Respecting the Rooker-Feldman argument, which is the policy argument being made to advance all this, even if the Court looks at the Supreme Court holding from T.M. from this term, which greatly expanded the Rooker-Feldman doctrine developed out of this circuit literally a hundred years ago with Rooker, it still requires the existence

of a final order. It defines a final order as a final order of the trial court now, as opposed to one of the appellate court, which was the circuit split.

THE COURT: Yeah, but your argument in your motion that you filed when you were still counsel essentially calls these injunctions. So aren't we just here beating a dead horse, and at this point the question is whether I dissolve or whether I put in a bond and because these are also injunctions?

MR. VERSTANDIG: Your Honor, a TRO is an injunction.

THE COURT: Well --

MR. VERSTANDIG: TRO is absolutely an injunction. In fact, I think the title of Rule 65 is injunctions.

THE COURT: And restraining orders.

MR. VERSTANDIG: Well, a TRO is an injunction. I don't have a cite for that offhand, but I'm confident of that. It literally is a document that enjoins someone.

I would also just point out, it would be wildly deceptive to title a preliminary injunction as a TRO or to use the language the judge got did because had an appeal been taken, it would have almost assuredly invited the denial thereof for the reason Mr. Sadowski just stated, which is that you can't appeal a TRO.

And if nothing else, if the argument is that the two District of Columbia judges were so rushed that they could not decipher the difference between a TRO and a PI, I think that

speaks to some of the more intellectually vacuous issues in front of the Court today. And the reason that these were dealt with as an expedited TRO that ought not be regarded as having the meditative foresight of a preliminary injunction. That's all I got, though. I'm going to go sit back down in the gallery.

THE COURT: Let me hear from Mr. Willner. Thank you.

MR. VERSTANDIG: Thank you.

MR. WILLNER: Your Honor, I guess I'll take some umbrage with the suggestion that we are leading the Court down a path of reversible error. Frankly, we haven't had a chance to thoroughly review the cases cited in Mr. Sadowski's memo or the cases that Mr. Sadowski read to the Court, like, three minutes ago. But even the case -- even the case citations or the quotes that the Plaintiffs are providing to the Court, it doesn't seem to pass muster. It doesn't seem to fit with the facts of this case, particularly because as Mr. VerStandig just highlighted to the Court, it is without question that the Superior Court judges, in the cases before them, ruled very quickly. Very quickly.

THE COURT: That doesn't change the nature of the fact that they extended them beyond the statutory -- or the rules period, in both their rule and our rule. And you have to admit, it's not exactly clear what the hell they were issuing.

MR. WILLNER: Then all the more reason to not treat

them as preliminary injunctions, and I'll explain why, Your Honor.

THE COURT: That's where I'm having the problem.

MR. WILLNER: Right.

THE COURT: If the default is where TRO extends beyond the permissible time of allowed, which essentially, I think, under both Rules is now twenty-eight days unless there's consent, then the question is aren't these -- I'm not going to say magically changed into, but at least don't I treat them as a PI, and we're here on a motion to dissolve or to impose a bond?

MR. WILLNER: Well, Your Honor, there was no ruling by any court, any of the courts that touched this case, that seem to indicate that this case -- that these orders were to be treated as preliminary injunctions. The judges, for sure Judge Lee. I mean, it's clear from Judge Lee's opinion. He literally says, we're going to set preliminary -- we're not going to do a preliminary injunction hearing now because we're going to consolidate it with the trial. Clearly, Judge Lee viewed those orders as a TRO.

And then, yes, once the case was removed -- let's just take the 423 Kennedy case for a second, which Judge Lee had. Clearly, Judge Lee issued a TRO. That was his mind. That's what he says in his order. Once that case was removed to federal court, the TRO expired. That's what Granny Goose says.

And they have no -- and they have no law opposing that.

THE COURT: But the language in his order specifically extends the terminus of the whatever he issued in that order long beyond the up and down.

MR. WILLNER: But whatever he said in his order regarding the term of the TRO, it was abrogated at that point once the case got removed to federal court because once the case gets removed to federal court, federal law kicks in, and then the TRO is dissolved on its own accord.

THE COURT: But the language under which Judge Lee issued his order is essentially the exact same language under the Federal Rules. So what do you -- how, if it was a valid issuance under the state court Rule 65, does it change that under the federal law Rule 65, other than the fact that the federal courts, at least the appellate courts, look at these, stating that if vit goes beyond the twenty-eight days, then it has to either be an invalid extension of the order or it has -- or it is treated as a preliminary injunction.

MR. WILLNER: Well, okay. So let's take it under those two options. Either it's an invalid extension of the order, or it's a preliminary -- actually, it doesn't have to be either. It could just be that the TRO expired on its own accord, and neither the parties -- none of the parties nor the courts did anything about it. And that's what happened.

THE COURT: But looking at the language, how would it

expire of its own accord? Because these languages -- these languages. The language of the orders specifically state that this order enjoins -- looking at Judge Scott's order, it just enters an immediate stoppage and then sets a scheduling hearing with the trial in September. Judge Lee's is a little more specific. It says, "injunction shall immediately issue until further order of the court or at any time before the conclusion of the litigation of the matter."

MR. WILLNER: So at the point that the case was removed to federal court, and forget about what it was under Superior Court law, whether that was appropriate or not. But at the moment that the case was removed to federal court, that prong of the order was no longer the law. The law was then, at that moment in time, at the point of removal, the law became federal law. That is indisputable under Supreme Court precedent. So at that point, the TRO became nothing.

THE COURT: I was looking behind the Supreme Court opinion remember I made for reference -- good Lord. I referenced the state court case behind the Sampson opinion. And that's exactly what happened in the Sampson case is that the court entered a fourteen-day -- well, in that case, it was ten day, ten day, and ten day. And then it went past it. So all of the appellate courts, including the Supreme Court, all the way up, treated it as an injunction.

MR. WILLNER: Understood, and perhaps I need to read

the facts of Sampson case. But what happened, there was no extensions that occurred here. No one extended. There was no -- no one confronted any court.

THE COURT: They didn't need to because the court didn't put a deadline in, which is unfortunate.

MR. WILLNER: Correct. And then the case was removed -- right. So in the Superior Court, no one needed to do anything to extend the TRO. And then the case was transferred or removed to federal court. And then no one did anything. Perhaps, at that point, if someone had raised an -- had raised a question for an extension, this issue would be relevant, but no one did anything at that point.

Plus, I think, A, it's important to -- the following point is, I think, very, very relevant. A preliminary injunction, by definition, has grave more effect than a TRO because the preliminary injunction has no term. It lasts until the trial of a -- the trial on the merits of a case. And it prevents everything. It stops whatever the action is that is being enjoined. When a court rules on a preliminary injunction, the court takes that in mind -- keeps that in mind, and likely issues rulings, keeping in mind that this is going -- this ruling is going to be the status quo until a trial happens, whenever a trial happens. So the court then looks at things differently.

At the moment in time when these emergency hearings

were held, the point that -- the question was there's a foreclosure sale impending. With Judge Scott's hearing, there was a foreclosure sale that day. The court just needed to get the foreclosure sale stopped. That's it.

Now, what the Plaintiffs' trying to say -- are trying to do is to extend the preliminary injunction ad infinitum so that the burden of proof is now on the Defendants, when that's just not how the Superior Court judges were looking at it. The Superior Court judges in -- Judge Lee was expecting the trial to be expedited. So the preliminary injunction hearing will be merged with the trial. Judge Scott was --

THE COURT: So wouldn't that be the same thing here? Essentially, this is continuing until trial, but for the motion to dissolve, which you all have -- that you all have brought and you're asking me to consider today?

MR. WILLNER: No because -- well, I also want to take a step back for a second. The Court is -- really, the Court has already ruled on this. Your Honor has -- at the conclusion of the motion to dissolve hearing, the Court said, we're going to have a preliminary injunction hearing.

So Mr. Sadowski is upset at the Defendants for trying to use this Court as appellate court. Mr. Sadowski is now trying to get -- trying to use this Court as an appellate court of its own rulings. The Court has already decided. We're having a preliminary injunction hearing. At a preliminary

injunction hearing, the Plaintiffs bear the burden. They're seeking the injunction.

But what we have here is it's just, the Superior Court judges issued their TROs under emergency expedited circumstances. They just needed to get the foreclosure sale stopped. They were intending to have expedited hearings in the immediate future. Judge Scott granted an expedited trial. Judge Lee said, we're going to have a preliminary injunction hearing consolidated with trial. It didn't happen for a myriad of reasons, and Mr. Sadowski, I'm sure, has his -- or has stated his thoughts on that.

But we are here today, and it would be fundamentally unfair to the Defendants to have the TRO treated as a preliminary injunction when the record was -- the exhibits that are before Your Honor today are double or triple what was presented to the Superior Courts. It's a much more -- it's a much more fully developed record. In fact, the evidentiary burdens are lighter in a TRO than they are in the preliminary injunction. It's a totally different hearing. It's a totally different hearing. And on that basis, the Court should treat this as a preliminary injunction hearing, just as it did when it ruled on the motion to dissolve in May.

MR. SADOWSKI: Jim Sadowski again, and I'll try not to be repetitive, Judge. But what Mr. Willner said was, once the cases were moved, the TRO expires. The TRO became nothing.

Well, why do you need to file a motion to dissolve an injunction if the TRO expired? That's just false under federal law.

You take the cases as you find them, and the cases as you found them, there was two preliminary injunctions issued. You did decide to hold a preliminary injunction hearing, again, not under full briefing of that issue because the only issue they raised in their motion was changed circumstances. They didn't even ask for a preliminary injunction hearing, which is why that issue wasn't fully briefed by us or researched by us because I came into that hearing, as the Court may recall, saying they haven't provided a snitch of evidence for what a $3 million bond would be. Nothing. Zero. And that's when we got into this, oh, are these TROs still available. And I think everybody at that hearing did not know the full verse of the case law that we've described to you.

But no matter how you slice it, Judge, those orders were not temporary. Those orders did not expire. Those orders came to you in the status that they were when the cases were removed. You can't fix it. You can't go back into the judges' minds and say what they were thinking. You can't infer what they did under the orders. You go by what the Supreme Court said and the federal court cases have said, and that is did the order go beyond the temporary restraining order period, and were there contested adversary proceedings and briefs and

hearings and so on.

And I, again, take issue with their whole surprise nature of this thing. The 423 Kennedy and Developer RE1 filed both of their TROs when they filed their complaints. There was an initial TRO hearing on 423 Kennedy in the first case. Right. And that was in February of 2023. And then, as a result of the judge's decision in that case, which was, I'm not issuing that TRO because there's no threat of foreclosure, RE1 withdrew their TRO in the RE1 case. Then when the foreclosure notices came through in June, 423 Kennedy had to file another case because the judge had dismissed the first case, improperly, in my view, and RE1 had to renew its TRO.

So yes, those TRO hearings were scheduled on an expedited basis, but the issues were briefed back in January and February of 2023. And actually, a hearing was held in 2023. So there was -- those judges did have to take quick action. But again, you have what before you are two orders that continue indefinitely. Those are preliminary injunctions under the Supreme Court standards, and they haven't told you what else they could be if they were not.

MR. GREENBERG: Just briefly, Your Honor. Jeffrey Greenberg, on behalf of the Debtor, as special counsel. And I'm drawing the Court's attention to Rule 65, and that's (b)(2). And it says,

"The order expires at the time after entry, not to

exceed fourteen days, that the court sets, unless before that time, the court, for good cause, extends it for a like period or the adverse party consents to a longer extension."

Your Honor, by filing the motion to dissolve the temporary restraining orders, we believe that we demonstrated the lack of consent. And congruent, the motion to dissolve expressly sets forth that the question is whether, one, new facts justify dissolution or modification of the injunctions and/or to change the legal posture of these cases.

UNIDENTIFIED SPEAKER: Well, that's a --

THE COURT: Hold on a second. You got it. Thank you. Go ahead.

MR. GREENBERG: I'll continue. Yes. And two, whether the changed legal posture of these cases now being in federal court justifies the dissolution or modification. And that's exactly why we're here today, because the TROs, by virtue of having been removed to federal court, have expired. We've signaled our lack of consent, and we're here on a PI hearing to determine whether or not these injunctions should continue. Thank you.

MR. WILLNER: Your Honor, may I --

THE COURT: Just me sitting here isn't an invitation for people to stand up and start talking again. So just give me a second.

All right. Go ahead, Mr. Willner.

MR. WILLNER: Sorry, Your Honor. Very briefly. Your Honor doesn't necessarily need to find right now that the TROs dissolved at the moment of the removal, although that is our position. Your Honor can merely find, in accord with what Your Honor found at the hearing in May, that significant changes in either factual or legal conditions have occurred. Significant changes have occurred in factual or legal conditions. So Your Honor can either find that the TRO has dissolved as a matter of law at the time of removal, or that factual change in circumstances justify the dissolution of a TRO, if a TRO continued to exist. Or a preliminary injunction, if it's called a preliminary injunction.

THE COURT: All right. I'm ready to roll. All right. So the issue before me is who really has the burden of proof today and what am I making a decision on? The Plaintiffs seem very happy with two orders entered on limited discovery on a very slanted record and on what was put before the Superior Courts in very short time. I'm going to let them hang their hats on that. We're going to hold those preliminary injunctions. I'm going to take the facts in the very circumstances they were before the Superior Court, which is on three or four or five days -- fourteen days notice to the Defendants. I'm going to give the Defendants in entirety the ability to show why I should dissolve them, why there's a

change in circumstances, why the evidence presented at that hearing was incomplete or does not support the finding, or for any other reason which would support dissolution of those and or modification of those orders, because the factual record is not what was found on the short notice. That's what would happen at a hearing.

Whether you want to call this a dissolution or whatever, I'm going to allow -- I'm going to take the orders as they are. And as you noted, Mr. Sadowski, they're not great. There's lots of holes in there. And they're based on one-sided testimony, which was not given a lot of challenge. And I'm going to allow that to go forward on whatever basis it wants to today. But I am going to put the burden on the movants to show that, as you said just now, Mr. Willner, that there is a significant change in circumstances that resolve in the question of dissolution or modification of the orders. And I'm going to put you all first, and then I'll have Mr. Sadowski go after that.

So that's what we're going to do. Given I just made that ruling, I'll give everybody a five or ten-minute recess, and then we'll come back and begin that case.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

THE COURT: Thank you.

THE CLERK: Thank you, Judge. All rise. This Court stands in a brief recess.

(Recess 11:54 A.M./Reconvene 12:10 P.M.)

THE CLERK: This Court is again in session. Please be seated and come to order.

THE COURT: All right. So we are moving forward on a Rule 7065(b) for a motion to dissolve. Clearly there's been sufficient notice. So the question is whether there are sufficient circumstances or a change in circumstances to modify the existing orders. But if I'm stating the standard incorrectly, I'm sure you guys will tell me in opening. So Mr. Willner, do you want to open?

MR. WILLNER: Yes, Your Honor. Just wanted as one final preliminary --

THE COURT: All right.

MR. WILLNER: -- regarding the exhibits.

THE COURT: Okay.

MR. WILLNER: From my understanding, the Plaintiffs did not object to any but five of the exhibits --

THE COURT: Correct.

MR. WILLNER: -- that were on the WCP Defendants' list. So we'd like to move Exhibits A through D and I through Y into evidence.

THE COURT: I think X is also on their list of objections.

MR. WILLNER: I apologize, Your Honor. Yes. All exhibits other than E, F, G, H, and X.

THE COURT: Any objection, Mr. Sadowski?

MR. SADOWSKI: As long as that's consistent with what I filed.

THE COURT: That's consistent. You objected to E, F, G, H, and X. All right. So everything but those five is admitted.

(Various documents were hereby received into evidence as WCP Defendants' Exhibits A through D, I through W, and Y, as of this date.)

MR. WILLNER: Okay. And I can't imagine Mr. Sadowski will have any objection to this, but we'd also like to move into evidence Plaintiffs', all of Plaintiffs' exhibits, which we did not object to any of them.

MR. SADOWSKI: One second, Judge. Judge, I can't agree to that.

THE COURT: He's moving your exhibits.

MR. SADOWSKI: I get that.

THE COURT: Okay.

MR. WILLNER: Okay.

