**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| **423 KENNEDY ST HOLDINGS LLC,** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **vs** | : | **Docket No. 2023 CAB 4260** |
| | : | |
| | : | |
| **DP CAPITAL /D/B/A WASHINGTON** | : | |
| **PARTNERS, ET. AL.** | : | |
| **Defendant** | : | |

**ORDER**

On July 13, 2023, plaintiff filed a Complaint seeking relief for: Breach of Contract (Count 1); tortious interference with business relations (Court II); breach of duty of good faith and fair dealing (Count III); breach of fiduciary duty by the trustee (Count VI). The Complaint also seeks declaratory judgments regarding the meaning of provisions in the two Deeds of Trusts and a determination that the liquidated damages provisions are unenforceable because those provisions constitute a penalty (Count IV). Plaintiff also makes a claim that the trustee cannot serve in that position because of the existence of a conflict (Count VII). Finally, in Count V plaintiff's seeks injunctive relief to stop a foreclosure sale scheduled for July 25, 2023 (Count V).

On July 18, 2023, plaintiffs filed an Emergency Motion for a Temporary Restraining Order to Prevent an Imminent Foreclosure Sale. On July, 20, 2023 defendants filed an opposition. The parties appeared for a hearing on July 21, 2023.

In determining whether to grant a request for temporary restraining order, plaintiff must demonstrate: 1) the likelihood of irreparable injury in the absence of the

requested injunction; 2) the likelihood of success on the merits for the underlying; 3) that the balance of injuries favors granting an injunction, and 4) that the public interest would be served by granting the request for an injunction. *Ifill v. District of Columbia*, 665 A.2d 185, 187-88 (D.C. 1995). The moving party has the burden to demonstrate that each of the factors, taken together, weigh in favor of issuing an injunction. *Davis v. Pension Be. Guar. Corp.*, 571 F.3d 1288 (D.C. D.C. Cir. 2009).

## I. Likelihood of Success on the Merits

### A. The Breach of Contract Claim

To prevail on the breach of contract claim plaintiff must establish: 1) the existence of a valid contract between the parties; 2) an obligation or duty arising out of the contract; 3) a breach of that duty; 4) damages caused by the breach. *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 186 (D.C. 2009). There is no real dispute regarding whether there was a valid contract between the parties. The parties do not agree on what is included in the terms of the contract and whether there was a breach.

In support of the claim of breach contract, plaintiffs argue that defendants improperly discontinued performance of the contract by stopping construction draws for the 423 Kennedy Street property (the project). When defendants discontinued construction draws, they knew that plaintiff would not be able to move forward with the project. Shortly after the construction draws stopped, defendant gave notice of default to plaintiffs. Plaintiffs claim that there is no basis for the default because plaintiffs had complied with the terms of both deeds of trust and the reasons advanced by defendants for the default is nothing more than a pretext. According to plaintiff, the real reason for the default was to create leverage against plaintiffs to force them to

address a problem with an unrelated construction project and, alternatively, to gain control of the 423 Kennedy Street project before its completion. Plaintiffs argues that it is defendants initial breach of the deeds of trust that caused plaintiff to be unable to continue to make payments on the deeds.

Defendants contend that plaintiff was in default on the second deed of trust because plaintiffs continually made late payments the loan. In addition, defendant argues that plaintiff was in default because the District of Columbia Department of Regulatory Affairs issued a Notice of Infraction on November 17, 2021 and the fine due on that infraction remained unpaid causing a lien to be placed on the 423 property. Based on the terms of the deed of trust, defendants argue, that this failure to cure the lien caused by the failure to pay the infraction created a basis to default loan.[1] Lastly, defendants claim that plaintiffs have defaulted on the loan because they failed to make the payments necessary by the maturity date of the loan.

At the hearing, Mel Negussie testified that he is a 50 percent owner of 423 Kennedy ST. Holdings along with several small investors known as Brighton KSDC that owns the remaining shares. 423 Kennedy ST. Holdings is a sole purpose, limited liability company that owns and has developed the 423 Kennedy Street property. According to Mr. Negussie, his company entered into a construction financing loan with the defendants and executed two deeds of trusts and two commercial deeds of trust for each deed on March 31, 2022. Approximately 50% of the project was completed at the time of the refinancing. The first commercial deed of trust was for $8,689,693.00 and the second deed of trust was for $1,256.000.00. Defendants claim that a default occurred on the second deed of trust only.

