WCP EX. S

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

423 KENNEDY ST HOLDINGS LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT, effective as of the date of signature set forth below, is entered into by and between Brighton KSDC, LLC (hereinafter "Brighton") and Mel Melaku Negussie (hereinafter "Negussie") each of which is referred to individually as "Member" and collectively as "Members." In consideration of the mutual promises contained in this Amended and Restated Operating Agreement (this, "Agreement"), the Members agree as follows:

**ARTICLE 1**

**THE LIMITED LIABILITY COMPANY**

Section 1.1 Formation. The Members hereby amend an existing limited liability company upon the terms and conditions provided in this Agreement, subject to the provisions of Title 13.1, Chapter 12, the District Of Columbia Limited Liability Company Act (the "Act"), as the same may be amended from time to time and any successor to such Act.

Section 1.2 Name. The name of the limited liability company shall be 423 KENNEDY ST HOLDINGS LLC (the "Company").

Section 1.3 Articles of Organization. On May 20, 2016 the Company caused Articles of Organization for 423 KENNEDY ST HOLDINGS LLC, a limited liability company under the laws of the District of Columbia, to be filed with the Commonwealth of District Of Columbia State Corporation Commission. In the future, the Members shall execute such further documents and take such further action as shall be appropriate or necessary to comply with the requirements of law for the formation and operation of a limited liability company in all jurisdictions where the Company elects to carry on its business.

Section 1.4 Business. The purposes for which the Company is organized are (i) the investment, ownership and management of real property, (ii) the investment, ownership and management of personal property, (iii) other lawful investments, (iv) to engage in all other lawful activities as are reasonably necessary to carry out the foregoing purposes of the Company and (v) to engage in all activities pursuant to and in accordance with §13.1-1008 of the District Of Columbia Limited Liability Act. Title to any property held by the Company may, by unanimous agreement of the Managers, be held by a nominee on behalf of the Company. The Company may sell or otherwise dispose of all or substantially all of its assets and any such sale or disposition shall be considered to be within the scope of the Company's business.

Section 1.5 Principal Office; Registered Agent. The principal office of the Company will be located at 1215 1st ST NE, PHC, Washington DC 20002. The name and address of the

initial agent for service of process of the Company is Charles Paret, 1140 3rd Street, NE, Washington DC 20002. The agent for service of process of the Company may be changed from time to time by the Managing Member (as defined below), subject to applicable law.

Section 1.6 Additional Members. Additional Members shall not be admitted to the Company without the prior written consent of all of the Members.

## ARTICLE 2

## DEFINITIONS

Section 2.1 Cash Flow. "Cash Flow" shall mean the excess of all cash receipts of the Company over all cash disbursements of the Company except that cash flow shall not include any amount that represents a return of the capital invested by the Company that is being held for reinvestment or for return to the Members under Section 4.2(a).

Section 2.2 Code. "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute.

Section 2.3 Manager or Managers. "Manager" or "Managers" shall mean a person or persons elected by the Members to manage the Company. The Managers shall be Brighton and Negussie.

Section 2.4 Profit or Loss. "Profit" or "Loss" shall mean the profit or loss of the Company as determined under the capital accounting rules of Treasury Regulation §1.704-1(b)(2)(iv) for purposes of adjusting the capital accounts of the Members, including, without limitation, the provisions of paragraphs (b), (f), and (g) of those regulations relating to the computation of items of income, gain, deduction, and loss.

Section 2.5 Total Cost and Investment. "Total Cost and Investment" shall mean, with respect to each project (a "Project"), the total expenditures to acquire, improve, develop, remodel, rehabilitate, hold, and otherwise prepare any property for sale including, without limitation, money used to purchase the property (including closing costs) and to renovate the property but does not include selling costs.

Section 2.6 Sharing Ratio. Except as may be indicated in any subsequent agreement to the contrary, the "Sharing Ratio" of each Member shall be as follows:

| | |
|---|---|
| Negussie | 50.0% |
| Brighton | 50.0% |

Section 2.7 Treasury Regulations. "Treasury Regulations" shall mean regulations promulgated by the Department of Treasury under the Code. Any reference to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations promulgated under the Code.

Section 2.8 Voting Interest. "Voting Interest" shall mean a number of votes equal to a Member's Sharing Ratio multiplied by 100.