THE COURT: Do you agree to it on any of them, or do you, I mean, what's the --

MR. SADOWSKI: Well, Judge, the ones that overlap, I can't object to. I didn't take the time to look at each one of those. But there are a variety of things in here that are not on their list. So to the extent that there's inconsistency

between the two, then I'm objecting to all the ones that I didn't conceive as part of their -- as part of not objecting to their exhibit list.

MR. WILLNER: Your Honor, this is a unique scenario where I have, in my exhibit list, reserved the right to admit all of their exhibits into evidence, and they didn't object to the admission of their own exhibits into evidence.

MR. SADOWSKI: That's not true, Judge. If you look at our exhibit list, we say we reserve all sorts of rights, including reserve the right to object to the admission of our exhibits.

MR. WILLNER: Your Honor, to make this simple, we'd like to move at this time Exhibits 1 through 8 into evidence.

THE COURT: All right. 1 through 4, I noted, are identical.

MR. SADOWSKI: I believe 1 through 8 are identical, Judge, the deeds of trust and the notes.

MR. WILLNER: Right. Now, the notes --

THE COURT: The notes weren't part of their exhibits, but it's --

MR. SADOWSKI: I'm not going to object to the notes, Judge.

THE COURT: Okay.

MR. WILLNER: Okay.

THE COURT: So 1 through 8 are in.

(Various documents were hereby received into evidence as Plaintiffs' Exhibits 1-8, as of this date.)

MR. WILLNER: Any objection to the appraisal, the Cushman & Wakefield appraisal?

MR. SADOWSKI: No objection to the Cushman & Wakefield appraisal.

THE COURT: Okay. Hold on. Let me make sure I know what number that is.

MR. WILLNER: Number 40.

MR. SADOWSKI: Exhibit 40.

THE COURT: 40. Okay. The Cushman, okay.

(Cushman & Wakefield appraisal was hereby received into evidence as Plaintiffs' Exhibit 40, as of this date.)

MR. SADOWSKI: No objection to Number 39, too, Judge on the Plaintiffs' list, which is the other appraisal.

THE COURT: It's the CL Group appraisal.

MR. SADOWSKI: Yes, but --

THE COURT: Hold on. I'm letting Mr. Willner take a peek at whatever he has in his magic box.

MR. SADOWSKI: Yes, it's CL Group LLC, I think, is what it's called.

THE COURT: Did you want 39 in, Mr. Willner?

MR. WILLNER: Yes, Your Honor, we'll agree to 39 in.

(CL Group appraisal was hereby received into evidence as Plaintiffs' Exhibit 39, as of this date.)

THE COURT: Okay. All right. Any of the other ones, consider them, Mr. Sadowski's list. I haven't done a one-for-one comparison what else is already in.

MR. WILLNER: So Your Honor, just to confirm, Exhibits 1 through 8 are in, 39 and 40 are in.

THE COURT: Correct.

MR. WILLNER: And all of the WCP Defendants' exhibits other than E, F, G, H, and X are in.

THE COURT: X. Yes. Now, Mr. Sadowski, they haven't objected to your exhibits. Are there any of the other ones you'd like to get in now on stipulation, so we don't have to go through them?

MR. SADOWSKI: I'd actually rather have them be developed through Mr. Negussie, because it ties with his testimony if the Court goes forward with a preliminary injunction hearing.

THE COURT: All right. Well, then we'll just keep the record as it stands, and we'll take the rest up as we go forward.

MR. SADOWSKI: Right. And I'll probably do the same thing that Mr. Willner did, Judge, at the beginning to get the authenticity stuff out of the way when we got there. Yeah. And just to be clear, Judge, we never objected to going forward with the motion to dissolve.

THE COURT: I know. That's what we're doing today.

MR. SADOWSKI: Okay.

MR. WILLNER: Your Honor, Court's indulgence for sixty seconds?

THE COURT: Sure.

MR. WILLNER: Good afternoon, Your Honor.

THE COURT: Good afternoon. Yes.

MR. WILLNER: Steven Willner on behalf of WCP Defendants. Your Honor, the law is that if there are significant changes in circumstances, an injunction can be dissolved under Rule 65. There have, indeed, been significant changes in circumstances.

First and foremost, it's been three years, three plus years since the TROs were first issued back in the Superior Court, with lots of litigation in between. It's been even more time since these notes have matured. The WCP Defendants lent $14 million, upwards of $14 million to the Plaintiffs. They've been out of the money for three plus years. Under any scenario that money, the loan money, should be returned to the lenders. Perhaps the Plaintiffs will certainly argue that there's been damages here. Maybe there's some sort of offset for damages. But that's for a trial on the merits. Again, the WCP Defendants have been out of the money for $14 million. The Plaintiffs still have their properties. They've essentially been living on interest-free loans for three and a half years. The lenders have been out of the money.

Three years is significant change in factual circumstances. Admitted deterioration of a property is a significant change in circumstances, and Mr. Negussie is on the record telling the senior lenders, representatives of the senior lenders in this case, that the property, or the 423 Kennedy property, the more valuable of the two properties at issue in this case, is deteriorating. Of course it's deteriorating. Nothing's happening. The property is supposed to be developed as a multifamily property. Nothing's been happening.

But it's not just the physical condition that's deteriorating. Everything around the properties are deteriorating. Most notably, real estate taxes haven't been paid, as is in evidence. There's $150,000 of real estate taxes due at the Developer RE1 property, and there's $120,000 of real estate taxes due at the 423 Kennedy property. In fact, the 423 Kennedy property has been sold in a tax sale. Those real estate taxes constitute senior liens over everyone, including the lender Defendants.

THE COURT: Has the redemption period for the tax sale run?

MR. WILLNER: Not yet, Your Honor.

THE COURT: All right.

MR. WILLNER: Or else there would be much more dire circumstances that I would be yelling and screaming about. So

fortunately, we are not there yet.

THE COURT: Well, that's why I asked.

MR. WILLNER: But we are getting there. And Your Honor, simply put, having the collateral continue to be in the possession of the Plaintiffs poses a significant risk to the lender Defendants. The Plaintiffs will have their damages case. They'll have their moment, their time in court on a full trial on the merits. But that is not where we are right now. We are in preliminary land, and the tax sale really does threaten, or the taxes and all the other expenses that we don't even know about that are piling up on these properties certainly, really threaten the collateral, the only collateral of these loans.

And just to emphasize, there is no other security for these four real estate loans. There is no personal guaranties. There is no membership interest pledges. Nothing else. It is solely the properties, which, as things go, continue to slide forward, and with interest rates where they are, the dire circumstances, just the continued delay just continues to hurt the lenders.

Your Honor, this hearing gives the Court an opportunity to review the facts under which the Superior Court rulings were issued, and really to review even more significant facts and really to review the loan documents in greater detail. As Your Honor has already noted, it is quite clear

from the orders, from Judge Lee's orders and from Judge Scott's orders, that they did not have the opportunity, or at least those orders were not sufficiently based on the terms of the loan documents.

And this is not to criticize those esteemed members of the Superior Court. They were operating, again, as I mentioned earlier today, on true emergency circumstances. Judge Scott had her hearing on the day the foreclosure sale was scheduled to occur. They did not review or undertake a careful study of the loan documents. And just to point out and be very brief, I'm not going to go through all the loan document terms that are at play here, at least not now. I plan to do that at closing and to do a careful review of the loan documents and all the defaults that the Plaintiffs had engaged in.

But just as a couple examples, Judge Lee, the linchpin of Judge Lee's order was the construction draw issue for 423 Kennedy. Judge Lee held that the lender Defendants failed to disburse construction draws, and that was a breach. Judge Lee never once referenced the clear and express provision in the promissory notes that disbursements of any funds under those loans was in the sole and absolute discretion of the lender. Sole and absolute discretion. He never once referenced it in his order.

Judge Scott adopted Judge Lee's reasoning, even though Judge Lee's was pretty much entirely predicated on the

construction draws, and the loans at issue before Judge Scott, not one of them, neither of the two loans had construction draw provisions. There were no construction draws in those loans.

So fortunately, with the significant change in circumstances and facts and law that are now before the Court today, the Court will now be able, on a more fully developed record, to take a second look, a more studied look, at the loan documents. And we believe the Court should come to the conclusion that, in fact, the Plaintiffs do not have a substantial likelihood of succeeding on the merits in this case. In fact, they have engaged in numerous defaults. We'll show that there's at least six categories of defaults, and therefore they should not have a preliminary injunction anymore. They can sue for damages at a later date. But the injunctions should be dissolved. Thank you, Your Honor.

THE COURT: Thank you.

MR. SADOWSKI: You're not a party to this motion.

MR. VERSTANDIG: But my client is bound by your injunction. I get to give my one sentence opening. It's literally one sentence.

Your Honor, the record will show that there is no likelihood of success on the merits in connection with any claim against Mr. Drazin. I guess thank you is the second sentence. Thank you.

THE COURT: All right. Mr. Sadowski.

MR. SADOWSKI: For starters, Judge, it would be helpful, if we do go forward with the preliminary injunction hearing later today, that the Court make a finding as to what it considers the orders to be. I don't disagree that --

THE COURT: Didn't I rule before I left the bench that they are preliminary injunctions which now the Defendants have the burden to go ahead and ask me to dissolve?

MR. SADOWSKI: I might have missed that, Judge. I'm sorry.

THE COURT: Oh. I said, you win, Mr. Sadowski.

MR. SADOWSKI: Okay.

THE COURT: And then I took a break --

MR. SADOWSKI: Okay.

THE COURT: -- to make some tea to come out here and hear why I shouldn't let you win anymore.

MR. SADOWSKI: And I apologize, Judge.

THE COURT: All right.

MR. SADOWSKI: In the hectic of me trying to take notes, I missed those words.

THE COURT: All right.

MR. SADOWSKI: I'm sorry.

THE COURT: Well, I maybe didn't say you win, but I said they will be treated as preliminary injunctions to which there is an obligation to show me the standard to dissolve them.

MR. SADOWSKI: Thank you for solving my memory problem. Judge, the standard here is what we set forth in the Doe v. Shanahan case in our supplemental memorandum. And they have to show a significant change either in factual conditions or in the law -- I don't think you're going to hear any argument that the law has changed -- such that continued enforcement of the injunction would be "detrimental to the public interest", end quote, and "detrimental to a public interest" is in quotes. I don't think they're going to be able to meet that standard.

The changed conditions. Mr. Willner rattled off a whole bunch of things that they were previously in default, and there were those defaults. Those aren't changed conditions. Those are conditions that existed, according to them, at the time the litigation was filed.

THE COURT: So the tax sale was a condition when it was before the judges?

MR. SADOWSKI: Well, the tax sale, the Court could consider, is a changed condition. And whether or not that'd be detrimental to the public interest is another story, but I'll address that. And the Court already addressed that. You'll hear, probably in rebuttal from Mr. Negussie, what efforts he's made to challenge the taxes, to appeal the taxes, and to deal with the situation of whether the tax purchase, deed certificate holder goes forward with a case to foreclose on the

right of redemption, which the Court noted hasn't happened yet. I believe the time frame is four months from the date the tax certificate was given. So that's certainly not an immediate risk.

They talk about how these loans have no security, Judge. That's --

THE COURT: So wait. I want to go back to what you just said.

MR. SADOWSKI: Yeah.

THE COURT: You are saying that in addition to the standard, which was previously established by this Court and other courts, that the parties seeking a modification or dissolution bears the burden of establishing a significant change in facts or law, you believe, in this court, there's an additional element, such that --

MR. SADOWSKI: That's what the --

THE COURT: -- continued enforcement of the injunction would be detrimental to the public interest?

MR. SADOWSKI: Yeah, Judge, that's --

THE COURT: Or is that applicable only to the type of injunction in that case, which was an injunction requiring the ability of transgender individuals to have certain rights, whereas this is a business dispute where public interest is clearly not involved on either side.

MR. SADOWSKI: I'll have to drill into the string cite

there, Judge, because I didn't look that hard at that quote. So I'll have to look into that. I don't have an answer, unfortunately, today, because I did not drill into those string cites to find out if that quoted language applied only to the public interest cases. But the --

THE COURT: Right. Because, I mean, Doe also cites to Wright and Arthur Miller, Wright and Arthur Miller on federal procedure. And that quotation on the next page says, "refusal to dissolve or modify an injunction that was not appealed or was affirmed should only be disturbed on a compelling showing of changed circumstances not adequately considered by the trial court". So am I not thinking about -- a changed circumstance is not adequately considered by the original courts, the original court on this, or is there a different standard? Because I think, if you read the cases that are being quoted by this, the DC circuit, that the injunction is detrimental to the public interest is particularly relevant to public interest cases such as this case, which was a transgender case, as opposed to what we have here, is a business case.

MR. SADOWSKI: I think it applies to both types of cases, Judge. And if I have a chance to get to those individual cases before you rule, I'll report back to you on that. I don't think they're going to be able to meet the standard, that there is sufficient compelling change in circumstances that the injunction should be dissolved. I

think, at best, they're going to come away with some argument that there should be a bond imposed.

And I didn't hear anything from Mr. Willner, and I didn't see anything in their exhibit binder about how they're going to go about proving what those numbers will be. We'll just have to wait and see on that. But I suspect they won't.

And our position Judge, and they didn't say what their position on the bond was, that if there was a bond, you don't look at the interest rates in the loan documents and what they could have collected. You look at the harm that the continuance of the injunction would cause them, which means, in my opinion, they're going to have to put on a witness that says, okay, if we didn't have the injunction, we'd be able to sell this property. We'd be able to sell this property at X value, and we'd be able to earn interest on that money at X value, but for the injunction. I don't see an expert witness designated here. They have an accounting rep. So I don't think they're even going to give you that evidence. I think they're going to argue that you just have to look at the loan documents and say, well, we could have been getting this interest rate and that interest rate, but that's not --

THE COURT: Isn't there a time value of money argument that could be made?

MR. SADOWSKI: There is.

THE COURT: Okay.

MR. SADOWSKI: But they don't get their money until they have a foreclosure sale, and they sell the property, and they give you evidence of what that price would be. And then you could, if you had that evidence, and I don't think you're going to get it, you could make a determination of, okay. And I think that would be somewhat speculative, but at least you'd have some --

THE COURT: You're telling me on every temporary restraining order hearing that people asking -- the Defendants are expected to bring in an expert to do that?

MR. SADOWSKI: I didn't say that.

THE COURT: Isn't a bond set in the discretion of the Court, and doesn't the --

MR. SADOWSKI: It is. I didn't --

THE COURT: Okay. So you're arguing that they don't have an expert, but they can give me testimony on what they feel they're losing. And isn't it simply my discretion as to what the number should or should not be?

MR. SADOWSKI: They could give you a witness who could opine as to what their -- I don't know what they're going to say, but if it were me, I would have brought in an expert and explained how much it would cost, a foreclosure sale would cost. What's the average discount that you buy a property in foreclosure? Because, as the Court knows from going through many auctions and bid processes and other matters, it's often a

fire sale at a severely discounted rate. So I think they're going to come and say, we're losing all this interest. And we would have, you know, these loans should have been paid. But that's not the standard. The standard, and they're going to have to prove what money they are losing, what value they are losing, and the time value of that money. And I'll be interested to see what their witness says about that.

I will continue to argue that they cannot review the underlying preliminary injunctive factors. This business about the prior judges operating on emergency circumstances, those hearings were quick. But the Court, I think, mentioned that it was one-sided testimony. Those hearings before Judge Scott and Judge Lee were contested. Mr. VerStandig represented the Defendants. He called a witness similar to the witness they're calling here. So it wasn't that me and Mr. Negussie went into Judge Scott or Judge Lee's chambers with just Mel and said, here's our evidence. That's not what happened. They were fully briefed.

Again, they say Judge Lee disregarded the promissory notes. Those factors are preliminary injunction factors. So and to me, that's an impermissible argument.