---

[1] Def. opp. at 2.

According to Mr. Negussie there is no default. During his testimony, Mr. Negussie indicated that each of the interest payments required by the second deed of trust were made on time except for the first payment. The first payment was due on May 1, 2022. That payment was not made on time because, as Mr. Negussie testified, all parties to the second deed of trust worked under the idea that the second deed included an escrow account that would be responsible for the payments in a manner that was identical to the first deed of trust. When Mr. Negussie was notified by the lender of the failure to make the first payment, he testified that he immediately addressed the issue and payment was made in early July 2022. Plaintiff further testified that all future payments were made on time or within the grace period created in the deed,[2] and plaintiffs' obligation on the loan was current through the end of 2022.

Mr. Negussie testified that in October 2022 there was a conversation with Daniel Huertas, the CEO of Washington Capital Partners. Mr. Huertas informed Negussie that there would be no further construction draws for the project. According to Negussie, the reason for the discontinuance of the construction draws was that Negussie participated in business dealing with Charles Paret, and that investors in that project were unhappy with Paret and the progress of a project known as 2507 I St Holdings. Negussie testified that he was shocked by this development because all parties knew that without construction draws the project could not move forward and would not be completed on time. Negussie testified that Huertas informed him that the project would continue if Negussie and his investors covered a $700,000 dollar shortfall that was created in 2507 I St. project and the failure to do so

---

[2] Plain. Exh. B.

would result in trouble because the investors were wealthy. According to Negussie, Huertas indicated that covering the $700,000 shortfall on the 2507 I ST project would be the right thing to do or otherwise the holders of the 423 Kennedy project would make trouble. 423 Kennedy ST. Holdings refuse to accede to Huertas' demands.

Negussie testified that these developments forced him and his partners to refinance the loan with defendants, so he began discussions with Main Street Bank. At this point, WCP had forwarded payoff statements to Negussie as he made efforts to refinance. Those payoff statements did not reflect a default or late fees.[3] On or about December 8, 2022, Huertas informed plaintiffs that all prior payoff statements would be withdrawn, and that he was defaulting all loans for 423 Kennedy including a separate property under development. Defendants almost immediately forwarded notice of default documents dated December 8, 2022 to plaintiffs.[4]

On that same day, Negussie received two new payoff statements[5] that included default interest of $97,130.67 and a default penalty of $125,600 on the second loan.[6] When Negussie called Huertas to inquire about the reason for the default, Huertas explained that Negussie would have to contact WCP's counsel, Russel Drazin. On December 9, 2022, Russell Drazin authored an email to counsel for 423 ST. Holdings that indicated that the email "amplifies and supersedes the Notices of Default issued" on December 8, 2022.[7] The only basis for the default included in that email was a reference to Section 7.9 of the Deeds of Trust that

[3] Plain. Exh. C, D, G and H.
[4] Plain. Exh. K and L.
[5] Plain. Exh. I and J.
[6] WCP included separate payoff statements for the first deed as well and that document included a default interest amount of $456,927.95 and a default penalty of $868.969.30.
[7] Plain. Exh. M.

provides that "any default or breach of any other loans, obligations, etc. of the borrower or borrower's affiliates is an Event of Default." Immediately below that passage, the email referenced the issuance of a District of Columbia Certificate of Delinquent Fines dated November 17, 2022. Drazin further indicated that any unpaid principal, accrued interest, and any other charges would become immediately due and payable prior to the maturity date.

Plaintiff claims that it is likely to prevail on the merits of its breach of contract claim because defendants' basis for default are a pretext and the stoppage of construction draws was an improper, purposeful act undertaken by defendant to cause the default on the loan because plaintiff would not be able to continue with the project without the construction draws. Once construction draws ceased, plaintiff could not make interest payments in 2023 and would not be able to make payments necessary by the March 31, 2023 maturity date.

During cross-examination, Mr. Negussie agreed that the loan matured on March 31, 2023 and that plaintiffs had made no payments since the December 2022 interest payment. Negussie also agreed that defendants' Exhibit 7 reflected the payment dates on the account including a delayed payment for May 2022.[8]

Defendants argue that plaintiffs are in default because: 1) payments on the loan were consistently late each month, 2) of the Certificate of Delinquent Fines issued by the District of Columbia Department of Regulatory Affairs, and 3) plaintiffs made no interest payments in 2023 and did not satisfy the loan by the maturity date of March 31, 2023.[9]

---

[8] This document was admitted over objection during defendants' case-in-chief.
[9] Def. Exh. 7.