Section 2.9 Indemnification. "Indemnify" Negussie shall defend and indemnify Brighton against all third party claims, actions, suits, demands, damages, non-fiscal obligations, losses, settlements, judgments, costs and expenses ( including without limitation reasonable attorneys' fees and costs) ("Claims") which arise out of or relate to the negligence or misconduct of any party (other than Brighton) associated with the redevelopment or sale of certain real property located at 419-423 Kennedy St. NW, Washington, DC.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS

Section 3.1 Capital Contributions. Prior to the date of this Agreement, the Members or their predecessors in interest have made capital contributions to the Company in the following amounts:

Capital Contributions

| | | |
|---|---|---|
| Tranche 1 Acquisition - | Brighton | $2,500,000 |
| Tranche 1 Acquisition - | Negussie | $1,000,000 |

Section 3.2 Additional Capital Contributions. If additional capital contributions are required at any time, any of the following steps may be taken:

(a) the necessary amount may be contributed by one or more of the existing Members in such shares as they may agree upon and the Sharing Ratios may be adjusted accordingly;

(b) a new Member may be admitted to the Company and make part or all of the required contribution and the Sharing Ratios may be adjusted accordingly; or

(c) the funds may be borrowed from any source, including any existing Member or Members.

Section 3.3 Return of Capital Contributions. Capital contributions shall be expended in furtherance of the business of the Company. All costs and expenses of the Company shall be paid from its funds. No Manager shall have any personal liability for the repayment of any capital contribution to a Member.

## ARTICLE 4

## DISTRIBUTIONS

Section 4.1 Nonliquidating Distributions. Except as provided in Section 4.2 or otherwise agreed to by the Members, the Company shall make distributions of Cash Flow to the Members after each Project (reconciled annually) as follows:

(a) first to all Members until they have received their aggregate principal amount of their Capital Contributions; then

(b) any Cash Flow remaining after distributions have been made pursuant to Sections 4.1(a) shall be distributed as follows: 50.0% to Brighton , and 50.0% to Negussie.

Section 4.3 Liquidating Distributions. All distributions made in connection with the dissolution of the Company pursuant to Article 12, shall be made to the Members in the following order of priority:

(a) first, to the Members proportion to each Member's initial capital contributions set forth under Article 3, until each Member's capital contributions have been returned in full under this paragraph (a); then

(b) the balance, 50.0% to Brighton , 50.0% to Negussie.

## ARTICLE 5

## ALLOCATION OF PROFIT AND LOSS

Section 5.1 Determination of Profit and Loss. Profit or Loss shall be determined on an annual basis and for such other periods as may be required.

Section 5.2 Profit Allocation.

(a) Except as provided in Sections 5.2(b) and 5.4, Profit shall be allocated to Members as follows:

(i.) first, to the Members, until they have been allocated an amount of Profit under this clause (i) on a cumulative basis equal to the Losses previously allocated to them on a cumulative basis under Section 5.3; then

(ii.) the balance, to the Members in proportions equal to their membership in the company.

(b) Any Profit or Loss with respect to the sale, exchange or other disposition of all or substantially all of the Company's assets or with respect to the sale, exchange or other disposition of assets in connection with the liquidation of the Company shall be allocated among the Members, so as to cause the balance in each Member's capital account to equal the amount that Member would be entitled to receive under Section 4.2 if all the assets of the Company (after the payment of liabilities) were distributed to the Member under that Section (the "Target Amounts"). If the Profit or Loss allocable under this Section 5.2(b) is not sufficient to cause the balances in the Members' capital accounts to be the Target Amounts, then items of income, gain, deduction and loss making up such Profit or Loss shall be allocated among the Members in the manner that would most nearly (on an aggregate basis) bring the balances in the Member's capital accounts to the Target Amounts.

(c) For purposes of Section 5.2(b), the capital accounts of the Members shall be determined (i) before giving effect to distributions under Section 4.2, (ii) after allocating all other items of Profit and Loss, and (iii) after making all distributions pursuant to Section 4.1.

(d) If the Profit with respect to the sale of all or substantially all of the Company assets is reported on the installment sale method for federal income tax purposes, the portion of the Profit allocated to each Member under the provisions of paragraph 5.2(b) for each year shall be determined by the accountants for the Company under such reasonable standards, consistently applied, as will result in an allocation of the total Profit from the sale among the Members in accordance with the provisions of paragraph 5.2(b).

Section 5.3 Allocation of Losses. Except as provided in Section 5.2(b) and Section 5.4, all Losses shall be allocated among the Members in accordance with their Sharing Ratios.

Section 5.4 Regulatory Allocations and Curative Provision.

The "qualified income offset" provisions of Treasury Regulation section 1.704-1(b)(2)(ii)(d) are incorporated herein by reference and shall apply to adjust the allocation of Profit and Loss otherwise provided for under Sections 5.2 and 5.3 to the extent provided in that regulation.