And then Mr. VerStandig said that there was no likelihood of success. Thank you. That, again, is a preliminary injunction standard. You're not here to judge the preliminary injunction standards. You're only here to judge

the -- determine whether there's been a significant change in the conditions or in the law. And you'll probably hear from Mr. Negussie on rebuttal about all the steps that he has taken to keep these properties in good shape, including visits and --

THE COURT: Well, he's not paying the taxes. So that seems like it's --

MR. SADOWSKI: And you're going to hear testimony of that, Judge. Don't worry. But they want you to look at the loan documents. I suggest you look at Section 4.11 in the deed of trust, which gives them the right to inspect the property. And I don't think you're going to hear one witness today tell you that they've gone to the property, looked at it, kicked the tires, went on stairs, asked for an inspection, taken pictures. I don't think they've done any of that. Okay? So if they are so worried about the changed conditions of the property and the property's deteriorating, why have they not taken advantage of that right?

On the Developer RE1 side, you'll hear that that building is going to be demolished. It doesn't matter if the building on the RE1 site deteriorates, because that's subject to demolition. So we're really only talking about deterioration of the 423 Kennedy property. And then you'll also hear testimony from Mr. Negussie about why he used the words in his email to 1Sharpe and the basis for why he sent those emails to 1Sharpe.

So for all those reasons, Judge, I think you should, at the end of the conclusion of evidence, you'll find that they have not met their burden, that the injunctions should remain in place, and at best, they may be entitled to some nominal bond.

And I also take issue, I guess, with in their motion, they set up this presumption that the federal rule requires a bond. And at one point Mr. VerStandig said it was extraordinary. He's never heard a case before where no bonds were issued. There are no bond cases out the wazoo. Most of them involve the government.

THE COURT: Well, that's because there's a specific exception for the government.

MR. SADOWSKI: Yeah. And we have -- we do have some cases, Judge, which I'll give you in closing, where there's been cases where there are private parties, and you really just have to balance the equities. And when you balance the equities here, the harm to them is irreparable. The harm to them perhaps may be some dollars lost or some interest lost. That is not going to change. There's been no change in the facts of the law on those issues.

And one more point, Judge. Oh I think that was it. Court's indulgence. Oh, sorry. I now remember. Balancing the harms. You're going to find out that these two entities have been devastated by these cases financially.

THE COURT: Well, aren't they single-purpose entities?

MR. SADOWSKI: They are.

THE COURT: Okay.

MR. SADOWSKI: They are financially. They have run them through the rigor, and part of the game plan here, Judge, as I alluded to at the last hearing, was set a bond so high that they can't afford it, so we can get these properties back.

You'll hear testimony from Mr. Negussie that the entities have little to no funds, that the investors, Mr. Negussie himself has been funding the litigations to keep these properties. And we'll ask you to balance that equity in the favor of the entities.

And then finally, Judge, you'll also hear that these investors, by and large, are not wealthy, and particularly on the 423 Kennedy side, the Brighton Group, which owns half of 423 Kennedy, is a group of Indian investors who basically took money out of their retirement accounts, et cetera, to invest in the 423 Kennedy property.

So we believe, at the end of the day, at the end of the hearing, the balance of equities will clearly favor not imposing any bond, or at best, a nominal bond. Thank you.

THE COURT: All right. Mr. Willner, your first witness.

MR. WILLNER: Your Honor, the Defendants will call Rosana Cordova to the stand.

THE COURT: All right. Ms. Cordova. Okay.

MR. WILLNER: Your Honor, I may just very briefly, just to be clear, we, in the absence, as an alternative to a dissolution of the injunction, we will be asking for a bond.

THE COURT: I understand.

MR. WILLNER: I didn't cover that, because Mr. Greenberg is going to take the lead on that in closing.

THE COURT: Okay. That's fine. All right. We've got Ms. Cordova.

(Witness sworn.)

THE CLERK: (Unintelligible).

THE WITNESS: Rosana Cordova.

MR. WILLNER: We'll look at the volcanic eruption going on the screen first.

DIRECT EXAMINATION

BY MR. WILLNER:

Q. Okay. Good afternoon, Ms. Cordova.

A. Good morning. Oh, good afternoon. Sorry.

Q. It's afternoon already. I know. Ms. Cordova, what do you do for a living?

A. I am a servicing manager for WCP.

Q. And how long have you been a servicing manager?

A. I have been there since September 2023.

Q. Okay. And what was your job title in September 2023 when you joined WCP?

A. Servicing manager.
Q. So same job title since 2023?
A. Yes.
Q. What is WCP?
A. It's a lender.
Q. What does a servicing manager do for WCP?
A. Overseeing the day-to-day collections on the loans, servicing the loans, delinquencies, and so on.
Q. And how does one oversee the collections and servicing on the loans?
A. Basically, we review a loan portfolio. We follow up on delinquencies. We verify payments, loan documents, and so on.
Q. Do you have access, as a servicing manager, do you have access to any records?
A. Yes, we do.
Q. Okay. What type of records do you have access to?
A. We have a CRM. It's called Dynamics.
Q. What does CRM stand for?
A. I -- I --
Q. Okay.
A. Sorry. You got me.
Q. All right. But what is it?
A. It's a software system that we --
Q. Okay.
A. -- contains the loan data.

Q. And I think you said the name of the software. What was it?
A. Dynamics.
Q. What is Dynamics?
A. Microsoft Dynamics does the loan system that we track every -- that tracks everything that we do on a daily basis.
Q. So it's an application on your computer they could --
A. Yes. It's a program. Yes.
Q. And when you log into Dynamics, just describe to the Court what happens. When you open Dynamics on your computer, what do you see?
A. You see a list of loans, and then you go into a loan. And depending on what areas you're looking for, most specifically payments, extensions, all the loan data, borrower data, all of it is in there.
Q. And as servicing manager for WCP, what kind of access do you have to Dynamics?
A. I have full access to Dynamics.
Q. So you're able to look up any loan you want?
A. Yes.
Q. Can data from Dynamics be taken out of Dynamics, like, exported?
A. Yes, it can be exported to Excel.
Q. Okay. Tell the Court how.
A. We, basically, there's a little button that says export to

Excel. And then you basically get the list of, depending on what you're looking for. For example, loan payments. You can export all the data that has been inputted into the system.

Q. Before coming here today, did you have an opportunity to look at the data in Dynamics for the loans that are at issue in this case?

A. Yes, I did.

Q. Okay. When did you do that?

A. I did that on Friday, and I did that last night.

Q. So fair to say you're prepared to testify about the data in Dynamics for those loans?

A. Yes, I am.

MR. WILLNER: Your Honor, I understand that this is small print. We're going to Zoom. I promise you, the Zoom is forthcoming.

Q. Ms. Cordova, I'm showing you on the screen what is marked as WCP Exhibit E. Do you see that?

A. Yes, I do.

Q. Have you seen this before?

A. Yes, I have.

Q. When did you last see it?

A. Last night.

Q. Okay. And what is it?

A. This is the export of the payment history for the second trust loan for 5505 or 5501 First Street Northwest.

Q. You said it's the -- which loan? The first trust or second trust?

A. Second trust.

MR. SADOWSKI: Judge, Jim Sadowski. I'm just going to object at this point. It looks like we're heading towards proving that there were nonpayment issues prior to the issuance of the injunctions, and that's just not relevant to this proceeding. These documents, I don't think, go beyond July 2023, and so that doesn't support changed circumstances, whether the loans were in default and when they were in default. I think that's what E, F, G and H --

THE COURT: I don't agree, Mr. Sadowski. The line is not going to be drawn pre- and post-entry of the injunction, because there was not a full trial at those entries on the TRO, and I'm going to allow them to explore if there was evidence not presented to the judge or unable to be presented to the judge, which I think there was, because there were objections at trial, given the types of witnesses that were present. And if they can properly authenticate that evidence today, it could be something in addition to what that Court considered that this Court can consider.

MR. SADOWSKI: Okay. Thank you, Judge. I'll just note for the record that I was at those TRO hearings and that WCP did offer nearly identical records of Exhibits E, the exhibits that I objected to. That was considered. That was

offered before Judge Lee and Judge Scott as to these. And that was their one witness they put on, to introduce these very similar records. So it's not new. It's old. But I understand that the Court wasn't there, but these exhibits were presented before Judge Lee and Judge Scott.

THE COURT: Well, then I should have them in my record. Are you stipulating to their admission, as opposed to having Ms. Cordova go through all of them?

MR. WILLNER: And Your Honor, they were admitted into evidence at those TRO hearings.

THE COURT: Well, that's what he just said.

MR. SADOWSKI: Over my objection, on a business records objection that was overruled. And I may have that same objection here.

THE COURT: All right. Well, then, he's establishing business record. If they were admitted over a business record objection, and I have to consider them here, then I will.

Go ahead, Mr. Willner.

MR. WILLNER: Thank you, Your Honor.

THE COURT: So can we go back? This is the second loan on which?

THE WITNESS: On First Street.

THE COURT: First Street. Is that what you said?

BY MR. WILLNER:

Q. Ms. Cordova, I'm going to show you now Exhibit --

THE COURT: Can we just clarify? E is the second loan on First Street?

MR. WILLNER: I was going to try to refresh the witness's recollection, because --

THE COURT: Okay. Thank you. Go ahead. I just wasn't sure if I had my -- if there was an answer. Go ahead.

MR. WILLNER: All right.

Q. Ms. Cordova, can you take a look at the amounts due column on Exhibit E?

A. I do see that.

Q. Okay. Can you take, and I'm going to scroll real quick to Exhibit F. Ms. Cordova, I'm showing you what's been marked as WCP Exhibit F on the screen. Do you see that?

A. I do.

Q. Okay. And take a look at the -- I want to direct your attention to the amounts due interest column on this Exhibit F.

A. I see that.

Q. Okay. Can you tell the Court what loan payment history, which loan this loan payment history is for?

THE COURT: So this being E or F? F now?

MR. WILLNER: This F.

THE WITNESS: F.

THE COURT: Okay. Thank you.

A. That would be the first trust.

Q. Okay.

THE COURT: On which property?

THE WITNESS: For 5505 First Street.

THE COURT: Okay.

THE WITNESS: 5501 First Street.

Q. Ms. Cordova, does it make sense that the first trust interest will be less than the second trust interest?

A. Can you repeat the question? I can't see the numbers.

THE COURT: I'm going to have you put whatever papers you have just down.

THE WITNESS: I'm sorry.

THE COURT: Because you to look at whatever Mr. Willner shows you.

A. Can you repeat the question? I'm sorry.

Q. Yes. Does it make sense that the first trust interest that is shown in Exhibit F will be less than the second trust interest?

A. No.

Q. Okay. So is it possible that Exhibit F is the second trust loan payment history and Exhibit E is the first trust loan payment history?

A. That is correct.

Q. Okay. All right. So just for the record, let's just make sure we're on the same page. WCP Exhibit E, this is the loan payment history for which loan?

A. According to my notes, this is the second trust. My --

I'm sorry. I might be confused. Go ahead. Can you repeat that?

THE COURT: Okay. Well, can you hand your notes to Ms. Lee (phonetic), because you shouldn't be referencing those in any event? So just answer Mr. Willner's question based upon what he's shown you.

A. Can you repeat that? Sorry.

Q. Yes. Exhibit E, WCP Exhibit E?

THE CLERK: Judge, (unintelligible).

THE COURT: Yeah. Can you hand her those, please? You need to answer the questions directly from Mr. Willner, what he shows you. And we can't be referring to anything. I didn't realize there were papers. Thank you, Ms. Lee.

MR. WILLNER: Thank you.

Q. Okay. WCP Exhibit E, Ms. Cordova, is this the loan history for the 5501 first trust loan or second trust loan?

A. Should be the first trust.

Q. Okay. And that matches the information that you saw on Dynamics on Friday and last night?

A. Yes, it does.

Q. And scroll scrolling now to the WCP Exhibit F, is this the loan payment history for the 5501 second trust loan?

A. Yes, it is.

Q. And again, this information that is in Exhibit F, that matches the information that you saw on Dynamics last night and

on Friday?
A. Yes, it does.
Q. I'm showing you now what's marked as WCP Exhibit G. And the first page of Exhibit G is a blowup of the second page of Exhibit G, so I'll just direct your attention to the second page. Have you seen this document before?
A. Yes, I did.
Q. Okay. And this is a loan payment history?
A. Yes, it is.
Q. And it matches the information that's in Dynamics?
A. Yes, it does.
Q. For which loan is this?
A. This should be 423 Kennedy.
Q. Okay. First trust or second trust?
A. Since I don't have my notes, this should be the first trust.
Q. Okay. But it appears to be the first trust?
A. Correct. Based on the amount due.
Q. Now, I'm showing you what is marked as WCP Exhibit H. And I'm directing your attention to the second page of that exhibit, because the first page is a blowup of the second page. Can you tell the Court what loan this is a loan payment history for?
A. This is the second trust for 423 Kennedy.
Q. And can you verify that the information in this exhibit

matches the information that's in Dynamics?
A. Yes, it does.
Q. Ms. Cordova, how does information get into Dynamics?
A. Regarding the loan payments? Depending on how the payment is received, it automatically gets inputted by the system into Dynamics and identified how it's received.
Q. So it's primarily -- it's primarily electronically generated. Is that what you're saying?
A. That is correct.
Q. Okay. Is there any information that's manually inputted?
A. Yes.
Q. Okay. Can you tell the Court what kind of information is manually inputted?
A. That would be -- yes, I'm sorry. That would be wire transfers. Those would be manually inputted.
Q. Okay. And who would input those wire transfer data?
A. Anybody in the servicing department, a servicing specialist or a servicing manager.
Q. And when would wire transfers typically be manually inputted in the ordinary course of WCP's business?
A. It would be -- it would be entered the day received.
Q. What about the calculations for the amount of interest due. How is that calculated?
A. That is a calculated field in Dynamics, and it is done automatically.

Q. So electronic automatic?

A. Electronically automatically the system calculates it based -- based on the loan amount and interest rates.

Q. And Ms. Cordova, are these loan payment histories, or I'm sorry. The data that is in Dynamics from which these loan payment histories, these meaning Exhibits E, F, G, and H, the native data that is kept in there in Dynamics, that is kept in the regular course of WCP's business?

A. Yes.

Q. And it's the regular practice of WCP to keep this Dynamics data?

A. Yes.

MR. WILLNER: Your Honor, I'd like to move for the admission of E, F, G, and H as business records.

MR. SADOWSKI: We'll object subject to cross-examination. I may be able to poke holes in whether this is an actual business record or not.

THE COURT: On what part?

MR. SADOWSKI: Well, if I tell you that now, Judge, then I'm giving the witness a clue as to what I'm going to ask on cross.

THE COURT: Okay. So he's established the elements for a business record entry, which is that she's the custodian of the record, it's kept in the ordinary course of business. How they were made, are they typed it or under her custody or

control? I mean, if you want to try and impeach the information, I suppose. But I'm trying to figure out why you think he hasn't established a proper foundation for a business record under 8036.

MR. SADOWSKI: I believe on cross, I will be able to establish that some of these entries were not contemporaneous.

THE COURT: All right. Well, that's to challenge the credibility of the document. But I'm going to the element of requirement to establish a foundation under Federal Rule of Evidence 8036.

MR. SADOWSKI: And I don't believe they've laid the entire foundation as to each of these individual records that were made contemporaneously with the time. In fact, she said that while transfers are manually entered, you'll also notice, Judge, that there's no late fees on this document anywhere. You'll also know that there's some defaulted entries on here. There's been no testimony about how those get entered, when are those get entered. And their position is that we've been in default for quite some time, and you'll see that the first entry of default is not until January of 2023, after the infamous December 8th phone call and letter.

THE COURT: Okay. But the contents and a challenge to them thereof or the relevance thereof is different than a challenge to whether Mr. Willner has established the elements of a business record exception.

MR. SADOWSKI: If you're going to overrule the objection, Judge, I can obviously live with that.

THE COURT: All right.

MR. SADOWSKI: And maybe --

THE COURT: So they're admitted as a business record, subject to examination as to the contents thereof.

(Business records from Dynamics were hereby received into evidence as WCP Defendants' Exhibits E, F, G, H, as of this date.)

MR. WILLNER: No further questions at this time, Your Honor.

THE COURT: All right. Mr. Sadowski.

CROSS-EXAMINATION

BY MR. SADOWSKI:

Q. Ms. Cordova, what is today's date?
A. October 19th.
Q. What?
A. October 19th. I'm sorry.
Q. October 19th of what year?
A. 2026.
Q. Okay. And what does the seal behind the judge say?