There is no dispute that the parties had a contract related to the construction project known as 423 Kennedy Street. There is, however, a dispute regarding whether the deeds of trust and commercial deeds of trust created an obligation for WCP to make construction draws available during the course of construction. Plaintiff argues that the HUD-1 and HUD-2 documents that were executed with the deeds of trust and signed by the parties make a direct reference to the construction draws including the total amount available during the life of the loan. Plaintiffs argues that because all parties knew that construction draws were a necessary part of the project and that the draws where consistently advanced by defendants through October 2022 thereby creating a detrimental reliance on defendants conduct until Daniel Huertas improperly announced that there would be no future draws.[10] Plaintiffs contend that the terms of the HUD documents coupled with defendants' consistent payment of the draws through October 2022 created an obligation and expectation that defendants would continue to make draws. Plaintiffs relied on the construction draw commitments to their detriment.

Defendants argue that construction draws were not a part of the deeds of trust or the commercial deeds, and that the second deed of trust contained no provision or reference to the construction draws. In addition, the HUD documents reference to construction draws is nothing more than "a government-promulgated, standardized document that sets forth the flow of monies occurring at the time of a real estate closing."[11] Moreover, defendants contend that, if the Court were to conclude that the construction draws were a bargained for part of the loan contract, violation of the

---

[10] See Plain. Exh. E dated November 3, 2022.
[11] Def. opp. at 8-9.

construction draw provision provides a basis for a claim of monetary damages and not injunctive relief.[12]

The testimony from the hearing established that plaintiffs and defendants entered into a construction loan that obligated plaintiffs to make interest payments beginning May 1, 2022. Defendants provided notice there would be no further construction draws after October 2022.[13] In that same email Daniel Huertas inquired about the "status of the payoffs of both loans." Defendants previously issued payoff statements dated October 24, 2022 that made no reference to a default, late fees or any accelerated payments.[14] The payoff statement for the first deed of trust does reference a construction draw balance of $2,703,485.96. There is no reference to a construction draw for the second deed of trust. A second set of payoff statements was issued on November 21, 2022 that reflected no evidence of a default or lates fee but did reference the same amount due as a construction draw balance.[15] The evidence established that plaintiffs learned from Huertas that there would no more construction draws sometime in late October 2022. Negussie testified that based on the absence of additional construction draws, Huertas understood that plaintiffs would have to obtain new financing. Huertas' knowledge of plaintiffs' effort to obtain new financing is reflected in a November 3rd email exchange between Huertas and Negussie where the payoffs of both loans was discussed,[16] and later in a November 15th email where Huertas specifically referenced "the refinance process on both projects."[17]

---

[12] *Id*, at 10.
[13] Plain. Exh. E is an email from Daniel Huertas to Mel Negussie that references the stoppage of construction draws.
[14] Plain. Exh. D and E.
[15] Plain. Exh. G and H.
[16] Plain. Exh. E.
[17] Plain. Exh. F.

Notwithstanding defendants' knowledge that plaintiffs were engaged in ongoing efforts to obtain new financing, Negussie learned that defendants' intended to place the 423 Kennedy Street project in default and would withdraw all previous payoff statements during an exchange with Huertas on December 7, 2022. The following day plaintiffs received a notice of default on the Kennedy Street project as well as a project known as 5505 1st Street. Also on December 8, 2022, defendants issued two new payoff statements that for the first time made a demand for default interest and a default penalty.[18] Neither notice identifies the basis for the default. Each of the payoff statements make no reference to unpaid late fees. Huertas instructed Negussie to contact WPC counsel Russell Drazin for additional information. The next day, Drazin forwarded an email that for the first time indicated that the issuance of the Certificate of Delinquent Fines dated 17, 2022 was the basis for the default.[19]

Mr. Negussie testified in a very credible manner regarding the facts and circumstances related to the loan agreement with defendants. While there is some question regarding whether the terms related to the construction draws were actually included in the contract, it is clear from Negussie's testimony that all parties operated in a manner that indicates that both parties believed that the construction draw was a part of the agreement. In support this conclusion, Negussie testified that at the closing all parties signed each of the four deeds as well as the term sheet that detailed the amount due on the construction draws. Because the HUD documents where not admitted into evidence it remains unclear whether all parties signed those documents.? What is clear is that Negussie testified that there was a discussion of the