The "minimum gain" provisions of Treasury Regulation section 1.704-2 are incorporated herein by reference and shall apply to adjust the allocation of Profit and Loss otherwise provided for under Sections 5.2 and 5.3 to the extent provided in that regulation.

Notwithstanding the provisions of Section 5.3, if during any fiscal year of the Company the allocation of any loss or deduction, net of any income or gain, to a Member would cause or increase a negative balance in a Member's capital account as of the end of that fiscal year, only the amount of such loss or deduction that reduces the balance to zero shall be allocated to the Member and the remaining amount shall be allocated to the other Members in accordance with their respective Sharing Ratios. For purposes of the preceding sentence, a capital account shall be reduced by the adjustments, allocations, and distributions described in Treasury Regulation

sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and increased by the amount, if any, of the negative balance in the Member's capital account that the Member is obligated to restore within the meaning of Treasury Regulation section 1.704-1(b)(2)(ii)(c) as of that time or is deemed obligated to restore under Treasury Regulation section 1.704-2(g)(1) or section 1.704-2(i)(5).

All allocations pursuant to the foregoing provisions of this Section 5.4 (the "Regulatory Allocations") shall be taken into account in computing allocations of other items under Sections 5.2 and 5.3, including, if necessary, allocations in subsequent fiscal years, so that the net amounts reflected in the Members' capital accounts and the character for income tax purposes of the taxable income recognized (for example, as capital or ordinary) will, to the extent possible, be the same as if no Regulatory Allocations had been given effect.

## ARTICLE 6

## ALLOCATION OF TAXABLE INCOME AND LOSS

Section 6.1 In General.

(a) Except as provided in paragraph 6.1(b) and Section 6.2, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such item is allocated for capital account purposes under Article 5.

(b) To the extent of any recapture income (as defined below) resulting from the sale or other taxable disposition of a Company asset, the amount of any gain from such disposition allocated to (or recognized by) a Member (or its successor in interest) for federal income tax purposes shall be deemed to consist of recapture income to the extent such Member (or such Member's predecessor in interest) has been allocated or has claimed any deduction directly or indirectly giving rise to the treatment of such gain as recapture income. For this purpose "recapture income" shall mean any gain recognized by the Company (but computed without regard to any adjustment required by sections 734 and 743 of the Code) upon the disposition of any property or asset of the Company that does not constitute capital gain for federal income tax purposes because such gain represents the recapture of deductions previously taken with respect to such property or assets.

Section 6.2 Allocation of Section 704(c) Items. The Members recognize that with respect to property contributed to the Company by a Member and with respect to property revalued in accordance with Treasury Regulation section 1.704-1(b)(2)(iv)(f), there will be a difference between the agreed values or "carrying values" of such property at the time of contribution or revaluation and the adjusted tax basis of such property at that time. All items of tax depreciation, cost recovery, amortization, amount realized, and gain or loss with respect to such assets shall be allocated among the Members to take into account the book-tax disparities in

accordance with the provisions of sections 704(b) and 704(c) of the Code and the Treasury Regulations under those sections.

Section 6.3 Integration With Section 754 Election. All items of income, gain, loss, deduction, and credit recognized by the Company for federal income tax purposes and allocated to the Members in accordance with the provisions of this Agreement, and all basis allocations to the Members, shall be determined without regard to any election under section 754 of the Code that may be made by the Company; provided, however, that such allocations, once made, shall be adjusted as necessary or appropriate to take into account the adjustments permitted by sections 734 and 743 of the Code.

Section 6.4 Allocation of Tax Credits. All tax credits with respect to the Company's expenditure of funds shall be allocated in the same manner as the allocation of Profit for the period during which the expenditures giving rise to the tax credit are incurred. If there is no Profit during such period, tax credits shall be allocated in accordance with the Members' respective Sharing Ratios.

## ARTICLE 7

## MANAGEMENT

Section 7.1 Management Authority.

(a) Management of the Company shall be vested in the Managers. The Managers shall have the power and authority to conduct the business of the Company and is hereby expressly authorized on behalf of the Company to make all decisions with respect to the Company's business and to take all actions necessary to carry out such decisions.

(b) Any document executed on behalf of the Company for the purpose of buying or selling properties on behalf of the Company must be signed by the Manager.

Section 7.2 Management Responsibilities. The Managers shall have the authority to manage the day-to-day operations of the Company including the renovation of properties owned by the Company.

Section 7.3 Duties. The Managers shall carry out its duties in good faith, in a manner that it believes to be in the best interests of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances. If the Manager so performs its duties, it shall not have any liability by reason of being or having been a Manager of the Company. The Manager shall devote such time to the business of the Company as the Manager, in its discretion, deems necessary for the efficient carrying on of the Company's business. The Manager shall at all times be free to engage in any business for its own account.