A. United States Bankruptcy Court, District of Columbia.
Q. Thank you.
MR. SADOWSKI: Nothing further. Judge, do I need to replug in if I move up there or if --
Steve, if you could just let me use that.
THE COURT: Ms. Smith, can actually run it from the table, if that's what you want her to do. We just have to change which cord is talking to the display.
MR. SADOWSKI: It might be easier if I just use the --
THE COURT: Okay. That's fine. However y'all want to do it. Just saying.
MR. SADOWSKI: Just struggle with it.
Q. Good afternoon, Ms. Cordova. My name is Jim Sadowski. I represent 423 Kennedy St. Holdings LLC and Developer RE1, LLC in this case. I'm sorry if I missed your start date at WCP. Was it --
A. September 2023.
Q. How do you know that the entries that were made on this document were entered contemporaneously?
A. It's policy to enter the information as it is received.
Q. Okay. So you don't actually know that they followed the policy? You just think they were entered that way because of the policy. Is that right?
A. That is proper procedure.
Q. Okay. And who made these entries on Exhibits E, F, G, and

H? What person made those entries?
A. By looking at the document I'm not able to determine who, but the system will track the person who enter -- who made the entries.
Q. Okay. How many people have access to CRM?
A. In the servicing, I cannot tell you exactly how many people have access to the CRM.
Q. Okay. Is it more than a hundred? Is it less than ten? Do you --
A. At the -- at the time of the entries being done?
Q. Yes, at that -- during that time frame.
A. I cannot determine that, because I was not employed by WCP.
Q. Right. So you didn't come to WCP until, was it September 2022, right?
A. 23rd. 23. I'm sorry. September 2023. September.
Q. 2023.
A. Yes.
Q. So you weren't employed until -- let's stick with Exhibit --
MR. SADOWSKI: Is this F, Steve?
Q. So you weren't employed at WCP for the vast majority of these entries in CRM, correct?
A. I was not.
Q. Okay. There is a listing of late five to fifteen days on

a couple of these entries. Do you see that?
A. I do.
Q. Who made that determination that something was late?
A. The Dynamics does, the system Dynamics. When the payment is not received, it automatically gives you the servicing status.
Q. So sitting here today, if I made a mistake in any one of these exhibits in CRM, could somebody go back and change a late payment to a current payment if they later realize that it was wrong?
A. It can be changed.
Q. Right. So all these entries on Exhibits E, F, G, and H are subject to someone going back and changing them, correct?
A. Yes.
Q. Right. And you don't know -- you don't know who had access to CRM besides you? Can you elaborate on that? I think --
A. I cannot, because this is a page, but if I'm in the system, I would be able to see who had access to it.
Q. Okay. How about this word defaulted. It's listed on here. And I think we're on Exhibit -- oh, I can't see the exhibit number, Steve.
MR. SADOWSKI: Is it in here somewhere? Where is it?
THE COURT: Yeah, looks like H.
MR. SADOWSKI: Okay. Thanks. It just doesn't have H

on it.

THE COURT: Yeah, it's H.

MR. SADOWSKI: I have H up on the screen. And now I forgot my question.

THE COURT: You were asking about the service and status of defaulted.

Q. Ah, yes. Who's in charge of putting that entry in, defaulted?

A. The system mathematically does it based on payments or based on maturities. Dynamics automatically adjust -- assigns a servicing status based on payments and based on maturity dates.

Q. Okay. So this says, if this doesn't have an entry for defaulted, that means that the, according to you, that the payment was made, that the -- when a payment was made, there wasn't a default. Is that right?

A. No. That's not what it means. It means that the loan has been past due for 199 days. There was no payment received for 199 days, therefore it's default.

Q. Which entry are you talking about?

A. Talking about entry 1/1.

Q. On January 1st?

A. January 1st, 2023. That's when you see default. Is that the one you're referring to?

Q. Yeah. Well, we can just pick that one.

A. So that one is, is there is -- there is past due for 199 days. Therefore, the loan is deemed matured. I mean, defaulted.

Q. Okay. And so you're telling me that the system makes a decision on whether there's a default or not?

A. There is two different defaults, the payment and also the maturity date.

Q. Okay.

A. So here, because it's, I'm only looking at this, I cannot tell you whether is -- is the -- this one, because it's a payment history it's talking about. It's taking into account the payment that has not been received for 199 days.

Q. Okay. So in the servicing status column, is your testimony that all of those entries, the words used there automatically are generated by CRM?

A. Yes.

Q. Okay. So if somebody at WCP made a mistake in entering when a payment was made, let's say a wire transfer, the system wouldn't be able to correct for that unless somebody went back in and manually fixed it. Is that right?

A. That is correct.

MR. WILLNER: Objection. Calls for speculation.

THE COURT: I'm going to allow it, because she's telling me how the system works. Go ahead.

THE WITNESS: Yes.

Q. Okay.

THE COURT: I have a question. Do you mind if I interject?

MR. SADOWSKI: Oh, of course.

THE COURT: All right. So I'm going to presume that this was printed some day after August 1st of 2023, and that gives us these defaulted statements. If this was printed on February 1st of 2023, so only thirty days after that January payment was due, would it say defaulted, or does it start saying defaulted after they count up to a certain number?

THE WITNESS: It depends. So if, you said, if we print this in February --

THE COURT: Yeah.

THE WITNESS: -- 2023, correct?

THE COURT: Yes. Say they're one month overdue.

THE WITNESS: It will say default.

THE COURT: So if I printed it on January the 28th of 2023?

THE WITNESS: Then it would be late. It would be delinquent --

THE COURT: It would say --

THE WITNESS: -- thirty to sixty days --

THE COURT: Okay.

THE WITNESS: -- sixty to ninety days, depending on how many days it's past due.

THE COURT: Okay. And then at some point there's a trigger, presumably after ninety days, where it goes to defaulted?

THE WITNESS: Yes. But also if the loan has matured, means --

THE COURT: Right.

THE WITNESS: -- means the loan has been alive for more than --

THE COURT: But I'm just talking about payment defaults.

THE WITNESS: Yes.

THE COURT: Okay. Thank you.

THE WITNESS: Yeah.

BY MR. SADOWSKI:

Q. And Ms. Cordova, on all of these entries, E, F, G, and H, am I correct that there's no in the -- whoops. I think I started drawing on that. In the service status category, there's no entry of defaulted prior to January 1 of 2023?

A. That is correct.

Q. Now, prior to testifying here today, did you talk to anyone at WCP about the CRM system or how these exhibits were created? Did you talk to anyone?

A. About this specific one?

Q. About these exhibits, yes.

MR. WILLNER: Objection, Your Honor.

Q. Besides counsel?

THE COURT: Yeah.

A. No.

Q. Okay. All right. So you didn't independently verify any of the information on any of these four exhibits, correct?

A. Yes, I did.

Q. No, no. You verified that it was in CRM, right? But did you actually go back and look at the payment history of the loans and look at checks as they came in, or wire transfers as they came in, and compare the dates on those things to this exhibit?

A. I did, but it's because of the dates.

Q. Okay. So how did you go about looking at the -- let's pick December 1, 2022. Late five to fifteen days. And I'm, I think I'm in Exhibit F. Or is that H?

MR. SADOWSKI: H.

THE COURT: That's H. So yeah.

Q. Yeah, I didn't know it. H. It says late, five to fifteen days. What did you do prior to testifying here today to find out when that wire transfer actually came in?

A. I attempted to go into the bank and verify the wire transfer.

Q. Oh, you say you attempted?

A. The bank, the bank account, the servicing bank account.

Q. And what was the result of that attempt?

A. I was not able to go far that back.
Q. Okay. So how many of all these time entries were you unable to verify with the bank?
A. Only the ones that say wire transfer, wire.
Q. Okay. So sitting here today, you don't actually know when the wire transfers came in on every entry for where there's a wire transfer on these exhibits, right?
A. Yes.
Q. And there's no late fees assessed on any of these statements?
A. You will have to move to the right. It should say amount, pay amount due, late fee amount due.
Q. Okay.
A. Let me see column --
Q. Am I going far enough?
A. Let me see. I need to find it.
Q. See that late fee column, right? It's zero the whole time.
A. I can't see.
THE COURT: Yes. I --
A. Oh, that's amount paid.
Q. Oh, sorry. Amount paid.
A. You need to go back to the other side, to the --
Q. Just tell me where to go.
A. Yeah. It says amount due, late fee.

Q. Okay. Zeros all the way through, right, on all late charges?
A. Yes.
Q. And is that true on Exhibits E, F, and G as well? No late fees?
A. Yes, because there is default interest.
THE COURT: I'd like you to show her E and F, please.
MR. SADOWSKI: Oh, sure. Am I doing this right, Steve? I just can't -- I don't know how you scroll on this.
MR. WILLNER: I'm a nice guy, so I'll help you out. That's H. That's G.
MR. SADOWSKI: Okay. All right. So scroll and then big. Okay. Judge, is it okay if I use the printed out versions of these to make it faster?
THE COURT: That's fine. We'll put on the overhead projector, or whatever you call it these days.
MR. SADOWSKI: Thank you. I learned a new skill today. Okay. Let's see if I can do this right.
THE COURT: Let's let Ms. Lee get it turned on.
MR. SADOWSKI: And this makes it bigger, right? Oh, boy. Does the Court have regular training on this? I'll sign up for it.
THE COURT: I mean, the overhead projector has been around since high school. That's how I took calculus.
MR. SADOWSKI: Okay. Let's see. So help me out, Ms.

Cordoza, the late fees column is --

MR. GREENBERG: What is it are we looking at?

THE COURT: This is right there.

MR. SADOWSKI: This is Exhibit E. I'll show you. Yeah, I folded it, so.

BY MR. SADOWSKII:

Q. So Exhibit E, where do I find the late fee column?

A. Move to the left.

Q. Keep going?

A. Right there. Amount due, late fee.

Q. Amount paid late fees. On Exhibit E, there's no late fees paid, correct?

A. Amount paid late fee? No, but amount due.

Q. So where is the late fees due on this?

A. Right next to amount due interest. No, to the other side. Right there where it says 2,383 with $0.02.

Q. Yes, I'm just talking about interest -- I'm talking about late charges. Are those late amounts there, the $2,383.02 on Exhibit E?

A. Yes. Yes, those are late fees.

Q. And were those late charges paid?

A. If we move further to the right, I don't think they were paid. You see amount paid late.

Q. So we got two late charges on Exhibit F, correct?

A. Yes.

THE COURT: That was actually E, but that's okay.

MR. SADOWSKI: E, I'm sorry. You're correct. Two late charges on Exhibit E. Thank you, Judge.

Q. And then on Exhibit F, there are two charges assessed. Looks like $523,56?

A. Correct.

Q. And were those paid?

A. No.

Q. Where are they -- does it just to show that they're not paid?

A. Amount paid, late fee. Right -- I can't point it out, but it's right there.

Q. Yeah, it says zero though, amount paid late fee, across the board.

A. That means they were not paid. Yes.

Q. Then the late fees were paid.

A. No, they were not paid. If they paid, it would show an amount that was paid.

Q. Ah, okay. All right. So is there an amount of late fees owed on this exhibit?

A. Correct.

Q. And where is that?

A. Amount due late fee, the $523.56.

Q. Sorry. Let's just go back to E again. I thought I'd ask this question, but I wanted to make sure. On Exhibit E, it

doesn't show a default status until February 1, 2023, in the servicing status column, correct?

A. Correct.

Q. And on Exhibit F, it doesn't show default status -- defaulted, correction, until February 1, 2023. Is that right?

A. Yes.

Q. And on Exhibit G, it doesn't show default status until January 1, 2023, correct?

A. Yes.

Q. And on Exhibit H, it doesn't show default status until January 1, 2023, correct?

A. Correct.

Q. And just to make sure I didn't miss this, but that default status, on any of these exhibits, what did you do before testifying today to verify that the loans were in default?

A. The payment, I verified the payment history, and the payment history based on the dates due makes the loan on default.

MR. SADOWSKI: Court's indulgence. Impeachment exhibits. Those are all the questions I have for this witness, Judge. Thank you.

THE COURT: Thank you.

Any redirect, Mr. Willner?

MR. WILLNER: Nothing, Your Honor.

THE COURT: All right. Thank you, Ms. Cordova. You can step down.

MR. SADOWSKI: And Judge, in light of the cross, I renew my objection to the admissibility of F, G and H. But I understand the Court's going to overrule that objection.

THE COURT: Overruled.

MR. SADOWSKI: Okay.

MR. WILLNER: Court's indulgence.

THE COURT: Fine, take your time.

MR. WILLNER: Your Honor, we rest.

THE COURT: All right. Mr. Sadowski.

MR. SADOWSKI: Well, I don't know if there's such a thing as a motion for a directed verdict on the motion to dissolve. They have not demonstrated --

THE COURT: Well, I haven't heard argument as to what all of the exhibits are going to show, so I'm going to reserve.

MR. SADOWSKI: Want to wait for that?

THE COURT: Even if there was a motion, I'm going to reserve until the close of evidence to, to rule since I want to hear closings on the points. There's a lot of documentary evidence in here, and I haven't yet heard exactly how to apply that.

MR. SADOWSKI: Okay. The Plaintiffs will call Mel

Negussie.

THE COURT: Okay.

(Witness sworn.)

THE WITNESS: Yes.

THE CLERK: Thank you. You can have a seat. And then state your name for us.

THE WITNESS: Thank you. Mel Negussie.

DIRECT EXAMINATION

BY MR. SADOWSKI:

Q. Good afternoon. In introducing yourself to Judge Gunn, which you did, you took away my question, but can you tell Judge Gunn a little bit about your educational background?

A. Sure. I went to an engineering school, graduated in chemical engineering. Worked for a couple of years with Dow Chemical, and I went to law school and then practiced law primarily in intellectual property and international trade. And I have taken courses in project management and so forth since then with Georgetown, Georgetown University and whatnot.

Q. And can you give Judge Gunn just a little bit of background about your development experience?

A. Sure. Initially, it started with being a part of raising funds from 300 physicians of Ethiopian descent, throughout the world, but primarily eighty percent here in the United States. We raised the funds to develop a hospital to build the hospital in Ethiopia. These are eighty percent American citizens. And

I was in charge of that project dealing with architects, engineers, and so forth and whatnot. So that gave me a great education in terms of how to do construction work.

And then I started doing smaller projects throughout the DC Metro for a number of years. And then I had a chance to do a thirty-five unit condominium in Arlington, Virginia on behalf of a nonprofit. And initially, I was retained as an owner's agent on behalf of the nonprofit that owned that property.

Then when the GC did not perform, since I was already a GC, I became a general contractor in Virginia and developed successfully a thirty-five unit condominium. That was sold off around 2020 -- 2019-2020 time frame. So that was sort of the first major project that I had done. And I had done a bunch of smaller projects prior to that. Should I continue? Did you ask me my whole -- my whole career up to today? Or is that --

Q. What is your -- did you leave anything out in terms of your career up to today? If you did, go ahead and let Judge Gunn know what that is.

A. Yeah. I mean, basically after the -- the -- the successful completion of that thirty-five unit condominium, I got approached by a few people to help on a project -- projects, I should say plural, that was financed or owned by WCP and another individual by the name of Charles Perret (phonetic). And they asked me if I can help in executing these projects.

And -- and since then, one of the projects, for instance, 201 Kennedy, we got an investor group to come in, and I was the managing member. And we successfully built and stabilized that project. And now it's -- it's operating nine units with a commercial on the ground floor. There's -- there's also other projects that I've done single family homes in Georgetown and other places since then.

MR. SADOWSKI: Ms. Matthews, can you connect me, please? Just see if I can work my own laptop.

THE COURT: Just know that anything you see on your desktop we're going to see on here. So if you have notes or something, don't do that.

MR. SADOWSKI: I think I've cleared everything. I had my AI images of Mac playing in a circus. I'm just kidding, Judge. Thank you for the cue, Judge.

THE COURT: Hold on.

MR. WILLNER: Your Honor, is Ms. Cordova free to go?

THE COURT: For me she is. I don't know if the parties have any reason to keep her.

MR. SADOWSKI: Yes. Thank you so much.

MS. CORDOVA: Thank you.

MR. WILLNER: Thank you. Sorry to interrupt.

THE COURT: No. That's fine.