---

[18] Plain. Exh. K and L.
[19] Plain. Exh. M.

construction draws at the closing and that the HUD documents specifically referenced payments as construction draws. Perhaps some of the most compelling evidence supporting the fact that the construction draws were part of the contract is that the payoff statements that reflect the terms of payments between the parties includes a reference to a construction draw balance that remained due. In addition, Negussie testified that construction draws were consistently distributed for five or six months following each request made by plaintiffs with the last payment occurring in October 2022. These facts are sufficient to establish that the parties acted as if the construction draws were part of the agreement that obligated the parties and that the parties understood that the construction draws were an essential part of the agreement because the project could not move forward without those funds being available to plaintiffs. Defendants argue that the failure of defendants to make construction draws does not excuse plaintiffs' noncompliance with the second deeds because there was no requirement for a construction draw on that agreement. Defendants' argument glosses over the point that both deeds and their commercial counterparts were identical in almost all respects, were executed at the same time and were part and parcel of the same objective of the parties: the refinancing and development of the 423 Kennedy Street mixed use project. Too conclude otherwise is to simply ignore the uncontroverted testimony of Negussie on each of these points and the objective facts that support that testimony. The testimony further established that the parties treated the construction draws as a part of the contract and plaintiffs relied on those terms to their detriment.

Defendant contends that the default was based on plaintiffs' history of late payments, the lien placed on the 423 Kennedy Street property, the failure to make interest payments in 2023 and the failure to satisfy the demands of the loan by the maturity date. In regard to the late payments claim, the testimony of Mr. Negussie and a review of defendants' own records related to the payment history demonstrate that late payments could not be a legitimate basis for the default. First, Negussie testified that all payments were timely made except for the first payment that was delayed because both parties filed to recognize that the second deed of trust did not have an escrow provision that would have automatically made the payments. It appears that this was a simple oversight by all parties and that once Negussie was made aware of this oversight, plaintiffs acted appropriately to rectify the problem. Second, Negussie testified that he had multiple discussions with defendants, and they continually assured him that there were no problems with payments. According to Negussie, the WCP payment portal website that reflects payment history always reflected that the account was current. Negussie also testified that the payment portal often displayed payments as having been made after the first of the month deadline because there were regular problems with getting the payments through the portal and credited on the account accurately. Again, defendants' own documents, defendant Exh. 7, support this contention and reflects that payments were timely made after the escrow error was addressed.

Defendants suggest that the default was proper because plaintiffs failed to cure a lien that was placed on the 423 Kennedy Street property by the Department of Consumer Affairs for a violation identified as a "Prohibitive Excessive Vegetative

Growth."[20] As Mr. Negussie testified, plaintiffs were not aware of the $500 violation for failure to cut the grass because the notice of infraction (NOI) was mailed to an incorrect address. The Office of Administrative Hearings issued a final order regarding the NOI on September 7, 2022. Once 423 Kennedy Street members learned of the final order an appeal was filed. Negussie testified that instead of waiting for the appeal to be addressed, 423 Kennedy elected to pay the minimal fine. It is difficult for the Court to conclude that defendants realistically believed that it was appropriate or legally proper to base a default for multi-million dollar protect on a $500 fine that plaintiffs did know about and was cured almost immediately after plaintiffs learned of the lien through the default. Section 7.6 of the deed of trust addresses the issue of liens on the property. That provision indicates that plaintiffs had the right to discharge or appeal any lien within the 30 days of the judgment. The Office of Administrate Hearings final order was issued on December 11, 2022 and that order vacated the lien because the fines had been paid by 423 Kennedy. Mr. Negussie's testified credibly on these points and demonstrated that 423 Kennedy acted promptly to resolve the lien once they learned of the existence of the violation.

Defendants' final basis for the default relates to the failure of plaintiffs to make interest payments on the loan in 2023 and the failure to satisfy the loan by the maturity date.[21] The reasons for the failed interest payments leading up to the maturity date is accurately described by plaintiffs as a problem of defendants' own

[20] Plain. Exh. M.