Section 7.4 Number. Initially, there shall be two Managers. The number of Managers may be increased or decreased by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%), but no decrease shall have the effect of shortening the term of any incumbent Manager.

Section 7.5 Tenure and Removal. The initial Managers shall be Negussie and Brighton. The initial Manager shall hold office until the first annual meeting of the Members and until a successor has been elected and qualified. At the first annual meeting of Members and at each annual meeting thereafter, the Members shall elect Managers to hold office until the next succeeding annual meeting. Each Manager shall hold office for the term for which it is elected and until its successor has been elected and qualified. At a properly called meeting, any Manager may be removed, with or without cause, by the vote of Members with aggregate Voting Interests of more than 50 percent.

Section 7.6 Reliance by Third Parties. No third party dealing with the Company shall be required to ascertain whether the Managers are acting in accordance with the provisions of this Agreement. All third parties may rely on a document executed by the Managers as binding the Company. The foregoing provisions shall not apply to third parties who are affiliates of a Member or the Manager. If a Manager acts without authority, it shall be liable to the Members for any damages arising out of its unauthorized actions.

Section 7.7 Resignation. Either Manager may resign at any time by giving written notice of resignation to the Members. Unless otherwise specified in the notice, the resignation shall take effect upon receipt by the Members and the acceptance of the resignation shall not be necessary to make it effective.

Section 7.8 Newly Created Manager Positions and Vacancies. Newly created Manager positions resulting from an increase in the number of Managers shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%). A Manager elected to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until its successor has been elected and qualified. Vacancies occurring for any reason shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%). A Manager elected to fill a vacancy shall be elected to hold office for the unexpired term of its predecessor.

Section 7.9 Transactions Between Company and Manager. Any Manager, on behalf of the Company, may contract and deal with itself and may cause any person or entity affiliated with the Manager to contract or deal with the Company; provided, however, that such contracts and dealings must be on terms comparable to and competitive with those available to the Company from others dealing at arm's length and must be approved in writing by all of the Members.

Section 7.10 Management Fees and Reimbursements. The Managers shall not be entitled to a management fee or salary for managing the operations of the Company. The Managers shall, however, be reimbursed by the Company for reasonable out-of-pocket costs incurred on behalf of the Company.

Section 7.11 Insurance. The Company shall maintain, for the protection of the Company and all of its Members, such insurance as the Managers, in their sole discretion, deems necessary for the operations being conducted.

Section 7.12 Exculpation. Except as may be indicated in Section 2.9 to the contrary, he Managers shall not be liable to the Company nor to any Member for any act or failure to act, nor for any errors of judgment, but only for willful misconduct or gross negligence. The Company shall indemnify and hold harmless the Managers and the agents and employees of the Managers against and from any personal loss, liability, or damage incurred as a result of any act or omission, or any error of judgment, unless such loss, liability, or damage results from such person's willful misconduct or gross negligence. Any such indemnification shall be paid only from the assets of the Company, and no Manager or third party shall have recourse against the personal assets of any Member for such indemnification.

## ARTICLE 8

## MEMBERS

Section 8.1 Participation. A Member, in its capacity as a Member, shall take no part in the control, management, direction, or operation of the affairs of the Company and shall have no power to bind the Company.

Section 8.2 Quorum. A majority of the outstanding Voting Interests, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members. Each of the Members hereby consents and agrees that one or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting. If a quorum is present, the affirmative vote of the majority of the Voting Interests represented at the meeting and entitled to vote on the subject matter shall be the act of the Members, unless a greater number is required by the Act or this Agreement. In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed sixty (60) days.

Section 8.3 Informal Action. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken, signed by each Member entitled to vote. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

Section 8.4 Annual Meeting. The annual meeting of the Members shall be held on the first Saturday in January beginning in 2020, at the hour of 1:00 PM, local time, or at such other time and on such other day within such month, as shall be fixed by the Managers, for the purpose of electing Managers and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day. If the election of Managers shall not be held on the

day designated for an annual meeting of the Members, or at any adjournment thereof, the Managers shall cause the election to be held at a special meeting of the Members as soon as may be convenient.

Section 8.5 Special Meetings. Special meetings of the Members for any purpose or purposes may be called by either Manager or by holders of not less than one-tenth (1/10) of all Voting Interests.

Section 8.6 Place of Meeting. The Manager may designate the place of meeting for any annual meeting and the person calling a special meeting may designate the place for such special meeting. If no designation is made, the place of meeting shall be the registered office of the Company.