Q. Now, this is -- the bookmarks don't work. Mr. Negussie, as part of the record in the case, the Defendants have moved

into several exhibits regarding real estate taxes. So let's start with 423 Kennedy. What is the -- since the injunctions were issued, what has 423 Kennedy done to pay, challenge, appeal the real estate taxes for that property?

A. So the -- the DC law is that you can get an exemption for either construction or other exemption items to not get a vacant property designation. A vacant property designation sometimes triples or five times the property taxes. So if -- if a project is under construction, you can get an exemption.

So this project has been in construction since about 2020 at 423 Kennedy and we -- we had gotten a series of exemptions. So when the -- when this -- when they claim that this loan was defaulted, and they tried to foreclose on it, we continued getting an exemption.

And in -- for instance, in 2024, it was designated as vacant property. So we had to appeal before the -- the Department of Buildings in DC. And -- and get the exemption so that we don't have to pay at the vacant rate. The vacant rate is, like I said, three to four times more than what the regular property taxes are. So that's sort of the process.

And in 2025, they actually again designated it as vacant. So we appealed, where I actually went before the real -- real estate tax commission. And I appealed it, and we were not successful because we had, by that time, exhausted the five years. So that's how the history is. I mean, it's been an

ongoing, it's very costly. We're just paying property taxes for -- you know, without being able to develop the property.

Q. Let me go back to the sort of beginning in a way. When 423 Kennedy signed off on the loans that have been admitted into evidence here, how long did 423 Kennedy expect that it would have to pay the real estate taxes?

A. Two years. The maximum of three years, sometimes you can have an extension of one year because of unforeseen circumstances, COVID being one, anything that you may encounter on the land could be another unforeseen circumstance that could result in this. In fact, initially, when this project -- I was introduced to this project by Charles Perret that they had already a permitted set of drawings, and that it was anticipated that it should not take about a year and a half is the schedule that they provided. That was right before COVID. So obviously COVID and -- and other things changed that circumstance.

Q. And did 423 Kennedy -- when, if ever, did 423 Kennedy engage a lawyer to help reduce the real estate taxes?

A. In 2020 for the first time, I believe the first time DOB designated as vacant property because it was just standing vacant. There was no activity going on since 2022, I believe. Yeah, 2022. So they designated the property as vacant, I believe in 2024 was the first time. They may have done it in 2023. I can't remember, sitting here, but certainly in 2024.

Q. So how long when did -- the 423 Kennedy loan was supposed to mature, what was the date of that?
A. I believe it was supposed to mature in March, April of 2023.
Q. And did 423 Kennedy continue to pay the real estate taxes after whatever the maturity date of the loan was, the loans?
A. Correct. Yes, until recently. Yeah.
Q. And so when did 423 Kennedy stop paying real estate taxes?
A. Yeah. So we appealed the 2025 designation, and we appealed it, like I said, with the real estate tax property commission, and we had not paid the 2025. And regarding 20- -- I'm sorry?
Q. What was the difference roughly in between -- what were the taxes before the vacant charges started being assessed?
A. Yeah. For every half year we were paying about $5,000. And then, once they designated it as vacant, it was about $25,000 for every half year.
Q. And that initial designation was challenged. And what was the result of that challenge?
A. The initial, the 2024 was successful. So they gave us an exemption. So we paid those taxes. And then in 2025, again, they designated as vacant. Like I said, you -- there's actually another step that I should have -- there's a document that you filed a request for exemption with DOB, which we -- we submitted. And when they make a final determination rejecting

it, then we appeal that. And that appeal was denied.
Q. Now there's been an exhibit admitted into evidence which looks like a notice of tax. Let me just check. I'm still on 423 Kennedy, Mr. Negussie.
A. Yes.
Q. I'm doing my first time winging it with this electronic exhibits, and I'm definitely a novice. That was exhibit O as in Oscar. And it's Exhibit O says the 423 Kennedy property was sold at a tax sale. Do you see that?
A. Yes.
Q. Okay. What does 423 Kennedy's plan to address the fact that there's now -- has been a tax sale of the property?
A. Yeah. So you know, it's been very expensive financially, a huge hardship on -- on myself and the other investors. So our whole plan has been to pay when we have to pay certain bills, particularly as it relates to these property taxes, in case it settles, in case something happens. And really, to make sure that we are represented by counsel, so we've paid over $600,000 in attorneys' fees for both cases throughout these years.
So we plan to pay it when we have to in this. This was interred on August 20th is what I see. I believe we have four months from that time to be able to redeem it. So we plan to pay it before December 20th.
Q. And we'll, we'll stick with 423 Kennedy. But how much

money does 423 Kennedy have currently?
A. Essentially zero. This is -- we're, we're funding it. In fact, for all of the expenses we've taken a loan that I have personally guaranteed that loan on behalf of 423 Kennedy, so we have no money up to now. It's the other investors and myself that are funding it from our out of our own pocket.
Q. And to skip ahead on the question, does that same answer apply to the Developer RE1 property? How much money does RE1 have, and how's it been able to pay the bills since the injunction was issued in July of 2023?
A. Yeah. For Developer RE1, it's really us the investors. Same thing that we've been paying it. I didn't have to take a loan on that property, on my personally guarantee that to be able to do this, but we've been paying it out of our own pocket.
Q. And that next step in the process for the tax certificate holder, are you aware of the process for that person to foreclose the right of redemption?
A. Yes, somewhat.
Q. That requires filing a lawsuit, correct?
A. Correct.
Q. Right. And so there still would be time, even after the 120 days, for 423 Kennedy to negotiate with the tax lien holder after that lawsuit is filed, correct?
A. Correct. Correct.

Q. All right. Shoot. The computer just shut off.

A. I mean, we're not going to allow to lose the property. But at the same time, we pay those bills that we have to pay to make sure that we are adequately represented.

Q. So let's go now back to RE1 and talk about what -- and when I say RE1, I mean Developer RE1, LLC. What did RE1 do to either pay, appeal, challenge the real estate taxes due after July 2023?

A. Yeah. So the same thing with RE1, Developer RE1. We paid the property taxes until there was a vacant determination. And then we appealed it, filing an exemption request with the DOB. They granted in 2024. And then in 2025, again, the same thing happened that they denied it. And we filed for a hardship exemption. That's one of the items that you can do that. And

I have filed -- for 2025, I have filed an appeal to the real estate tax commission. And we're waiting for a hearing for the 2025. For 2026, I have submitted an exemption request with DOB. You have to get an exemption request and then get a final determination before you can actually appeal it.

Q. Okay.

A. And then you asked -- just to finish that thought. You did ask me about the -- we did pay the 2025 as soon as they -- they gave a notice of a tax sale. So we paid it before it actually sold on that -- on that property.

Q. So I'm sorry if I missed it, but what about the time

period after the injunction? So after July 2023, at what point going forward did everyone pay the real estate taxes?

A. We paid every time until 2025 that we have -- that appeal is still ongoing. 2025 is also paid. 2026 is not paid because we have submitted an exemption with DOB. It takes DOB sometimes ninety days, six months and so forth, for them to give you a final determination. So 2025 and prior is paid. We've always paid it. Prior to that, 2025 was -- even though we have it under appeal, if we are successful under the appeal for 2025, we'll hopefully get reimbursed as the plan.

Q. Mr. Negussie, introduced as evidence already as Exhibit R, which I'm trying to scroll through with my novice skills here, which is an email that you wrote to 1Sharpe. There's a series of emails that you wrote to 1Sharpe. So let's start with the first one, which is the one I have up on the screen, November 16th, 2025. Why did you first reach out to the individuals listed on this email?

A. Yeah, so I read an article in The Washington Post in August of 2025 regarding a property called DIX Property, D-I-X -- D-I-X Street. And when I read into it, it said a financier from West Coast was involved in that property. And this property, the article was that the -- the DC Attorney General's Office had gone after the developer of -- of that property. And I think they had made a claim of some sort. It seems like regarding the financial institution as well. So

I -- I went in, in DC Recorder's Office, and I looked and behold, it's 1Sharpe. That was actually part of that property.

Q. And in November 2025, was that around the time the parties were meeting before preparing to mediate before Judge Hennekens?

A. Correct.

Q. So I'm not sure if you answered the why you wrote them in November, what led to it, but what were you trying to accomplish by writing them in November 16th, 2025?

A. Yes.

Q. The email that's part of the Exhibit R as in road?

A. And yeah, I honestly -- as a business person, I honestly do not understand how a property financier will sit on a property for three, four years and not engage in genuine settlement negotiations. And I wanted to tell them I really felt WCP was not telling them, from that article as well, were not telling 1Sharpe truly what is happening.

MR. WILLNER: Objection. Hearsay.

THE COURT: He's indicating what he intended to say, and that's all I can take it for, not the truth of the matter of what he's saying.

MR. WILLNER: I believe he's also testifying about communications between 1Sharpe and WCP, or what he believes 1Sharpe and WCP -- that would be hearsay in both.

THE COURT: I don't take it for the truth of the

matter that they were talking. Just that that was his belief.

MR. SADOWSKI: Yeah.

THE WITNESS: So should I continue?

MR. SADOWSKI: You can continue.

A. So I -- I really believe that if 1Sharpe really knew what was happening, that this case will settle, both for their benefit, because they still are holding -- at the time, I thought the notes. And also us and us the investor group. So that was an attempt to say, listen, maybe you don't know what is happening to -- to these properties. And I searched through online and so forth, and I found out who owns 1Sharpe, who are the CEO, the person in charge of the real estate. And I reached out to them for that purpose, following that article that I -- I saw.

Q. What, if any, response did you get?

A. Nothing.

Q. Okay. Now how about the second piece of Exhibit R, which is an April 20, 2026 email that you sent. And you replied to your prior email in that one, right?

A. I'm sorry?

Q. You replied to their initial email?

A. Yes.

Q. That right? And why were you contacting 1Sharpe in April 20, 2026?

A. So we had a settlement negotiation, I believe, in January

of 2026.

Q. And I'll caution you, Mr. Negussie, not to talk about settlement negotiations.

A. Sure.

Q. I don't think you're going there, but that's going to draw an objection.

A. Sure.

Q. Okay.

A. Sure. And it was not successful. I can say that. It was not successful. In fact, the person who was sent by WCP lasted about an hour or so.

MR. WILLNER: Objection.

THE COURT: Sustained.

A. Okay. So I can't talk about that, right?

Q. Yeah.

A. Okay. So -- so at the time, at the conclusion of that, there was supposed to be further discussions. We -- and I think the mediator was open to entertain additional negotiations, which never happened. So I waited a little more, and it was an attempt to interest the holder of the note that, let's have a conversation. They were not a named party. It's really for that purpose that I wrote that -- that email to them.

Q. Okay. And in this email -- and this was in their motion to dissolve, which I forwarded to you. They, it says here that

the property is deteriorating as a result. Which property were you referring to?
A. That was referring to 423 Kennedy.
Q. Okay. And flipping back to Developer RE1, just tell the judge the current status of the property and what's expected to happen to the building on that property?
A. Yeah. Developer RE1, that property is going to be razed or demolished. It has -- it's not going to -- it's going to require a huge amount of dollars to rehabilitate that building. It was intended always to -- to demolish it and move forward. We found -- even prior to -- to them defaulting it, asbestos was found in those buildings. So there was no -- we removed that, but --
Q. Right. So you're not worried about the RE1 property --
A. Yes.
Q. -- deteriorating, correct?
A. Yeah. Correct.
Q. Okay. How many times since the injunctions were issued has anyone from the WC Defendants come to inspect the property?
A. Zero.
Q. Okay. Has anyone during that same time frame -- putting aside this motion, has anyone from the WC Defendants indicated that they were worried about the condition of the property?
A. No.
Q. Okay. Now let's go back to the 423 Kennedy property.

When you said deteriorating as to that property, and that's the only property you're referring to, correct?

A. Yes, correct.

Q. What did you mean by that when you wrote those words?

A. Yeah. Yeah. So this is a property that was about eighty percent completed. It's not completely sealed in terms of the roof and other places because it was all of a sudden, I believe in October of 2022, I believe, that the draws were stopped. So no further construction can take place to seal the property. So they're exposed to the elements. It's been three years. Any house where no one is living is going to deteriorate or have issues with that building.

So as much as I can, I try to fix what I see at any point in time. And really, the primary reason was also to get the attention of the -- of the -- of, in this case, 1Sharpe that, you know, listen, pay attention, and -- and let's really try to come to some kind of a resolution regarding this -- this property.

S1: Okay. And as to the 423 Kennedy property, since construction stopped -- and when did construction stop? I don't know that we -- Judge Gunn knows that.

A. Yeah. In October of 2022.

Q. And why did construction stop?

A. Because of the -- the -- they pulled the draws. They weren't providing draws anymore.

Q. Okay. And what impact did that have on your ability to make the property more weather resistant?
A. It actually stopped it. We -- we didn't have any funding to -- to be able to do that. That was part of the -- the construction loan that we had obtained from WCP.
Q. Okay. And what has 423 Kennedy been doing since October of 2022 to maintain the property, inspect the property, visit it. Can you please let Judge Gunn know?
A. Yeah.
Q. What efforts have been made?
A. Yeah. So we have 24/7 monitoring, camera monitoring so we don't have any intruders. I inspect the property myself at least two to three times, sometimes more, particularly if there is rain. And if there's any kind of problem that I see, a leak and so forth, as much as I can, I try to plug it to make sure I hire contractors to come in to -- to make sure that that doesn't continue leaking into the building, because it can have further damage. And you know, we maintain the landscape.
Q. How often?
A. Particularly during the summer when there's obviously growth. But during the winter, you also have snow that -- that -- we have to clean the snow in front of the building and so forth. But I would say -- in terms of the landscape during the summer, I would say at least once a week, because we have a lot of growth there during -- on the front and the back of the

property.

Q. Okay. And what about cleanup efforts? Are there any -- were there any cleanup effort -- what type of cleanup efforts, if any, were made since construction stopped by 423 Kennedy -- at the 423 Kennedy property?

A. Yeah. There's a lot of cleanup. People dump trash. We have to clean that up. You know there are intruders. There's animals that go in, dead animals in there. So there's a slew of cleanup and effort that we do just to maintain that property. Not only just, you know, my time and so forth, but also getting a contractor to make sure they come in. We had a large raccoon die and -- and we had to hire an animal -- I guess, a company to come in and take that raccoon and so forth.

Q. Okay.

A. I mean, there's a constant effort to -- to maintain that property.

Q. And how often do you inspect the 423 Kennedy property, if I didn't hear you say that earlier?

A. At least two to three times a week.

Q. Okay. When's the last time you were there?

A. I was there this weekend.

Q. Okay.

A. Sunday.

Q. And what, if anything, did you observe this weekend that caused you any concern?

A. Yeah. So I was there with a contractor to make sure that we sealed some of the leakage that is actually occurring from the roof and from the parapet wall of the building.

Q. Okay. And over the course of -- since construction stopped, have you -- what, if any, concerns that you have that went unaddressed? Or did any concerns go unaddressed?

A. Did any -- I'm sorry?

Q. Concerns about a leak or the wind or raccoons.

A. Yes. I mean, it's a constant effort. And I think that's part of the reason that I reached out to 1Sharpe, that even if they take over the property, it has to be, you know, at some point, you know, to -- to limit the amount of exposure. The inclement weather, whenever you have it, during the winter and also the -- the summer, has an impact in the building. And I try to solve as much as I can.

Q. Okay. Do you have an estimate, roughly, about how much money 423 Kennedy has spent in maintenance and repair costs since construction stopped? Just ballpark figure.

A. Yeah, I'll say $250,000.

Q. All right. And now there's a provision in the deed of trust, I believe it's section 4.11, that obligates you to put a lockbox on the property so the lender can get in. Did the WCP Defendants ever ask you to put a lockbox on the property?

A. No.

Q. After construction stopped, did the WCP Defendants ever

call you to schedule an inspection?
A. No.
Q. Okay. What, if anything -- to your knowledge, did the WCP Defendants to reach out to you to go look at the 423 Kennedy property?
A. No.
Q. Let's just talk a little bit about a bond.
A. I apologize. I just want to make sure.
Q. You want to correct something?
A. Yeah, I want to correct something. There was maybe three or four months ago that you reached out to me that somebody from their side -- I just want to be -- yeah.
Q. Right. But I'm talking about direct reach out from them.
A. Oh, no.
Q. Okay.
A. No direct reach out.
Q. That reach out you're referring to is a reach out from their counsel to me to inspect the property, correct?
A. Correct.
Q. And did they, to your knowledge, ever follow up on that request for an inspection?
A. No.
Q. Mr. Negussie, the Court has discretion about whether to impose a bond or security. What, if any money does 423 Kennedy have to pay towards a bond?