[21] Defendants also contend that section 7.9 of the deeds of trust permit a default because Negussie's connection as an affiliate of Developer REI. This does order not address that basis for the default because the only testimony on this point was received from Mr. Negussie who indicated under oath that he was affiliated with Developer REI. Based on that uncontroverted testimony the record indicates that there was no basis for a default based on an affiliation.

creation. This Court concludes that there is sufficient reliable evidence to conclude that plaintiffs would have continued to make interest payments on the loan but for defendants' unilateral decision to discontinue the agreed upon construction draws. Even after the construction draws were discontinued, plaintiffs continued to make monthly until the end of 2022. There is no reason to believe that plaintiffs would not have made payments by the maturity date given that the project was 75-80% completed when the construction draws stopped. Negussie's testimony that Huertas discontinued the construction draws because the lenders were unhappy with work on the Charles Paret project further supports plaintiffs' contention that the default was actually a pretext. Negussie testified that Huertas wanted 423 Kennedy to rescue the Paret project by covering a $700,000 shortfall. When Negussie refused to address the shortfall created in a project that he was not involved with, it was not until then that construction draws were discontinued, payoff statements were withdrawn and default notices were issued. It is more than curious that defendants issued a default notice on the second deed that did not contain a construction draw provision while at the same time included default notice on the 5501 1st Street project also under construction by Negussie.

Based on the foregoing, plaintiffs are likely to prevail on the claim for breach of contract. The evidence presented by plaintiffs is more than sufficient to support the conclusion that the defendants' claims that plaintiffs defaulted on the loans is a pretext. A breach of the terms of a contract means an unjustified failure to perform all of any part of what is promised in the contract. *District Cablevision v. Limited Partnership v. Bassin,* 828 A.2d 714, 729 (D.C. 2003). The record adequately

demonstrates an unjustified failure to perform the terms of the contract between the parties and that initial breach caused plaintiff to be unable to make future payments on the loan.

**B. The Tortious Interference with Business Claim**

On the intentional interference with business claim, plaintiff must demonstrate 1) the existence of a valid contractual or other business relationship; 2) the defendant's knowledge of the relationship; 3) intentional interference with that relationship by the defendant; and 4) damages. *Onyeoziri v. Spivok*, 44 A.3d 279 (D.C. 2012).

Negussie's testimony established that defendants' and Huertas knew in November 2022 that plaintiffs were engaged in efforts to refinance the loan. The email exchanges between Negussie and Huertas demonstrates this knowledge. As Negussie testified, defendants provided "clean" payoff statements that were necessary for the completion of the refinancing on two occasions close in time to the Huertas emails and prior to December 2022. The closing with Main Street Bank was scheduled to take place prior to Thanksgiving but was delayed because of the holiday. When the closing was delayed, defendants issued new payoff statements on December 8, 2022 that reflected for the first time the default as well as default interest and penalties that were due. As Negussie testified these new payoff statements would prevent any refinancing from moving forward.

Negussie's uncontroverted testimony easily establishes that plaintiffs were engaged in business relationship with Main Street Bank that included the creation of a term sheet for a new loan. Based on the email exchange, Huertas knew of the

impending refinancing efforts with Main Street Bank. The issuance of the new December 2022 payoff statements interfered with plaintiffs' ability to complete the refinancing with Main Street Bank. The evidence of defendants' intent to interfere with the business relationship between plaintiffs and Main Street Bank is found in WCP's pretextual efforts to default the loan. As Negussie indicated, WCP had a history of defaulting loans late in the construction process to gain control over the project and because the 423 Kennedy project was close to completion, defendants would be particularly motivated to declare a default on this project because it was so close to completion.

Plaintiffs have produced evidence sufficient to support their claim that they are likely to prevail on the claim for tortious interfere. Defendants have failed to produce any evidence that would indicate otherwise.

**C. The Conflict of Interest Claim**

On this claim, plaintiff contends that the Trustee Russell Drazin had a conflict of interest created by the deeds of trust because he had a fiduciary duty to both the borrow and the lenders and that duty was in conflict with Mr. Drazin's role as counsel for defendants in connection with the default and foreclosure sale. Plaintiff argues that when a fiduciary has conflicting interest, the burden shifts to the trustee to demonstrate that he has been faithful to his duties and did not take action that was influenced by the conflict. *Sheridan v. Perpetual Building Association.*, 299 F.2d 463, 465 (1962) (en banc).