Section 8.7 Notice of Meeting. Written notice, given five (5) days in advance of a meeting, stating the date, time and place of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered either personally or by mail, by or at the direction of any Manager or other person calling the meeting, to each Member of record entitled to vote at such meeting. If mailed, such notice shall be deemed delivered as provided in the Act. Waiver of notice and actions taken at a meeting shall be effective as provided in the Act.

Section 8.8 Proxies. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by the Member's duly authorized attorney-in-fact. Such proxy shall be filed with any Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

Section 8.9 Conduct of Meeting. At each meeting of the Members, a Chairperson for that particular meeting shall be elected. The Chairperson shall be the Member in attendance who has received the vote of the majority of the Voting Interests represented at the meeting. The Chairperson shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting. Following each meeting, the minutes of the meeting shall be sent to the Managers and each Member.

Section 8.10 Tax Matters Partner. Pursuant to section 6231(a) of the Code, Brighton is hereby designated as the tax matters partner for the Company. Brighton is authorized to perform, on behalf of the Company or any Member, any act that may be necessary to make this designation effective.

## ARTICLE 9

## ACCOUNTING AND REPORTING

Section 9.1 Books. The Company shall maintain complete and accurate books of account at the registered office of the Company. The Company shall provide any Member any information requested relating to the business of the Company. During ordinary business hours,

any Member or that Member's authorized representative shall have access to all books, records, and materials regarding the Company and its activities.

Section 9.2 Capital Accounts. The Company shall maintain a separate capital account for each Member in accordance with the Treasury Regulations under section 704(b) of the Code and such other accounts as may be necessary or desirable to comply with the requirements of applicable laws and regulations.

Section 9.3 Transfers During Year. In order to avoid an interim closing of the Company's books, the share of profits and losses under Article 5 of a Member who transfers part or all of its interest in the Company during the Company's accounting year may be determined by taking the transferring Member's pro rata share of the amount of such profits and losses for the year. The proration shall be based on the portion of the Company's accounting year which has elapsed prior to the transfer, or may be determined under any other reasonable method; provided, however, that any gain or loss from the sale of Company assets shall be allocated to the owner of the transferred interest at the time of such sale. The balance of the profits and losses attributable to the transferred interest shall be allocated to the transferee of such interest.

Section 9.4 Reports. Within Forty-Five (45) days after the end of each calendar quarter (the "Prior Quarter") the Manager shall deliver to each Member a written report detailing the assets and liabilities of the Company as of the end of the Prior Quarter and setting forth the profits and losses of the Company for the Prior Quarter and for the Company year. The books of account shall be closed promptly after the end of each fiscal year. As soon as practicable thereafter, a Manager shall deliver a written report to each Member which shall include a statement of receipts, expenditures, profits, and losses for the year, a statement of each Member's capital account, and such additional statements with respect to the status of the Company's assets and the distribution of Company funds as are necessary to advise the Members properly about their investment in the Company. Prior to March 15th of each year, the Members shall also be provided with a copy of the Company federal income tax return (Form 1065) to be filed for the preceding year.

Section 9.5 Section 754 Election. If requested by a Member, the Company shall make the election provided for under section 754 of the Code. Any costs attributable to making such election shall be borne solely by the requesting Member.

## ARTICLE 10

## TRANSFERS – RIGHT OF FIRST REFUSAL

Section 10.1 Restrictions. Notwithstanding anything to the contrary contained in this Agreement, no Member shall sell, assign, pledge, or otherwise transfer or dispose of any portion of its interest in the Company without (i) complying with the terms of and procedures set forth in Sections 10.2 through 10.8 or (ii) first obtaining the prior written approval of all of the Members (which approval shall be within the sole and absolute discretion of each Member).

Section 10.2 Offer to Other Members. If at any time any Member proposes to sell, assign, or otherwise dispose of all or any portion of its interest in the Company, such Member ("Offeror") shall make a written offer to sell such interest (the "Offered Interest") to the other Members on the same terms and conditions as those on which Offeror proposes to transfer the Offered Interest. Such offer shall state the name of the proposed transferee and all of the terms and conditions of the proposed transfer, including the price to the proposed transferee.

Section 10.3 Acceptance of Offer. The other Members shall have the right for a period of 30 days after receipt of the offer from Offeror, or such longer period as may be required under Section 10.5, to elect to purchase all of the Offered Interest. In exercising their right to purchase, the other Members may divide the Offered Interest in any manner to which they all agree, and in the absence of agreement, the Offered Interest shall be divided among the Members in proportion to the relative Sharing Ratios of the Members who choose to participate. To exercise their rights to purchase, the participating Members shall give written notice to Offeror prior to the end of the period provided for in the first sentence of this Section 10.3. Upon the exercise of a right to purchase, and provided the right is exercised with respect to all of the Offered Interest, the purchase shall be closed and payment made on the same terms and conditions as those on which Offeror proposes to transfer the Offered Interest.