A. Zero.
Q. Okay. And if a bond were imposed, how would 423 Kennedy have to go about complying with that? Let's just pick a number $50,000. What does that entail?
A. Basically, it would have to either come out of my pocket or I'll have to borrow it like I did for the ongoing, from another person or entity.
Q. Right. And have you investigated what -- with any bonding company about what collateral they would want if a bond were imposed?
A. Yes, they --
Q. And --
A. I'm sorry.
Q. And what was the result of that investigation?
MR. VERSTANDIG: Objection. Calls for hearsay.
THE COURT: Sustained.
Q. When you did your investigation about the bond, did you review any applications for bonds?
A. Yes.
Q. Okay. And did the applications require any form of security?
A. Yes.
Q. And what was that?
A. A hundred percent.
MR. GREENBERG: Objection. Hearsay. Best evidence.

THE COURT: Sustained.

MR. SADOWSKI: Just thinking, Judge.

Q. Does 423 Kennedy have any ability to provide the property as collateral to a bonding company?

A. No, as far as I know.

Q. Okay. Does 423 Kennedy have an ability to provide any cash to a bonding company without borrowing money from somewhere?

A. No.

Q. Okay. And at the time the construction draws stopped and constructions -- construction draws were stopped by the WCP Defendants, how complete was the project?

A. I would say about eighty percent.

Q. And had the construction draws continued, when do you think 423 could have completed construction?

A. March of 2023.

Q. All right. Okay. At that point, March of 2023, the property would not be subject to all these open areas and some of the things that you described that may contribute to deterioration, right?

A. Correct. Actually, it would have taken a lot less. Within two to three months, we would have been completely enclosed the building, if we had those draws.

Q. Okay. Now there were some exhibits admitted, E, F, G, and H, I believe, that showed late payments, payments off by a

couple of days. What is your recollection, and let's stick with -- let's start with 423 Kennedy, about whether 423 Kennedy made late payments and how those were resolved, if at all?

A. Sure. There's a series of -- of circumstances. One is initially, I was not getting the emails to me. I was not the -- for some reason, even though they had my email, these emails saying that, you know, a payment is due, was not coming to me. That was something that we had to resolve with WCP in the summer of 2022.

The other is, there've been instances where I would wire the money, that they would actually not record it, but I would have an email confirmation from the WCP saying, oh, perfect, we got it, or at least it's, you know, thank you, whatnot. So there's never been, I can say zero emails from WCP saying that I've defaulted or you're late and you're going to have to pay these late fees or anything like that in my communication.

Once we made a payment and the payment is made, whether it's on the day it's due, or on the fifth or the tenth, whatever it is, or the fourteenth, there's one circumstance where there was an instant -- interest reserve already in the -- in the budget.

And on the second deed of trust, apparently, we didn't have any interest reserve, and we didn't realize nobody had informed me and us till much, much later that -- that for the second deed of trust, no payment -- that interest reserve was not included.

But again, there was no notice. So once we paid all of those,

it's resolved. It's -- it's became a nonissue. So they've never raised any late payment as a basis for late fee charge or -- or default. In fact, since I saw on the screen this -- this -- what you're showing here and what the earlier witness was testifying.

MR. SADOWSKI: Exhibit F is on the screen for the record.

THE WITNESS: Yeah.

THE COURT: Thank you.

A. That was never shown. Prior to today, I've never seen a statement from WCP, even at the TRO hearing, saying late fees and here's the amount. This is my first time seeing this.

Q. Okay. Let's go back to the hearings before Judge Lee and Judge Scott. Was there evidence presented at those hearings by WCP that looked like Exhibits E, F, G, and H?

A. Yes. Very similar, without having the -- I don't remember this column about there.

Q. And you were questioned about those things at those hearings?

A. Correct, yes.

Q. As to both properties, correct?

A. Correct.

Q. Okay. And when, if ever, was there an unresolved late fee over the history of -- was there an unresolved late payment over the history of the course of the loans through December

7th, 2022?
A. No.
Q. On both loans, correct?.
A. On both loans.
Q. Okay. And would it be fair to sum up to say that, whenever there was a payment that was alleged to be missed, that you took immediate action to fix that?
A. Correct.
Q. And the WCP Defendants allowed you to do that?
A. Correct. I would act --
Q. Send some sort of confirmation like, okay, we're clear, we got it, or something along those lines?
A. Correct. I would -- I would either talk with Cara Farley (ph.) or Leslie Cardenas (ph.). They were the servicing managers. And one way or the other, all of these will be resolved. There are actually emails that I have, that actually would say thank you and so forth. Never said, oh, you still have an outstanding late fee.
MR. WILLNER: Objection. Hearsay.
THE COURT: Sustained.
MR. SADOWSKI: What they never said, Judge, is not hearsay.
THE COURT: He's testifying as to the content of the emails with WCP. He can say he received them, but if, whether or not they said --

MR. SADOWSKI: Okay.

THE COURT: -- whether there was a late fee or not.

MR. SADOWSKI: Okay. All right.

Q. And Mr. Negussie, prior to December 8th, 2022, was there ever any allegation by the WCP Defendants that the 423 Kennedy borrower was in default?

A. No.

Q. And December 8th, 2022, was there ever any allegation from the WCP Defendants that RE1 borrower was in default?

A. No.

MR. SADOWSKI: Judge, I'm new to impeachment exhibits and how I put them on the screens, get them admitted. But I do have a couple of emails related to that, and I know it's kind of lunch time too.

THE COURT: Oh, no. No. Lunch time is 4 o'clock when I have to leave for the airport.

MR. SADOWSKI: Okay. Right.

THE COURT: Yeah. We might take a five-minute bathroom break in a few because I'm -- but lunch time is 4 o'clock.

MR. SADOWSKI: Just checking. Okay. All right.

THE COURT: Impeachment exhibits, you can put them up, ask the questions, and then we can take admission and/or objections as necessary.

MR. SADOWSKI: Okay.

THE COURT: Actually, this is a great time. We'll take a five-minute bathroom break.

MR. SADOWSKI: Yeah. Okay.

THE COURT: Mr. Negussie, you can't talk with Mr. Sadowski about any of the content of your testimony. You're welcome to use the restroom.

And stick close to five, everybody. If I can go in five, you can.

MR. SADOWSKI: Okay. Thank you.

THE CLERK: All rise. This Court is in a brief recess.

(Recess 1:56 P.M./Reconvene 2:03 P.M.)

THE CLERK: -- session. Please be seated and come to order.

THE COURT: All right, Mr. Negussie. You can come rejoin me up here.

MR. WILLNER: Your Honor, I'm going to make a motion to exclude the evidence that Mr. Sadowski is going to use. They're not impeachment documents. They're just documents that Mr. Sadowski is trying to put in his case-in-chief. They weren't on his exhibit list.

THE COURT: All right. Let me see them. Do you have hard copy?

MR. SADOWSKI: I do, Judge.

THE COURT: Just give it to Ms. Lee.

MR. SADOWSKI: Okay.

THE COURT: What am I looking at here? What am I

looking at here, Mr. Sadow --?

MR. SADOWSKI: Okay. So Judge, just, we're not in our case-in-chief. This is our rebutting --

THE COURT: I know.

MR. SADOWSKI: -- evidence.

THE COURT: It's your --

MR. SADOWSKI: Okay. So when you said --

THE COURT: But I'm asking you which of these you like to look at.

MR. SADOWSKI: Sure. 42, 43, 44, 45, 46, 47, 48, 49.

(Counsel confer)

MR. WILLNER: Your Honor, just to supplement the motion --

THE COURT: Okay. Hold on. Let me, -- okay. So I've reviewed. It's 42 through 49, right?

MR. SADOWSKI: Yes.

THE COURT: All right. So Mr. Willner, let me hear what your objection is to the use of these documents.

MR. WILLNER: We have never seen them before today. They weren't on the exhibit list, which is required under the -- Your Honor's local Bankruptcy Rules.

THE COURT: Correct.

MR. WILLNER: Based on the conversation with Mr. Sadowski just now, it doesn't appear that these were produced in discovery. So I haven't seen them, and I don't know what

they contain. They shouldn't be used.

MR. SADOWSKI: I never said they weren't produced in discovery, Judge.

THE COURT: Okay.

MR. SADOWSKI: What I said was, I don't have our discovery-produced binder with me, and I had no reason to bring that with me, because these emails originate --

THE COURT: All right. So how are these --

MR. SADOWSKI: -- with the WCP.

THE COURT: How are you -- okay. You're offering these as impeachment as to what?

MR. SADOWSKI: No. I'm offering these as our rebuttal case to their claim in Exhibit E, F, G, and H that we were in default, that we were late. And Mr. Negussie has already testified that all of these issues were resolved with WCP. I can rest on that, but I thought it would be helpful for the Court to see actual physical evidence of when WCP says, we did receive the November 1st --

THE COURT: Okay. I know what they say. I've reviewed them.

MR. SADOWSKI: Yeah, yeah.

THE COURT: Okay. My rules say, if you wish to use a document, then you need to list it on the exhibit list. And unless it is for rebuttal or impeachment purposes. So you are saying these rebut something --

MR. SADOWSKI: I'm rebutting --

THE COURT: -- that was in the testimony.

MR. SADOWSKI: Yeah. I'm rebutting Exhibits E, F, G, and H.

THE COURT: Hold on.

MR. SADOWSKI: And because of the way these exhibits were presented, Judge, they didn't parse out which exhibits were for which hearing or not. So I didn't know how they were going to use Exhibits E, F, G, and H. I actually thought they were going to use those in the --

THE COURT: Well, I don't care how you thought they were going to be used.

MR. SADOWSKI: Yeah. Yeah.

THE COURT: How they were used is how they were used.

MR. SADOWSKI: Yeah.

THE COURT: And the argument will be made later.

MR. SADOWSKI: Okay.

THE COURT: So if you want to point to a specific entry that then is specifically rebutted by one of these, then we can consider whether we use it. If these are simply just to establish a pattern of email traffic, then that's not sufficient.

MR. VERSTANDIG: Your Honor, they're not the movant. They don't get a rebuttal case. It's just how he won first thing this morning, establishing --

THE COURT: Okay. You're not getting picked up by the record. If you want to say something, come forward and do it where I can hear you.

MR. VERSTANDIG: Your Honor, they're not the movant. They don't get a rebuttal case. Mr. Sadowski won this morning in asserting that those bound by the injunction would carry the burden today of dissolving the injunction, meaning they are the movements, meaning the people to my left. They are thusly the ones who have a rebuttal case. Mr. Sadowski's clients would be stuck with their case-in-chief and impeachment evidence. They cannot avail themselves of rebuttal evidence.

THE COURT: All right. So this could be -- then, I used the wrong word. If he wants to refer to something to impeach the records here, then we can do that. But other than that, that's the only reason we would use these. So if there's something inconsistent with what's in E, F, G, and H compared to what's in these emails, then that's allowable. The rest of it would be the objection would be sustained as to any other use.

MR. SADOWSKI: And Judge, I'm going to just cut to the quick on this and that. I do not think I need any of these exhibits --

THE COURT: Okay.

MR. SADOWSKI: -- because they don't show --

THE COURT: All right. Then, move --

MR. SADOWSKI: The issue of nonpayment is not relevant to the issue of --

THE COURT: Right. That's fine.

MR. SADOWSKI: -- changed circumstances.

THE COURT: Okay.

MR. SADOWSKI: So we'll hold off on those.

THE COURT: Okay. I'm going to pass this back up so I don't do something stupid with it.

MR. SADOWSKI: Sure.

THE COURT: Thanks.

MR. SADOWSKI: Much indulgence, Judge. I just lost my place.

(Pause)

MR. SADOWSKI: Those are all the questions I have for Mr. Negussie at this time.

THE COURT: All right. Thank you.

MR. SADOWSKI: You're welcome.

THE COURT: Mr. Willner?

CROSS-EXAMINATION

BY MR. WILLNER:

Q. Good afternoon, Mr. Negussie.

A. Good afternoon.

Q. You testified that you're a lawyer, right?

A. I usually describe myself as a recovering lawyer. I'm not a real estate lawyer.

Q. Lucky you. One day, maybe I'll be a recovering lawyer as well. But you went to law school, right?
A. Correct.
Q. And you graduated from University of Southern California law school?
A. Correct.
Q. Good law school, right?
A. I hope so, thank you.
Q. And then you went to work for a good law firm for eight years, right?
A. Correct.
Q. Dewey Ballantine; is that right?
A. Ballantine. Yes. Correct.
Q. Okay. About 500 lawyers at that firm, right?
A. Yeah. It's not for eight years that I worked for them. There was another firm that I worked for prior to that.
Q. Okay. But you practiced as you worked as a practicing lawyer for eight years, right?
A. Correct.
Q. Yeah. And you were barred in the California State Bar?
A. Correct.
Q. And you became a member of the D.C. bar?
A. Correct.
Q. Fair to say you're familiar with how the law works, right?
A. I wouldn't call myself an expert. I have some knowledge,

but I know what I don't know.
Q. And you also you testified about some significant development and construction experience that you have as well, right?
A. Yes.
Q. And you've had successful developments in your career, right?
A. Correct.
Q. At least ten; is that right?
A. About there. Correct.
Q. Single family home, multifamily, correct?
A. Correct.
Q. Okay. And you're a licensed D.C. contractor as well, right?
A. Correct.
Q. So in your experience as a practicing lawyer and as an experienced developer you know that you're bound by the terms of your loan documents, right?
A. Yes.
Q. Okay. You signed the promissory notes for the four loans at issue in this case, right?
A. I did.
Q. All right. And you read them before you signed them, presumably because you're a lawyer, right?
A. I'm not a real estate lawyer, so I didn't look at it from

a prism of a real estate lawyer.
Q. Okay. But you read them and then signed them, right?
A. Correct.
Q. And you signed them. Not anybody else. Or you signed those promissory notes, right?
A. Yes. Where my name has on it, yes. Correct.
Q. And the deeds of trust as well. You signed those as well, right?
A. Correct.
Q. All four of them?
A. Yes. Correct.
Q. And you understood the terms that you were entering into when you signed those documents, right?
A. At the time they put it in front of us, we didn't have a choice. So I signed it as presented.
Q. Someone put a put a gun to your head and said, sign these documents?
A. No, there was no negotiations open. They were not willing to negotiate. It was either sign it or not.
Q. Okay. But you had the chance to either sign it or not, right?
A. Correct.
Q. You knew you were borrowing from a hard money lender, right?
A. I wouldn't call them a hard money lender, necessarily.

They're lenders. They're not commercial lenders, if that's what you're asking. But they're private lenders. That's how I looked at them.

Q. Okay. Nontraditional, nonbank lender, right?

A. Correct.

Q. Okay. So you know that they're not offering you the same traditional loan terms as a traditional bank, right?

A. I don't know about that. They're different requirements. Is my understanding that a normal commercial lender has versus them versus a hard money lender. So there's all kinds of different kind of lenders, private lenders out there. And I looked at them as a private lender.

Q. Okay. But you knew that, for example, under the loan documents that you signed you weren't entitled to any notice upon default, right?

MR. SADOWSKI: Objection, Judge. We're here on the condition of the property, not what the loan documents say or do not say. They have questions about the condition, the payment terms of the loan, whether there's late fee provisions, whether it's default notice provisions. None of that's relevant to the motion to dissolve the injunction. If you're just going to try and beat Mr. Negussie up on cross, then he's a lawyer. And he should have known better. That's not relevant either.

I've allowed it to this point, but I think the

question should be directed to the condition of the property and whatever he testified to on direct. And we did not get into the loan documents on direct, with the exception of section 4.11, which would be fair game.

MR. WILLNER: Your Honor, Mr. Sadowski himself put in evidence in his case-in-chief with Mr. Negussie regarding the payments, the timeliness of payments under the loan documents. And Your Honor noted that there are at this time, when considering the change in circumstances, it's also worthwhile to take a look at the errors in the Superior Court TRO rulings.