Defendant responds by contending that plaintiffs ignore the longstanding tradition in this jurisdiction of having creditors' attorneys function as trustee in

Case 24-10023-ELG Doc 1-1 Filed 09/04/24 Entered 11/04/24 ... Page 16 of 22
Exhibit A - All Docket Entries (with) ... Page 1316 of 1716

connection with a foreclosure proceeding. There is some support for this position in that the deeds of trust in Section 8.0 details the obligations of the trustee in the event of a default and foreclosure. Defendants further argue that the trustee's service is largely ministerial in nature and would not be influences by any potential conflict.

During the hearing, Mr. Negussie testified that prior to receiving the notice of default in December 2022, he had no contact with Mr. Drazin in connection with his duties as trustee. Contact with Drazin was suggested by Dan Huertas when Negussie sought an explanation for the default. According to Negussie, Huertas indicated that additional information regarding the default would have to come from WCP's attorney, Russell Drazin. In a December 9th email, Drazin indicated that he represented WCP in connection with the loans and went on to explain the basis for the default issued on December 8, 2022. The record does not indicate that plaintiffs had a prior contact with Drazin.

The parties agree that District of Columbia law provides:

> Trustees on deeds generally "have only those powers and duties imposed by the trust instrument itself, coupled with the applicable statute governing foreclosure sales in the District of Columbia." Trustees on deeds must exercise their powers "with religious fidelity to ethical principles." Where a trustee has conflicting interest, the trustee bears the burden of showing that it faithfully executed its duties.

*Evans v. First Mount Vernon, ILA*, 786 F. Supp. 347, 356 (D.D.C. 20011) (quoting *In re Rothenberg*, 173 B.R. 4, 16 (Bankr D.D.C. 1994). The trustee has a duty to both the borrower and the lender. Here, the record establishes that Drazin served as trustee under the terms of the deed and had a fiduciary duty to act faithfully to both. The record further established that Drazin took on a different role in December 2022 when

he functioned as counsel for WCP in connection with the default. At that point, it appears that Drazin had a legal and ethical duty to zealously represent WCP's interest in the default and foreclosure. Drazin's position as counsel to WCP created a conflict because Negussie and his partners were now adversaries over the disposition of the 423 Kennedy Street property.

When there is evidence of the conflict of interest, the burden of demonstrating the faithful discharge of duties shifts to the trustee. *Sheridan*, 299 F.2d at 465 Given these burden shifting principles and the absence of any explanation by the trustee, the Court concludes that plaintiffs have carried their burden by establishing a likelihood of success on the merits. Plaintiffs seek the appointment of substitute trustee given the existence of the conflict. The Court declines to address that issue today because resolution of that is not necessary for the determination of whether to grant injunctive relief.

**II. Irreparable Harm**

In regard to irreparable harm, defendants suggest that plaintiffs have remedies other than injunctive relief available to them. Defendants argue plaintiff could seek bankruptcy protection to address their interest in the 423 Kennedy Street project. In addition, defendants contend that should the foreclosure move forward, plaintiff would be entitled to damages if they prevail on the merits.

Plaintiffs argue that if the foreclosure sale proceeds, they will be irreparably harmed because they will lose their entire investment, including the improvements to the property in a project that is 75-80% complete and that ability to later recover damages is speculative at best.

The 423 Kennedy Street project is a mixed use, six level building with thirty-three residential units. A foreclosure sale would undoubtedly result in the lose of investment for plaintiffs and would almost certainly mean that they would never see the fruits of their labor, the completion of the project. As plaintiffs argue, property is unique and money damages would address nothing more than a potential monetary loss to the extent that such a loss could be quantified by money. The bankruptcy option, while initially appealing, overlooks the impact that bankruptcy will have on the ability of plaintiffs to secure financing to complete the project if they prevail on the merits.

The likelihood of irreparable harm for plaintiffs is significant and cannot be adequately addressed through other legal means.

**III. Balancing of the Injuries**

As stated, the harm to plaintiffs in the event of foreclosure is significant. The Court is cognizant of the fact that defendants have not received interest payments since the beginning of 2023. In addition, the loan maturity date was March 31, 2023 and plaintiffs have not satisfied that obligation as well. In light of the foregoing, the Court concludes that much of the harm experienced by defendants is due to their own action. As the Court has indicated, the improper ceasing of construction draw payments caused plaintiffs' inability to continue with the project. The reasons supporting the stoppage of the construction draws and moving to default and possible foreclosure appear pretextual and motivated by a plan to gain control of the 423 Kennedy Street project. While defendants have and will suffer harm, it is their failure to perform the duties created by the loan contract that is chiefly responsible for that

harm. On this record, the Court concludes that the balancing of harms weighs in plaintiffs' favor.