Section 10.4 Failure to Accept Offer. If the other Members do not elect to purchase all of the Offered Interest, Offeror may transfer the Offered Interest to the proposed transferee named in the offer delivered to the other Members. However, if that transfer is not made within 90 days after the end of the period provided for in Section 10.3, a new offer shall be made to the other Members and the provisions of Sections 10.1, 10.2, and 10.3 shall again apply.

Section 10.5 Cash Equivalents. If the proposed offer under Section 10.2 is for consideration other than cash or cash plus deferred payments of cash, the purchasing Members may pay the cash equivalent of such other consideration. The Offeror and the purchasing Members shall attempt to agree upon a cash equivalent of such other consideration. If they cannot agree within Twenty (20) days after the beginning of the 30-day period under Section 10.3, any of such Members may, by five days' written notice to the others, initiate arbitration proceedings for determination of the cash equivalent without regard to income tax consequences to the Offeror as a result of receiving cash rather than the other consideration. The purchasing Members may elect to purchase the interest at the determined cash equivalent by notice of such election to the Offeror within ten days after the arbitrator's decision.

Section 10.6 Direct and Indirect Transfers. For purposes of this Agreement, restrictions upon the sale, assignment, or other disposition of a Member's interest shall extend to any direct or indirect transfer including, without limitation, an involuntary transfer (such as a transfer pursuant to a foreclosure sale) or a transfer resulting by operation of law.

Section 10.7 Substitution of a Member.

(a) No assignee, legatee, or transferee (by conveyance, operation of law, or otherwise) of the whole or any portion of a Member's interest in the Company shall have the right to become a substituted Member without

the prior written consent of all of the Members. The granting or denial of a request for such written consent shall be within the sole and absolute discretion of each Member. A substituted Member shall succeed to all the rights and interest of its assignor in the Company. An assignee of a Member who is not admitted as a Member shall be entitled only to the distributions to which its assignor would otherwise be entitled.

(b) With the exception of the Managing Member, if a Member shall die, the executor, administrator, or trustee of such Member, or if a Member shall be adjudicated insane or incompetent, the committee, conservator, or representative of such Member, or if a Member shall be dissolved, merged, or consolidated, the successor in interest to such Member, shall have the same rights and obligations that such Member would have had if such Member had not died, been adjudicated insane or incompetent, or been dissolved, merged, or consolidated, except that the executor, administrator, trustee, committee, conservator, representative, or successor (as the case may be) shall not become a substituted Member without the prior written consent of all of the other Members. The granting or denial of a request for such written consent shall be within the sole and absolute discretion of each Member.

(c) No transfer of any interest in the Company otherwise permitted under this Agreement shall be effective for any purpose whatsoever until the transferee shall have assumed the transferor's obligations to the extent of the interest transferred and shall have agreed to be bound by all the terms and conditions of this Agreement, by written instrument, duly acknowledged, in form and substance reasonably satisfactory to the Manager.

Section 10.8 Conditions to Substitution. With the exception of the Managing Member, as conditions to its admission as a Member, (i) any assignee, legatee, transferee, or successor of a Member shall execute and deliver such instruments, in form and substance satisfactory to the Manager, as the Manager shall deem necessary and (ii) such assignee, legatee, transferee, or successor shall pay all reasonable expenses in connection with its admission as a substituted Member.

## ARTICLE 11

## TERM

Section 11.1 Events of Dissolution. The Company shall continue until dissolved by any of the following events:

(a) the unanimous written consent of all of the Members;

(b) the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company; or

(c) any other event causing dissolution of a limited liability company under the Act.

Section 11.2 Continuity of Company. Notwithstanding the foregoing provisions of Section 11.1, upon the occurrence of an event described in Section 11.1(b), the remaining Members shall have the right to continue the business of the Company. Such right may be exercised only if a majority in interest of the remaining Members consent in writing, within 90 days after the occurrence of the event described in Section 11.1(b), to continue the business of the Company. If a majority in interest of the remaining Members do not consent to continue the Company, the right of the Members to continue the business of the Company shall expire, the Manager shall file a statement of intent to dissolve, and the Company's affairs shall be wound up as provided in Article 12.

## ARTICLE 12

## DISSOLUTION AND TERMINATION

Section 12.1 Final Accounting. In the event of the dissolution of the Company, a proper accounting shall be made as provided in Section 9.4 from the date of the last previous accounting to the date of dissolution.