THE COURT: I'm going to overrule the objection and allow it.

The question is, did you know whether you were entitled to notice a notice of default under the loan documents?

THE WITNESS: I did not.

BY MR. WILLNER:

Q. So you didn't read the loan documents? You didn't see that in the loan documents?

A. I did not, yeah.

Q. You knew that you were supposed to make payments on the first of the month, right?

A. I believe we had five days' grace period. And the normal practice with WCP that I had --

Q. What's your belief based on?

MR. SADOWSKI: If he --

BY MR. WILLNER:

Q. What's your belief based on?

A. My --

MR. SADOWSKI: Can the witness answer the question, please, before he gets interrupted?

MR. WILLNER: I apologize.

THE COURT: All right. Go ahead, Mr. Negussie.

THE WITNESS: I had been dealing with WCP at the time, since 2020, and if there are any payments missing or late, that we would resolve it and then we would move on and there will be a confirmation them saying we received it. But if there was any late payments or default, whatever it is that they wanted, they would have let me know. They've never let me know. They had my email, my phone number. It's -- it's a company that I dealt with since 2010.

BY MR. WILLNER:

Q. Okay. I'm going to stop you now because now you're not just answering the question. Now you're elaborating. You can point to a provision of the loan documents that says you, it gives you the loan documents gave you a five-day grace period; isn't that right?

MR. SADOWSKI: Objection. The loan documents speak for themselves.

MR. WILLNER: Okay. That's fine.

MR. SADOWSKI: And there is a provision --

THE COURT: Sustained.

MR. WILLNER: Well, I'll withdraw.

MR. SADOWSKI: -- in the notes.

THE COURT: Okay. Sustained.

MR. WILLNER: I'll withdraw.

BY MR. WILLNER:

Q. And you were here for the testimony for that Ms. Cordova gave regarding the loan payment histories?

A. Yes.

Q. You don't dispute the content that's at least that on the payment dates in those loan payment histories, right?

A. Yeah. I do dispute them because there are times that I would wire money and/or they would actually -- the way another piece that I don't believe she testified how payments are made, they would actually make an automatic debit from an account that we had. And sometimes that process doesn't work from their side. So there's some emails that I've reviewed between myself and WCP during that period that that there was a glitch or a problem on their side.

Q. Okay. But that's not what you testified before, Judge Lee; isn't that right?

A. I don't remember why I testified.

MR. SADOWSKI: Objection.

BY MR. WILLNER:

Q. I'll read it to you.

MR. SADOWSKI: Objection. Improper impeachment. He can't just say you didn't say this before, Judge Lee. He needs to point it --

THE COURT: He's going to read it from the record, Mr. Sadowski.

MR. SADOWSKI: Okay.

THE COURT: He gave him an --

MR. SADOWSKI: All right.

THE COURT: -- opportunity to say whether he did or did not.

MR. SADOWSKI: Okay.

THE COURT: And now, he's going to use the actual impeachment. So overruled.

MR. WILLNER: Okay.

BY MR. WILLNER:

Q. I'm reading for you from your testimony before Judge Lee at the 423 Kennedy TRO hearing. And in there, you testified, I don't dispute these payments being registered on these dates the way that you've actually outlined it. All I'm going to be disputing is that it's been late. That's, quote, unquote, it's late is what I'm disputing because the communication that I have from Washington Capital is that these are not considered late. That was your testimony, right?

A. That was my testimony.

Q. Okay.
A. But I'm not sure --
Q. That was it. That was your testimony. Thank you. You testified that you've paid $600,000 in attorneys' fees on or -- I'm sorry. That 423 Kennedy has paid $600,000 in attorneys' fees, correct?
A. No. That's incorrect. What I said is combined as of, I believe, June of this past year -- this year, we've paid about $600,000 for both -- for both projects.
Q. Okay. So --
A. Total.
Q. And that's for attorneys' fees in connection with this case or in connection with this case, the property tax appeals, and --
A. No, no. This case in Superior Court and so forth, the entire litigation from the beginning till now.
Q. Okay. So you incurred $600,000 in attorneys' fees or $600,000 in attorneys' fees have been paid in connection with this litigation that's before Her Honor's court today, correct?
A. No. It also --
Q. Is that correct?
A. It also includes the Superior Court.
Q. Okay.
A. Everything from the beginning till now.
Q. Got it. And how much in attorneys' fees have you paid in

connection with the real estate tax appeals for both properties?

A. Initially, the one that I talked about, the 2024, we paid, I would say 20,000. But since then, I handled them myself because we're trying to keep costs down.

Q. Okay.

A. I educated myself how to appeal it and -- and I -- and I do it myself.

Q. So you paid in total between the 423 Kennedy and developer R1 tax appeals $20,000 in attorneys' fees and paid collectively?

A. It's an estimate. I just want to make sure, that's what I think it would be.

Q. Okay. But regardless, you paid $600,000 in attorneys' fees for these cases and you said you also paid $250,000 in maintenance costs?

A. Maintenance costs for both properties carrying costs and all of that that, you know -- to make sure that the properties are in preserved and whatnot.

Q. And those funds came from investors, right?

A. Myself and investors. Correct.

MR. WILLNER: Court's indulgence, Your Honor?

THE COURT: Sure.

(Pause)

BY MR. WILLNER:

Q. Mr. Negussie, the default notices were sent to you on December 8th, 2022, right?
A. Correct.
Q. 423 Kennedy didn't pay monthly interest in January 2023, right?
A. I'm sorry. I don't recall, but that's after the default.
Q. Um-hum.
A. I believe there was one payment we made on January 1 or around. I don't know which project it is.
Q. Okay. Okay. But suffice to say, fair to say that in 2023, 423 Kennedy stopped making interest payments after the default was called, right?
A. Yes. Correct.
Q. Okay. Although the loans didn't mature March 31, 2023, right?
A. Yes, they defaulted on the loan, so they asked us to pay just not only interest payments, but default fees and so forth and whatnot.
Q. Okay. And it was your contention that the loans were not in default, right?
A. Correct.
Q. Okay. But you still didn't make interest payments in 2023, even though your contention was the loans didn't default and therefore you were required to continue performing the loan under its terms; isn't that right?

A. We did not pay any interest payments in 2023, if that's your question. Yes. Correct.

Q. All right. Mr. Negussie, what's the value of the of the developer already RA1 property currently, in your opinion?

A. I would say 4.7 to 5 million.

Q. Okay. And you testified before Judge Scott that that value was about 4.1 to 4.5 million back at that time, which was in July 2023? That sounds about right?

A. If I testified like that. Yep. I believe that's probably correct at that time.

Q. All right. And did you have an opportunity to try to refinance that loan?

A. At the time or since? At the time, yes.

Q. Yeah.

A. Before -- before the default.

Q. I'm sorry. Let me rephrase the question. Prior to the default being called, you were trying to get a refinance for that loan; isn't that right?

THE COURT: By that loan, you mean RA1?

MR. WILLNER: Yes. The RA12 loan.

THE COURT: Okay. Thank you.

THE WITNESS: Yes. Correct.

BY MR. WILLNER:

Q. Okay. And that was with Main Street Bank?

A. Main Street Bank and others.

Q. Okay. What others?
A. I remember City First that -- that we tried I believe we made inquiries with Capital Bank. There was a -- a credit union called Self Help.
Q. But you did get a --
A. I believe --
Q. I'm sorry. Go ahead.
A. Yeah. I believe, Builder's Capital.
Q. But you did get a term sheet from Main Street Bank for a refinance loan for RA1, right?
MR. SADOWSKI: Objection, Judge. The refinancing efforts of the property are not at issue in this hearing. The question is, has the circumstances changed from the date the injunctions were issued to now to change it? And all these things he's getting into about the bank refinancing have to do with pre-injunctive behavior and not relevant to this proceeding.
THE COURT: Hold on.
MR. SADOWSKI: Just to add to that, I think the Doe case forecloses them asking questions to undo those injunctions.
THE COURT: That's not the question before me. I'm looking --
MR. SADOWSKI: Okay.
THE COURT: Hold on.

(Pause)

MR. WILLNER: Your Honor, let me know if you want me to scroll.

THE COURT: I'm actually looking at something entirely different. Just give me a minute.

MR. WILLNER: Okay.

THE COURT: I'm actually looking at Judge Lee's order to be very clear because his findings are adopted by both him and Judge Scott.

(Pause)

THE COURT: All right. Judge Lee, I don't know what page number this is because he didn't put page numbers on it. And part B references the Main Street Bank and the term sheet. And he makes certain findings with respect to that, which I agree we can't because it's a preliminary injunction whether to dissolve. But I'm going to allow Mr. Willner some leeway to bring this back in, since it's already in evidence, and to explore if there's been any change in circumstances as to the findings there, which would be a valid reason for the Court to consider dissolving the agreement. So to the extent this is starting to begin the discussion, there are findings there which the Court made, and I would be able to consider whether or not there's been a change of circumstances on that issue. So go ahead.

BY MR. WILLNER:

Q. Mr. Negussie, have you made any effort to determine whether you could refinance these loans currently?
A. Yes.
Q. Okay. What have those efforts been?
A. Contacting banks and talking to representatives of banks and whatnot.
Q. Okay. Did you receive any term sheets?
A. Nobody will give you a term sheet, including private lenders and so forth. Nobody will give you a term sheet or have really that much discussion unless this matter is resolved.
Q. Okay. So your opportunity to refinance these loans would have been back in 2022, 2023. Fair to say that?
A. That was one. But if this matter settles, I -- I was -- I'm always hoping that this matter is going to settle. I always try to do what I can to make sure that I'm ready.
Q. Correct. And I don't mean to interrupt you, Mr. Negussie, but I just want to keep us on point.
A. Sure.
Q. Yes, we all would love for a settlement. That would be great. But a refinance would have been the most opportune time for refinance would have been at the end of 2022, beginning of 2023 for both properties, all four loans on both properties, correct?
A. Well, I'm not sure even now, may be a good time, so long

as this case not only settled, but it could be resolved in some other fashion. So in this case. So I'm always prepared in case this matter is resolved to be able to refinance these two projects.

Q. Okay. And what's the burden? What's the reason for your proclaimed inability to refinance now?

A. It's in bankruptcy court.

Q. Okay.

A. But both properties. I mean, or it is tied up in the bankruptcy court system.

Q. Okay.

A. And no lender is going to have that much discussion, but they will actually consider and so forth. Look at, oh, this will be a project that we'll be interested in, but you need to resolve it.

Q. Okay. And certainly, but if you are able to pay off, you could pay off the debts that have accrued on these properties, then you could, you could go off and refinance with other lenders. Isn't that right?

A. Not with the default fees. I mean, just with one project, the default fees are over. I can't remember; it's just exorbitant.

Q. Exactly. So now their default fees are exorbitant. So therefore, the best time to refinance would have been at the time the defaults were called, right? Yes or no?

A. No.
Q. No. Okay. Well, let me ask some questions.
A. That's not the only place.
Q. Let me ask you some questions based on that.
A. Sure.
Q. You testified that at the time that three years ago, the developer already one property was worth about 4.1 to 4.5 million. You just testified to that, correct?
A. I think 4.1 to 4.5 million. You said 4.15 million. Is that what I testified to?
Q. 4.1 to 4.5 million?
A. 4.5 million. Yes. Correct. Correct.
Q. All right. And according to this, and I'm showing you what's been marked as WCP Exhibit U.
A. Sure.
Q. This is a Main Street term sheet that was signed by you as the last page of the exhibit shows, with respect to a refinance that you are pursuing for the RA1 property? Agreed?
A. Correct.
Q. Okay. And the loan amounts, according to this term sheet, was to be 75 percent LTV or loan to value. You see that?
A. Yes.
Q. Okay. So 75 percent of 4.1 to 4.5 million is about 3 to 3.3 million?
A. Correct.

Q. Can we agree on that?
A. Sure. Correct.
Q. All right. Do you recall how much the balance due was under the RA1 loans without the default fees and interest at the time of the maturity date?
A. About --
Q. In 2022?
A. Yeah. About 4.1 million.
Q. About 4.1 million, right?
A. Correct.
Q. Okay. So regardless of what happened, you were going to have a shortfall between the refinance loan that you were pursuing from Main Street and the payoff to WCP in December of 2022 for RA1, right?
A. We're going to have to come up with cash to make up that difference.
Q. Right. A shortfall. Can we call it a shortfall?
A. Sure.
Q. Okay. And you were going to have to come up with about 700,000 to $1 million cash, right?
A. Correct.
Q. Okay. But you didn't do that, right?
A. What do you mean?
Q. You didn't come up with the extra money in October of 2022, right?

A. We -- we could raise it among ourselves. Why -- yes, we do.

Q. You didn't have the money in your account in October of 2022 to pay off the shortfall; isn't that correct?

A. That is incorrect.

Q. You had the money in your account?

A. In my personal account?

Q. I'm sorry. I'm sorry. I shouldn't be using pronouns. The RA1 bank accounts. Did RA1's bank accounts have sufficient cash to pay off or refinance shortfall in October, November, or December 2022?

A. Yes. The investors of RA1 could have and planned to come up with the cash that we needed to refinance?

Q. So the answer is no. The RA1 didn't actually have the money in its account, right?

A. If you're asking, did RA1 have $750,000 as of that time? You're absolutely right.

Q. That's my question. Yes.

A. Okay. Yep. You're right.

Q. Okay. You are speculating whether the investors would have put up the money, right?

A. We're not speculating.

MR. SADOWSKI: Objection. Mischaracterizes his testimony. Poaching. Badgering.

MR. WILLNER: Badgering?

THE COURT: Sustained. Overruled on the badgering, but I've got the answer on the investors.

BY MR. WILLNER:

Q. But there's no evidence in the record that reflects that RA1 had the money in its account in October, November, or December 2022. Isn't that correct?

A. I'm not sure we put any -- any evidence or information in the record. I'm not sure I understand. I mean, I've already answered your question, if that's what you're asking.

Q. Okay. And if it's correct that the investors were prepared to contribute another million dollars to RA1 to refinance shortfall, they could have contributed more dollars to finance an increased shortfall because of default fees. Isn't that right?

MR. SADOWSKI: Mischaracterizes the testimony as to the amount needed. He did not testify. It was $1 million. He said the shortfall was about $700,000.

MR. WILLNER: I apologize.

BY MR. WILLNER:

Q. So if it was whether the shortfall was $700,000 or $1 million, and you testified that you were going to have to raise that money from the investors so you could have also raised additional funds from investors. Since you were so confident that you were going to be able to raise the money to cover default interest and fees, isn't that correct?

A. We disagreed with the default fees, and we did not agree that we had defaulted.

Q. And based on that --

A. But yeah, just so we could have raised the money if it was 4.1 million, which is the nondefault loan that existed. We could have raised the necessary money at the time to cover any you called it a shortfall or perhaps even to pay the entire 4.1 million. So we had the -- at the time, I'm sure we could have explored the ability to -- to pay that off if we were not defaulted.

Q. Well, so based on if I'm understanding your testimony correctly, and I believe I am, based on your disagreement with the default, you decided not to raise money from your investors to cover a bigger shortfall because of default, but instead you decided to take that cash and pay it for attorneys' fees to sue the WCP defendants. Isn't that correct?

MR. SADOWSKI: Objection. Again, mischaracterizing his testimony, the attorneys' fees were paid over a course of three years. They couldn't possibly have --

THE COURT: Sustained, Mr. Sadowski. You can sit down.

BY MR. WILLNER:

Q. There's evidence that your counsel submitted in its exhibits that we're going to pivot to 423 Kennedy. 423 Kennedy, the value of the property in November of 2022,

according to Cushman & Wakefield, was 11.9 million. Isn't that right?

A. I believe so, correct.

Q. And do you recall that the balance due on what the balance due on the WCP loans was for 423 Kennedy at the time?

A. I believe it was about 7.1 to 7.3 million.

Q. Okay. And with the default fees, it was about another million dollars more. Does that sound right?

A. At the time?

Q. Yeah.

A. Possibly. I -- I don't have anything to dispute that. That sounds -- yeah.

Q. But the property value was $11.9 million, and the default payoff would have been about $8.6 million. I've done the math. Is that fair? That's fair to say?