**IV. The Public Interest**

There is a significant public interest involved in this dispute. Obviously, the citizens of the District of Columbia benefit from the development of a mixed use property that brings thirty-three residential units to the community. A more specific public interest is found in requiring individuals and other entities to conduct themselves fairly in business dealings. The issuance of an injunction is not an effort to prevent lenders from using legal means to enforce the duties and obligations of a loan agreement. This also is not an effort to empower borrowers with the ability to access judicial means to stave off a foreclosure when they believe that defaults are unfairly undertaken with little or no proof of wrongdoing by the lender. Here, there is evidence of a pretextual basis for the default along with a conflict of interest for the trustee and an irreparable harm that cannot be adequately addressed by means other than the issuance of an injunction.

**V. Remaining Issues**

In the Complaint, plaintiffs seek declaratory relief related to the liquidated damages provision in the loan agreement. Determination of that issue is not necessary for the Court to determine the injunction relief claim. Resolution of the liquidated damages provision will be addressed when the Court considers the merits at a later hearing.

The Court is aware that Super. Ct. Civ. R. 65 governs the issuance of injunctive relief. That provision also includes reference to the imposition of a bond to

protect the interest of the enjoined party.[22] The issue of whether the language in the rule creates a mandatory imposition of a bond for the protection of the enjoined party has not been directly addressed by the District of Columbia Court of appeals. The local rule is almost identical to the federal version, so federal precedent is instructive. The circuits are split on this issue and the circuits that have interpreted the rule as being discretionary have recognized several exceptions to the mandatory language. The District of Columbia Court of Appeals has suggested that the security requirement is phrased in mandatory terms with the amount of any bond imposed being left to the discretion of the trial court. If the trial court exercises its discretion to waive the bond requirement, it is important that the trial judge states the reasons for taking such action. *See L'Enfant Plaza Properties, Inc. v. Fitness Systems, Inc.*, 354 A.2d 233, 237 (D.C. 1976).

Considering the underlying facts discussed in this order, the Court declines to impose a bond for the following reasons. First, defendant have not provided any evidence of what an appropriate bond might be under the circumstances. While defendants' counsel made a proffer of what might be appropriate, that proffer was not accompanied by any direct evidence that would demonstrate that the suggested bond was rationally related to any potential harm. Second, plaintiffs testified that they made payments on the loan through the end of December 2022 even though defendants discontinued the construction draws that were necessary for the project to

---

[22] Rule 65(c) provides:

SECURITY. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, the District of Columbia, and officers or agencies of either are not required to give security.

move forward. The clear import of that testimony was that plaintiffs had limited funds available to continue in the project. If the bond requirement were interpreted as a mandatory requirement, the inability of a moving party to pay a bond would effectively deny access to judicial review. Lastly, equity would support the waiver of the bond requirement given the overall strength of the plaintiffs' case.

Section (a)(2) of the rule permits the trial court to consolidate the preliminary injunction hearing with the trial on the merits. It is the Court's intention to schedule this matter for a combined hearing on a date convenient to the Court and available to the parties.

**VI. Conclusion**

The Court concludes that plaintiffs have made the showing necessary to support the issuance of an order enjoining defendants from foreclosing on the 423 Kennedy Street project on July 25, 2023 or at anytime thereafter until this litigation is concluded.

**WHEREFORE,** for the above stated reasons and any others that may appear from a review of the entire record herein, it is this 24th day of July 2023 hereby

**ORDERED:** that an injunction shall immediately issue that prohibits defendants from conducting a foreclosure sale on the property located at 423 Kennedy Street until further order of this Court or at any time before the conclusion of the litigation in this matter, and it is further

**ORDERED:** that the parties will be required to provide their position on what track should be used for a scheduling order. The parties should also consider a more expediated discovery, dispositive motion and mediation schedule that would permit

the parties to move forward to a trial within a reasonable period after the issuance of this order.

July 24, 2023
Date

/s/
MILTON C. LEE, JR.
ASSOCIATE JUDGE

cc: James D. Sadowski, Esq.
Alexandria J. Smith, Esq.
Counsel for Plaintiffs
jds@gdllaw.com

Maurice B. Versandig
Counsel for Defendants
mac@mbvesq.com