Section 12.2 Liquidation. Upon the dissolution of the Company, any Manager, or if either Manager is unable to act, some person selected by the Members whose Sharing Ratios comprise 51 percent or more of the Sharing Ratios of the Members, shall act as liquidator to wind up the Company. The liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and businesslike manner. All proceeds from liquidation shall be distributed in the following order of priority: (i) to the payment of debts and liabilities of the Company and the expenses of liquidation; (ii) to the setting up of such reserves as the liquidator may reasonably deem necessary for any contingent liabilities of the Company; and (iii) to the Members in accordance with Article 4.

Section 12.3 Distribution in Kind. If the liquidator shall determine that a Company asset should be distributed in kind, the liquidator shall obtain an independent appraisal of the fair market value of the asset as of a date reasonably close to the date of liquidation. Any unrealized appreciation or depreciation with respect to such asset shall be allocated among the Members (in accordance with the provisions of Article 5, assuming that the asset was sold for the appraised value) and taken into consideration in determining the balance in the Members' capital accounts as of the date of liquidation. Distribution of any such asset in kind to a Member shall be considered a distribution of an amount equal to the asset's fair market value for purposes of Section 12.2. The liquidator, in its sole discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in

distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.4. The liquidator, in its sole discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.5 Waiver of Right to Court Decree of Dissolution. The Members agree that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, each of the Members accepts the provisions of this Agreement as its sole entitlement on termination of its membership in the Company. Each Member hereby waives and renounces its right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company.

Section 12.6 Articles of Dissolution. Upon the completion of the distribution of Company assets as provided in this Article 12, the Company shall be terminated and the person acting as liquidator shall file articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE 13

## NOTICES

Section 13.1 Method of Notices. All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective upon receipt or, if mailed, upon the earlier of (i) the date set forth on the return receipt of registered or certified mail or (ii) the fifth day after mailing.

Section 13.2 Computation of Time. In computing any period of time under this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday, or legal holiday.

## ARTICLE 14

## INVESTMENT REPRESENTATIONS

Section 14.1 Investment Purpose. In acquiring an interest in the Company, each Member represents and warrants that it is acquiring such interest for its own account for investment and not with a view to sale or distribution. Each Member recognizes that investments such as those contemplated by the Company are speculative and involve substantial risk. Each Member further represents and warrants that the Manager has not made any guaranty or

representation upon which it has relied concerning the possibility or probability of profit or loss as a result of its acquisition of an interest in the Company.

Section 14.2 Investment Restriction. Each Member recognizes that: (i) the membership interests have not been registered under the Securities Act of 1933, as amended, in reliance upon an exemption from such registration, (ii) a Member may not sell, offer for sale, transfer, pledge, or hypothecate all or any part of its interest in the Company in the absence of an effective registration statement covering such interest under the Securities Act unless such sale, offer of sale, transfer, pledge, or hypothecation is exempt from registration under the Securities Act of 1933, as amended, (iii) the Manager has no obligation to register any Member's interest for sale, or to assist in establishing an exemption from registration for any proposed sale, and (iv) the restrictions on transfer may severely affect the liquidity of a Member's investment.

## ARTICLE 15

## ADDITIONAL COVENANTS

Section 15.1 Additional Covenants by Negussie. Negussie, on behalf of his development company, NT Construction, ("NT") covenants and agrees to provide to the Company, for no additional consideration, the development services set forth in Exhibit A (the "Services") for each Project of the Company. Negussie's predecessor in interest Charles Paret, LLC ("Coloma") and Brighton are parties to that certain Membership Purchase Agreement (the "Purchase Agreement") dated November 27, 2018 wherein Coloma made additional covenants and agreements for the benefit of the Company and Brighton (as the case may be). Subsequent or simultaneous to the execution of this Agreement, Brighton and Negussie shall enter into an amendment to the Purchase Agreement (the "Purchase Amendment"). In the event of any conflict between the terms of this Agreement and the terms of the Purchase Amendment, the terms of the Purchase Amendment shall control.

## ARTICLE 16

## BUSINESS OPPORTUNITIES

Except as otherwise specifically set forth herein, any Member or Manager, or any officer, director, employee, shareholder or other Person holding a legal or beneficial interest in any Member or Manager which is a member or manager of the Company, may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including such business ventures as may be in direct competition with the Company's business, and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such independent ventures or to the income or profits derived therefrom.

## ARTICLE 17

## GENERAL PROVISIONS

Section 18.1 Entire Agreement. This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings, or agreements in regard thereto.

Section 18.2 Amendment. This Agreement may not be amended without the unanimous written consent of all Members. No rights under this Agreement may be waived except by an instrument in writing signed by the party sought to be charged with such waiver.

Section 18.3 Applicable Law. This Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of District Of Columbia.