A. Could you repeat that to make sure I understand what you're asking?

Q. Sure. Well, let me rephrase the question. There was more than enough equity in the property to refinance the 423 Kennedy loans and pay off even the default shortfall based on the value of the property. Isn't that correct?

MR. SADOWSKI: Objection, Judge. Calls for speculation. The appraisal says one thing. You can't then assume that you're going to sell that property because it's been appraised at 11.9 million.

THE COURT: The objection is sustained. Lay a better foundation.

MR. WILLNER: Okay.

BY MR. WILLNER:

Q. Mr. Negussie, I'm showing you what's been marked as WCP Exhibit B.

A. Yes.

Q. This is in evidence. Have you ever seen this document before?

A. Yes.

Q. Okay. Can you describe to the Court what it is?

A. So this is a document that was presented by another joint venture being led by the three individuals that you see here, that they were going to take over the project 423 Kennedy, three developers and that they had gotten a term sheet to basically refinance the project at the time and move forward with this project. And so it's a term sheet.

Q. Okay. And this term sheet, it says it was it was contemplating the funds for both to continue the construction project and to purchase a 50 percent interest. Whose 50 percent interest was that?

MR. SADOWSKI: Is there something --

THE COURT: Okay. Well, show me where it says that because right now, I just have the first page.

MR. SADOWSKI: Yeah.

MR. WILLNER: Sorry. It says purpose to purchase the 50 percent interest in controlling ownership and construction project provide funds to complete the construction.

THE COURT: Okay.

MR. SADOWSKI: Judge, the question was this term sheet. I don't think this is a term sheet. I think this is a loan commitment letter.

THE COURT: Yeah. I'll give the characterization that it states on the top.

MR. SADOWSKI: Yeah. Thank you.

MR. WILLNER: Okay. So we can call it a loan commitment letter?

THE COURT: Yeah. It says lender's commitment is subject to the following terms.

MR. WILLNER: Okay. Even better.

THE COURT: That's fine.

MR. WILLNER: Okay.

BY MR. WILLNER:

Q. So this lender's commitment letter, who's 50 percent interest was this loan contemplating was going to be purchased?

A. A combination of the -- the existing investors, myself and the Briden Group (phonetic), who -- who had 50 percent ownership.

Q. Okay. But the loan was going to be made to the same entity, 423 Kennedy Street Holdings, LLC, the same entity that

owned the properties then and owns the property now, right?
A. Correct.
Q. And according to this loan commitment letter, Main Street was ready to loan $10.7 million as a commercial mortgage loan on the property; isn't that right?
MR. SADOWSKI: Objection. The terms of the documents speak for themselves.
MR. WILLNER: So he can say yes.
THE COURT: His understanding.
MR. WILLNER: Okay.
MR. SADOWSKI: That wasn't the question.
THE COURT: I understand.
MR. SADOWSKI: Okay.
THE COURT: I'm going to allow it to the extent of his understanding. What was your understanding as to this commitment letter?
THE WITNESS: That they were going to provide $10.7 million loan.
BY MR. WILLNER:
Q. And that would have been sufficient cash to pay off the default pay off statements for the two WCP loans against this property; isn't that right?
A. Incorrect.
Q. Okay.
A. So that $10.7 million was going to include construction as

it states there for construction and all of that. They weren't going to agree to pay default fees and which is why this thing died.

Q. I am turning your attention to -- let me just make sure I get the page numbers right. One, two, three, four. The fourth page of this exhibit, Exhibit V, where it discusses reserves for the loan proceeds. Do you see that?

A. Yes, I do.

Q. And the reserves that are called for in this commitment letter reflect an interest reserve of 728,000 and a payment reserve of $250,000. Those are all reserves that are referenced in this commitment letter; isn't that correct?

A. Yes, it looks like, yes.

Q. Okay. But you stand by your testimony that some of this money was going to be used for construction, although it's not in the commitment letter?

A. No, that is incorrect. This commitment letter is addressed to E3 developers. They were going to control that project. So how they're going to allocate what funds they're going to do and so forth was really up to them. My responsibility at the time is to be a minority shareholder and also complete the project as a GC. So what was going to happen with their funding, how are they going to operate it and so forth, is going to be all them. And this -- everything was going well till I -- till I -- as I told you, till WCP

defaulted the -- the loan.

Q. Okay. So what percentage, what amount of the $10.7 million in loan proceeds would have gone to a payoff of the prior of the WCP loans?

MR. SADOWSKI: Objection. Calls for speculation about what could happen if this loan went through, and it's irrelevant to the changed circumstances issues before the Court.

MR. WILLNER: Your Honor, Mr. Negussie must have known what percentage of the loan --

THE COURT: I'm going to allow it to his understanding. I mean, that's different than what the actual truth was, but I'll hear what he believed.

THE WITNESS: I honestly do not know because I don't know how they were going to structure it. If they were going to come up with cash, if they were going to use this loan to pay off WCP, whatever they were planning to do. They were basically going to take over the project. So I was not part of the intimate decision making of how they were going to approach this.

BY MR. WILLNER:

Q. Did you try raising money from the investors in order to cover a refinance shortfall for the 423 Kennedy property?

A. Refinance shortfall. I'm sorry. I'm not sure because things were going fine till they stopped the draws, right?

They said we're not going to give you any more draws. So it's around that time that we intentionally went out and tried to find someone basically to take over the project. So I'm not sure what -- what shortfall that you're talking about.

Q. Well, to pay off. So the construction draws stopped in in or around October of 2022, right?

A. Correct.

Q. Okay. So at that moment, you needed to go see if there was what the if you can get a refinance for the 423 Kennedy loans, right?

A. Yeah. We had a choice of suing them, WCP, or going out and try to find another partner, refinance, and so forth. So I've never sued someone until I actually encountered WCP in this case.

Q. Okay.

A. So at that time, that was the effort. We were trying to do all kinds of things to be able to resolve this issue.

Q. Understood. And so I'd like to hear from you what efforts you made to get -- you obviously chose the suing path. We know that that's been well established. What efforts did you make to refinance the WCP loans in order to pay off the loans?

A. Okay.

MR. SADOWSKI: We've already gone down this path, Judge, about refinancing efforts. He said he reached out to banks.

THE COURT: That was on RA1. I'm going to allow it on 423 Kennedy.

MR. SADOWSKI: Okay. Okay.

THE WITNESS: Yeah. I don't agree with your characterization that, you know, we -- you know, we like lawsuit or whatever that you said at the beginning. I'm sorry, I have to clean that up. At the same time, when this happened, our intention was, hey, this is a good project. So let's try to find a talk to a bank. Try to find another entity that would be excited about this project. So we made all efforts after the draws were stopped to continue with this project. With this development and we reached out to E3 development developers and they were very much interested and they pursued it. I hope I answered your question.

BY MR. WILLNER:

Q. No.

A. Okay. What was your question? I'm sorry.

Q. What other efforts did you engage in to try to get refinance loans for this property?

A. Yeah. I believe 423 Kennedy, if I remember right, we reached out to Builder's Capital. We may have reached out to others at the same time, I'm pretty sure.

Q. And did you get term sheets?

A. No because the -- the discussion with E3 developers was going very well. And we also wanted to have somebody else

share the risk. This is after COVID, you know, supply chain issues was a problem and so forth. So we wanted to have a bigger player, someone who has the wherewithal to be able to, you know, develop this project.

Q. Wouldn't it have been a good idea to have multiple different potential lenders to try to see if you could pay off or refinance in order to get out from the situation where we are in right now, which is mounting, mounting default fees?

A. No, we did. That's what I'm trying to say. In fact, if you go back to March of 2023, I had a Builder's Capital offer to refinance the project. We were about to close on that refinance when WCP said they're going to default these fees because they've spent so much time trying to work out this refinance and that they're not going to allow us to -- to exit without a default fees. That was in March of 2022 when we refinanced March of 2022.

Q. March of 2022 was before the 423 Kennedy loans at issue in this case were made?

A. No, no. When we were about to -- WCP had a loan on this project since 2020.

Q. Okay. And for this case, we're focusing on the loans that are at issue here. The loans that we made 423 Kennedy on March 31st, 2022, they were going to and they were called in default on December 8th, 2022. So my question, again, stands. Did you get any other term sheets from other lenders to try to

refinance even with the default payoffs for the two loans for 423 Kennedy?

A. Yeah, I'm saying yes. Builder's Capital, we had a discussion with them even -- that's what I'm telling you. Going back when this loan, the subject of this loan was signed. We had a discussion. I had a discussion with them again when WCP pulled the draws in October 2022.

Q. Okay. And how much did they offer you?

MR. SADOWSKI: Objection.

THE WITNESS: And -- and at the time. Wait. Hold on. At the time in 2022 –

BY MR. WILLNER:

Q. Answer my question.

A. No, no, I -- I'm answering you. I had a discussion with Builder's Capital in October of 2022. We thought --

THE COURT: Okay. That's the answer to this question.

THE WITNESS: Okay.

THE COURT: Next question.

BY MR. WILLNER:

Q. How much did they offer you for a refinance loan?

A. I honestly don't remember at this time.

Q. Mr. Negussie, you're the manager. You are the managing member for both 423 Kennedy and developer RA1, right?

A. Correct.

Q. And fair to say that you were the principal person for

both entities running these developments?
A. I was one of others, but I was also the managing member, so I made -- we had an internal agreement that I would be the lead in managing these projects.
Q. Okay. And you did, in fact, take the lead on managing the two projects, correct?
A. Correct. Yes.
Q. You negotiated terms with the lenders and potential lenders, right?
A. Me and others. But yes, primarily, I was sort of the point person.
Q. And you signed the notes and deeds of trust for WCP, right?
A. Yeah. If I signed it, it's me. Yes.
MR. WILLNER: Court's indulgence, Your Honor?
THE COURT: Um-hum.
MR. WILLNER: That's all, Your Honor. Thank you.
THE COURT: Thank you.
MR. VERSTANDIG: A lot shorter.
CROSS-EXAMINATION
BY MR. VERSTANDIG:
Q. Mr. Negussie, you heard the testimony earlier today that it is October 19th, 2026. Do you agree with that?
A. Yes.
Q. Okay. You heard the testimony that we're in a bankruptcy

court. Do you agree with that?
A. Yes, sir.
Q. How do we end up in a bankruptcy court?
A. It's a headache. Do you want me to explain?
Q. Is it because the holder of the second position notes filed for bankruptcy relief?
A. Yes. JPK NewCo, yes.
Q. And to the best of your knowledge, JPK NewCo is still a debtor in bankruptcy as we sit here today, right?
A. Yes, I believe so, yes.
Q. Okay. Mr. Negussie, if you found out today that a foreclosure was going to be conducted 35 days henceforth, would you have time to speak to a bankruptcy lawyer about putting one or both of these entities into Chapter 11?
MR. SADOWSKI: Objection, Judge. Completely irrelevant.
MR. VERSTANDIG: It is very relevant for this reason. If you look at the transcript, I argued in front of Judge Scott that Chapter 11 was an adequate remedy at law, and her verbal holding was that it wasn't because there wouldn't be enough time to file before the foreclosure sale that was just a few minutes away.
MR. SADOWSKI: And what does that have to do with the change condition of the property? Nothing.
MR. VERSTANDIG: No, no, no. The circumstance at the

time of Judge Scott's hearing --

THE COURT: Was that there was a foreclosure in the next hours. If there was a foreclosure schedule tomorrow, it wouldn't be thirty-five days, which would be a change in facts, that there would be time for the two entities to seek debtor's -- that's a material change in circumstances on the timing.

MR. SADOWSKI: He didn't ask about that. He asked about today.

THE COURT: Right. But it could --

MR. SADOWSKI: I'll withdraw the objection.

THE COURT: All right.

MR. SADOWSKI: Thank you.

THE WITNESS: I'm sorry. Could you ask it again?

BY MR. VERSTANDIG:

Q. If given thirty-five days, you could engage Mr. Williams to file a bankruptcy petition?

A. You mean today?

Q. Yeah.

A. I'm sorry.

Q. Thirty-five days, starting today.

A. Um-hum.

Q. You can engage Mr. Williams or another capable bankruptcy lawyer to file a petition for one or both entities, correct?

A. Correct. Yes.

Q. Okay. You testified earlier that you're not a real estate lawyer, right?

A. Correct.

Q. And you were insistent about that? Is that a fair characterization?

A. Correct.

Q. Okay. Why did you handle real estate tax appeals on behalf of two entities if you're not a real estate lawyer?

A. It's not that complicated. You don't have to be a real estate lawyer to handle it. There's a lot of private individuals that actually do that. And also the main reason is to preserve cash. We need cash for this project.

Q. You are a member of the District of Columbia Bar, correct?

A. Correct.

MR. VERSTANDIG: Thank you. Nothing further.

THE COURT: All right. Thank you.

Any redirect?

MR. SADOWSKI: No redirect.

THE COURT: All right. Mr. Negussie, you can step down. Thank you.

THE WITNESS: I can step down?

THE COURT: Yep.

THE WITNESS: Thank you.

THE COURT: Any other testimony, Mr. Sadowski?

MR. SADOWSKI: We have no additional witnesses, Judge.

THE COURT: Any rebuttal witnesses?

MR. GREENBERG: None, Your Honor.

THE COURT: All right. We're not going to get through argument an hour because this is going to be long. We've reserved virtual arguments on Wednesday. You can come and talk at Ms. Lee, but I'm going to be a big face on TV if you do come down here. So up to you whether you like my podium, or you like your office podium better. Doesn't matter to me. Courtroom will be open, but we will do the argument on Wednesday morning.

MR. SADOWSKI: Okay. At what time?

THE COURT: I don't remember.

MR. SADOWSKI: I have it on my calendar, but.

THE COURT: 10:00, 10:00 is what we put down.

MR. SADOWSKI: Yeah.

MR. WILLNER: Is there a normal docket at 10:00?

THE COURT: No.

MR. WILLNER: Okay. So we really will go. I'm in front of Judge Payne at 2:00.

THE COURT: No, we would start at 10.

MR. WILLNER: Okay. Thank you, Your Honor.

THE COURT: Um-hum.

MR. SADOWSKI: Yeah. 10:00.

THE COURT: Right. So we'd start argument at 10.

All right. Anything else before we conclude today?

This is going to let me actually get food at Dulles, which I'm kind of excited about.

MR. SADOWSKI: Which is great because it does take long to get there. Judge, if we were to come across a D.C. Circuit case that supports it, would you entertain a supplemental memorandum or just wait?

THE COURT: Bring it up in argument, and if I decide at that point I want supplemental memorandum --

MR. SADOWSKI: Sure.

THE COURT: -- I'll give everybody an opportunity to supplement. But at this point, I'm just going to look at an argument.

MR. SADOWSKI: Okay.

MR. WILLNER: And Your Honor, would it be possible to get a ruling from the bench on Wednesday?

THE COURT: I'm going to attempt to unless there's some reason I can't.

MR. WILLNER: Thank you, Your Honor. We appreciate it very much.

THE COURT: Um-hum. All right. Thank you all. Have a good afternoon.

THE CLERK: Thank you, Judge. That concludes the matters on our calendar for today. This Court stands in adjournment.

THE COURT: Thank you.

THE CLERK: Thank you.

(Whereupon, at 3:00 p.m., the hearing was adjourned.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

______________________________ Date: November 8, 2026
ESCRIBERS LLC

# I N D E X

| WITNESS | EXAM BY | PAGE | LINE |
|---|---|---|---|
| Roxana Cordova | Mr. Willner | 62 | 15 |
| Roxana Cordova | Mr. Sadowski | 75 | 17 |
| Mel Neguissie | Mr. Sadowski | 90 | 8 |
| Mel Neguissie | Mr. Willner | 121 | 19 |
| Mel Neguissie | Mr. Verstandig | 153 | 20 |

# E X H I B I T S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| WCP Defendants' Exhibit A through D, I through W, Y, Various documents | 43 | 7 |
| Plaintiffs' Exhibit 1-8, Various documents | 45 | 1 |
| Plaintiffs' Exhibit 40, Cushman & Wakefield appraisal | 45 | 12 |
| Plaintiffs' Exhibit 39, CL Group appraisal | 45 | 24 |
| WCP Defendants' Exhibit E, F, G, H, Business records from Dynamics | 75 | 11 |