Section 18.4 Waiver of Jury Trial. The Members agree that, in the event of a dispute, the Members hereby waive their right to a jury trial and shall submit to binding arbitration.

Section 18.5 Pronouns. References to a Member or a Manager, including by use of a pronoun, shall be deemed to include the masculine or feminine gender, singular or plural, and individuals, trusts, partnerships, corporations, or other legal entities where applicable.

Section 18.6 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be considered an original.

**IN WITNESS WHEREOF**, the Members have executed this Agreement to be effective as of the date set forth below.

Date: January 31, 2020

**Witness**

[signature]

[signature]

**423 Kennedy St Holdings LLC**
**Members:**
Brighton KSDC, Member Manager
By: Brighton Capital, LLC Manager

By: [signature]
Naveen Vavilala, Manager

[signature]
Mel Melaku Negussie, Member Manager

**EXHIBIT A**

1. **Design Phase Services.** NT shall assist the Company in determining the Company's program requirements for each Project to be constructed.

a. NT shall arrange and conduct meetings with all design consultants jointly deemed essential by the parties and coordinate the requirements of the Project and design development.

b. NT, in conjunction with the Project team, shall advise the Company on site use and improvements, selection of materials, building systems and equipment, and provide recommendations to the Company on relative construction feasibilities, applicability of materials and labor, time requirements for installation and construction, and factors relating to costs, including comparative costs of alternate designs or materials, preliminary budgets and possible economies. NT shall review with the Company, the Manager, the architect and the contractor, as applicable, the cost of various design and construction alternatives.

c. NT shall review and advise the Company with respect to draft plans and specifications prepared by the architect and recommend alternatives whenever it is apparent that design details affect construction feasibility or schedules, or may be improved for cost reductions and shall advise the Company when NT has knowledge of non-compliance of the same with applicable codes, laws, regulations, or ordinances or with industry standards.

d. NT shall review drawings and specifications that are being prepared to ensure that the Company's requirements are incorporated and shall advise the Company when the design details may affect the budget or Project schedule.

2. **Preconstruction Phase Services.** NT, the architect and the contractor shall coordinate, meet and assist with the appropriate governmental authority to ensure required permits are obtained at the appropriate times. NT or the manager or manager's representative shall represent the Company at all meetings and hearings necessary to obtain all required permits.

a. To the extent not previously provided by the Company and deemed necessary by the manager, NT shall arrange for applicable tests, surveys and/or inspections including, but not limited to, geotechnical, environmental, warranted by site conditions and appropriate due diligence requirements. The Company shall approve in writing in advance all testing companies.

b. NT shall review lists of prospective subcontractors provided by the contractor and assist in the review of bids. NT shall obtain information from the contractor to identify the financial condition and project experience of the proposed subcontractors to perform the work and make recommendations to the Company as to the preferred subcontractors based on price and qualifications.

3. **Construction Phase Services.** Subject to requirements of lender and review by the Manager, NT shall develop and implement procedures for the review and processing of applications by the contractor and subcontractors for progress and final payments. NT, after consulting with the Manager, shall make recommendations to the architect for certification of the contractor payment applications.

a. NT, with input from the Manager, shall oversee the efforts of the sub contractors in maintaining the budget and cost accounting of the Project suitable to the Company's needs. NT shall review cost detail reports to assist in the proper allocation of invoices and payment applications to the proper budget categories.

b. NT, with input from the Manager, shall facilitate the resolution of any questions or requests for interpretation that may arise in connection with the plans and specifications.

c. NT, with input from the Manager, shall develop and implement procedures for review and processing of change orders.

d. NT, with input from the Manager, shall oversee the efforts of the sub contractors who shall establish and implement adequate procedures for processing, approval and filing of shop drawings, product data, samples and other submittals.

e. NT, with input from the Manager, shall maintain appropriate record copies of all subcontracts, drawings, plans and specifications, shop drawings, and approved addenda, change orders and other modifications in good order. NT shall monitor the efforts of the contractor who shall mark up drawings and specifications to reflect as-built changes as they occur. Such plans shall be turned over to the Company upon completion of the Project.

f. NT, with input from the Manager, shall monitor the sub contractor's suppliers.

g. NT shall coordinate with the Manager the inspections by the Architect.

h. NT shall coordinate the efforts of the Manager, the Company, the architect, and the contractor in punchlist compilation. NT, with input from the Manager, shall monitor the efforts of the contractor in final completion of the punchlist items. NT shall assist the Manager and the Company in final inspection.

i. NT shall secure from the sub contractors all warranties and guaranties, manuals, record drawings, submittals and as-built plans, and keys upon final completion for turnover to the Company.